FILED

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

97 JUL 10 AM 10: 24

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| DAVID RAY DUREN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | CV 94-PT-2476-S |
| | ) | |
| TOMMY HERRING, Commissioner, Alabama | ) | |
| Department of Corrections, | ) | |
| | ) | **ENTERED** |
| Respondent. | ) | JUL 1 0 1997 |

## Memorandum Opinion

This cause comes on to be heard on objections to the Report and Recommendation of Magistrate Judge Armstrong ("the Magistrate") filed by the petitioner, David Ray Duren, on December 16, 1996. In his Report and Recommendation filed on October 9, 1996, the Magistrate recommended that this court deny the petitioner's requests for discovery and for an evidentiary hearing and that this court deny the petition for a writ of habeas corpus.

## Background

### I. Introduction.

On March 7, 1984, following a trial by jury in the Jefferson County Circuit Court, David Ray Duren was convicted of capital murder in the 1983 robbery and

33

murder of Kathleen Bedsole. Duren was charged in a one-count indictment as follows: that he "did intentionally cause the death of Kathleen Bedsole by shooting her with a pistol or by means otherwise unknown, and David Ray Duren caused such death during the time that David Ray Duren, a male, was engaging or attempting to engage in the commission of a theft while armed with a deadly weapon or dangerous instrument." He was convicted under Ala. Code § 13A-5-40(a)(2) (1975), Alabama's capital offense statute, for murder committed during a robbery. . . .

The same day the guilty verdict was returned, the jury recommended that Duren be sentenced to death. Joseph Jasper, the presiding judge, recused himself before the sentencing hearing before the bench. Judge James Garrett assumed the duties of the trial court. Following a sentencing hearing on September 14, 1984, Judge Garrett sentenced Duren to death. On direct appeal, the Alabama Court of Criminal Appeals remanded the case to the trial court to make specific findings with respect to aggravating and mitigating circumstances. Following remand, the capital conviction and death sentence were affirmed by the Alabama Court of Criminal Appeals. Duren v. State, 507 So.2d 111 (Ala. Crim. App. 1986). The Alabama Supreme Court affirmed. Ex parte Duren, 507 So.2d 121 (Ala. 1987). Duren then filed a state Rule 20 petition, which was denied after an evidentiary hearing. The Court of Criminal Appeals affirmed. Duren v. State, 590 So.2d 360 (Ala. Crim. App. 1990). The Alabama Supreme Court granted an application for writ of certiorari, and, after oral argument, denied relief. Ex parte Duren, 590 So.2d 369 (Ala. 1991). Duren's trial and direct appeal counsel was Roger Appell. His Rule 20 attorneys were Rory Fitzpatrick and Michael Blalock.

Duren then filed this petition for federal habeas corpus relief under 28 U.S.C. § 2254.

Magistrate Judge Armstrong's Report and Recommendation at 1-3.[1]

## II. Facts of the Case.

On the night of October 20, 1983, Charles Leonard and Kathy Bedsole, both sixteen years of age, went on a date to visit some haunted houses in the Birmingham area sponsored by a local radio station. Mr. Leonard and Ms. Bedsole were driving in Huffman in Mr. Leonard's car, attempting to find the location of one of the haunted houses when, behind them, a pair of headlights began to flash. Believing the car behind him to be that of a friend, Charles Leonard pulled his car to the side of the road. After he

---

[1] In citations throughout this opinion, Magistrate Judge Armstrong's Report and Recommendation will be abbreviated "R&R", the Record from Duren's Direct Appeal will be abbreviated "DAR", and the Record on Appeal from the Rule 20 Petition "PAR".

stopped, two men, David Ray Duren (the petitioner) and Richard Kinder, approached the front of Mr. Leonard's car.[2]  Mr. Duren, who was carrying a pistol, told Mr. Leonard and Ms. Bedsole to get out of the car.  The petitioner and Mr. Kinder, who was holding a knife, then forced the couple into the trunk of Mr. Leonard's car.

Mr. Duren and Mr. Kinder drove Mr. Leonard's car and Mr. Duren's car to a nearby parking lot.  At the lot, Mr. Duren and Mr. Kinder abandoned Mr. Duren's car and drove Mr. Leonard's car to a drive-in restaurant that the pair had decided to rob.  However, before the robbery could take place, Mr. Kinder botched it by exposing a gun.  The pair fled from the drive-in.

After driving some distance, Mr. Duren stopped the car, this time in a secluded area in Trussville.  Mr. Duren and Mr. Kinder opened the trunk, removed Mr. Leonard and Ms. Bedsole, and tied the couple together.  Mr. Kinder then took two twenty-dollar bills from the purse of Ms. Bedsole.  After a brief conversation between them, Mr. Duren and Mr. Kinder decided that Mr. Duren should shoot Mr. Leonard and/or Ms. Bedsole.  Mr. Duren shot Ms. Bedsole once through the head, killing her.  Mr. Duren then fired four shots at Mr. Leonard, hitting him either in the legs or chest with three of the shots.  Mr. Duren and Mr. Kinder then drove away in Mr. Leonard's car, leaving their victims behind.

Soon after Mr. Duren and Mr. Kinder left, Mr. Leonard freed himself from the ropes and managed to make his way to a place from where he phoned the sheriff's department for assistance.  He was interviewed by a sheriff's deputy who, after determining what had taken place, sent a radio transmission to another deputy sheriff.  This deputy sheriff later observed Mr. Duren and Mr. Kinder walking along a public roadway in the Roebuck/Huffman area.  The petitioner and Mr. Kinder were taken into custody.  Later in the evening, Mr. Leonard identified the petitioner as the man who had shot him and Ms. Bedsole.  Before the instant prosecution, the petitioner had no criminal record.

---

[2]  The petitioner contends that Mr. Leonard's car had been parked five to ten minutes at the time that he and Mr. Kinder approached it.

## III. Petitioner's Contentions Regarding the Trial Court.

After his arrest, the petitioner was adjudged to be indigent and an attorney, Mr. Roger Appell, was appointed to represent him.[3] At the time of his appointment as counsel, Mr. Appell had more than eight years of criminal trial experience and had handled four death penalty cases. Prior to the trial, states the petitioner, an abundance of publicity existed in the news and other media around Jefferson County about the trial's subject matter. Because of the publicity, states the petitioner, Mr. Appell filed a motion for a change of venue, which the trial court rejected.

Mr. Appell also requested, prior to trial, that funds be provided for the petitioner to hire a psychiatrist or psychologist, a criminal investigator, a pre-sentence investigation expert, a polling expert and a jury selection expert. The trial court denied all these requests.

At the trial, contends the petitioner, several prejudicial events occurred. First among these was that two of the jurors were, allegedly, biased against the petitioner. One, Juror Jones, had discussed the case with her coworkers before the trial. The other, Juror McFrancis, had been operated on by Ms. Bedsole's father. Mr. Appell challenged neither juror.

Second, contends the petitioner, the trial court allowed into evidence graphic photographs and autopsy slides of Ms. Bedsole's body. Third, during closing arguments at both the guilt phase and the sentencing phase of his trial, the prosecutor made (arguably) inappropriate comments to the jury. The prosecutor stated that, if Mr. Appell's theory that Mr. Duren had not meant to kill Ms. Bedsole were correct, it was only correct because Mr. Duren meant to sexually abuse her later. By referring to Ms. Bedsole as a "doll" and by stating that she was pretty, the prosecutor had allegedly led the jury to think about the victim's character. The prosecutor stated that by sentencing Mr. Duren to death, the jury would prevent future murders by Mr. Duren and others like him. Finally, the prosecutor told the jury to imagine that they were at the location of Ms. Bedsole's killing

---

[3] Mr. Appell represented the petitioner both at trial and on appeal.

on that night and to imagine that they could have stopped Mr. Duren by terminating his life; the prosecutor then told the jury to enact the decision to kill Mr. Duren "then" by sentencing him to death "now". Apparently, Mr. Appell objected to none of these statements.

Fourth, the trial court informed the jury that its role was only advisory. Additionally, the trial court neglected to inform the jury that it was not under a legal imperative to sentence Mr. Duren to death if it found that the aggravating circumstances outweighed the mitigating circumstances or that it could exercise the prerogative of mercy.

Fifth, the trial judge, Judge Joseph Jasper, recused himself after conclusion of both the guilt phase of the trial and the jury sentencing hearing because he discovered that he was, in some tangential way, related to the defendant.[4] A new judge, Judge James Garrett, was assigned to the case. The new judge did not conduct a new jury sentencing evidentiary hearing before imposing the death penalty on the petitioner, but instead relied upon the transcripts of the earlier hearing.

The petitioner contends that the entire trial was infected with prejudicial error by the ineffective assistance of his counsel, Mr. Appell. Besides failing to object to most of the errors that the petitioner claims occurred during the trial, Mr. Appell presented to the jury a legally invalid argument in the petitioner's defense; that the petitioner intended to kill Mr. Leonard, not Ms. Bedsole. Mr. Appell allegedly failed to investigate, and to present to the trial court, the only legally viable argument available, that the petitioner was under the influence of drugs and alcohol at the time that he killed Ms. Bedsole, and thus, he could not have formed the requisite intent to commit the offense of which he was charged. In any event, the evidence should have been offered at the sentencing hearing as a mitigating factor. Further, Mr. Appell allegedly was 'distant' from the petitioner throughout his representation of him. Mr. Appell was also ineffective, argues the petitioner, at the appellate stage.

A final error occurring in all of this, argues the petitioner, is that no Alabama court,

---

[4] Judge Jasper's deceased wife was Mr. Duren's fifth cousin.

trial or appellate, conducted an adequate proportionality review of his sentence.

## IV.  Direct Appeals.

After the petitioner's conviction and sentencing, Judge Garrett entered a notice of
appeal to the Alabama Court of Criminal Appeals on September 14, 1984.[5]  In his brief to
the appellate court filed on May 15, 1985, Mr. Appell raised the following issues:

- Whether the inclusion of kidnaping as an aggravating circumstance
without an instruction as to its legal definition violated Mr. Duren's
due process rights;

- Whether the new judge was required to provide a new sentencing
hearing; and,

- Whether the denial of funds for various experts rendered Mr. Duren
without effective assistance of counsel.[6]

In its brief filed with the Alabama Court of Criminal Appeals on July 2, 1985, the
State contested petitioner's arguments and contended that the death penalty was the
proper result in the case.

On February 25, 1986, the Alabama Court of Criminal Appeals upheld the
petitioner's conviction, Duren v. State, 507 So.2d 111,121 (Ala. Crim. App. 1986), and
found harmless error on the issue of the kidnaping charge, id. at 114, found no error on
the issue involving a separate jury sentencing hearing before Judge Garrett, id. at 115, and
found that no constitutional error existed in the denial of funds for various experts, id. at
118.  The Court of Criminal Appeals, in attempting a proportionality review of the
petitioner's sentence, found that the trial court had failed to provide sufficient findings
upon which the appeals court could conduct such a review.  Id. at 120.  On remand, the

---

[5]  On October 12, 1984, the petitioner submitted a letter to the trial judge, requesting that Mr.
Appell be dismissed as his counsel and that the appeal be dismissed.  On November 2, 1984, the trial court
ordered the motion overruled.

[6]  The brief submitted by Mr. Appell to the Alabama Court of Criminal Appeals (and to subsequent
appeals courts) is 'light' on citation to case law.  Three cases were cited in the twenty page brief and the
reasoning in the brief is unclear as to how the propositions for which any of the cases were cited
demonstrate constitutional error under either Alabama or Federal law.

trial court provided those findings and conducted a review of the death sentence to determine its propriety. On return to the Court of Criminal Appeals, the death penalty was determined to have been properly ordered. Id. at 121.

The Alabama Court of Criminal Appeals went on to address what it saw to be a potential constitutional error on the face of the trial court record.[7] In the record, the Court of Criminal Appeals found a misstatement in the indictment. However, the appellate court resolved that the mistake did not invalidate the indictment. Id. at 120.[8] On April 10, 1987, the Alabama Supreme Court affirmed the judgment of the Alabama Court of Criminal Appeals without comment. Ex parte Duren, 507 So.2d 121 (Ala. 1987).[9] Mr. Duren filed a petition for writ of certiorari in the Supreme Court of the United States on August 6, 1987, which was denied on October 13, 1987. Duren v. Alabama, 484 U.S. 905 (1987).

---

[7] Presumably, this issue was addressed by the Alabama Court of Criminal Appeals through the direction given it under § 12-22-240 of the Alabama Code of 1975 and Alabama Rules of Appellate Procedure 39(k) and 45A to independently review all death penalty cases for "all questions apparent on the record. . ." § 12-22-240 of the Alabama Code reads:

> In all cases appealable to the Court of Criminal Appeals, the court must consider all questions apparent on the record or reserved in the circuit court and must enter such judgment as the law demands.

Alabama Rule of Appellate Procedure 45A reads:

> In all cases in which the death penalty has been imposed, the court of criminal appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.

Alabama Rule of Appellate Procedure 39(k) reads:

> In all cases in which the death penalty has been imposed, upon review of the opinion of the Court of Criminal Appeals on certiorari, the Supreme Court may notice any plain error or defect in the proceeding under review, whether or not brought to the attention of the trial court, and take appropriate appellate action thereof, whenever such error has or probably has adversely affected the substantial rights of the petitioner.

[8] Mr. Appell filed an application for rehearing on October 28, 1986 that was denied on November 12, 1986. Duren v. State, 507 So.2d at 120.

[9] Rehearing on the case was denied on May 8, 1987. Ex parte Duren, 507 So.2d at 121.

## V. Collateral Attack.

## A. The Rule 20 Petition.

On February 10, 1988, Mr. Duren filed a petition for relief from conviction or sentence pursuant to then Temporary Rule 20 of the Alabama Rules of Criminal Procedure.[10]  The petition was amended on November 11, 1988.  As grounds for the petition, Mr. Duren stated that:

1. Petitioner's sentence was imposed in violation of his constitutional right to due process of law, when the trial court denied petitioner's motion for a new jury sentencing hearing following the recusal of the trial judge.

2. Petitioner's sentence was imposed on consideration of impermissible victim impact evidence, in violation of his right to due process and his Eighth and Fourteenth Amendment right against cruel and unusual punishment.

3. Petitioner's sentence was imposed in violation of the Eighth and Fourteenth Amendment prohibition against mandatory sentencing schemes, because the trial court instructed the sentencing jury that it was required to return a verdict of death if aggravating evidence outweighed mitigating evidence.

4. Petitioner's sentence was imposed without review of its proportionality in relation to the punishment of similar crimes throughout the state, in violation of Alabama law and petitioner's right to due process.

5. Petitioner's due process rights were violated by the introduction of impermissible evidence of prior offenses during the sentencing hearing.

6. Petitioner was denied his due process right to the assistance of a defense psychiatrist.

7. Petitioner's conviction was obtained by use of confessions coerced from him through physical force and threats, in violation of his Fifth Amendment and Fourteenth Amendment right against self-incrimination.

8. Petitioner's Sixth Amendment rights were violated by the trial court's denial of his change of venue motion.

9. Petitioner was denied his Sixth Amendment right to effective assistance of counsel.

10. Petitioner's sentence was imposed in violation of the Eight and Fourteenth Amendments because the trial court improperly instructed the jury as to its role in the sentencing process.

11. Petitioner's sentence was imposed in violation of the Eighth and

---

[10]  This rule was finalized as Rule 32 of the Alabama Rules of Criminal Procedure.

Fourteenth Amendments because the Alabama mandatory sentencing
statute is unconstitutional.

PAR at 555-56.

On November 14, 15 and 16, 1988, a hearing was held in the Circuit Court of
Jefferson County, Criminal Division, ("Rule 20 court") before Judge James Garrett on
matters involved in the petition.[11]  In a ruling entered on July 27, 1989, the Rule 20 court
found all of the petitioner's claims except the ineffective assistance of counsel claim
precluded based on the rules of preclusion for Rule 20 petitions, Temporary Rule
20.2(a)(3)-(5) of the Alabama Rules of Criminal Procedure.  The Rule 20 court denied the
ineffective assistance of counsel claim on the merits.  In making its findings of fact about
the ineffective assistance of counsel claim with respect to Mr. Appell's use of an
inappropriate defense and his choice not to raise the issue of the defendant's intoxication,
the Rule 20 court stated:

> At trial, and on direct appeal, Duren was represented by Roger Appell.
> Appell is, and was at the time of Duren's trial, an experienced criminal defense
> attorney.  Since his admission to the bar, in 1976, Appell has practiced in Jefferson
> County, Alabama, and about fifty percent (50%) of his practice has been criminal
> defense.
> Before Duren's trial, Appell had tried about fifty (50) to one hundred (100)
> felony cases.  He had been involved in (5) capital cases before Duren's trial.
> Appell had both attended seminars and reviewed materials on defending capital
> cases before Duren's trial.  In addition, Appell is and was deeply opposed to
> capital punishment and this personal opposition strongly motivated him in his
> defense of Duren.
> Before Duren's trial, Appell met with Duren often, at least ten (10) to
> fifteen (15) times.  Appell and Duren discussed the facts of the case and Duren's
> background in these meetings.  Appell also met with Duren's family and friends
> before trial.  He met with them to develop evidence for use at the punishment and
> sentencing stages of Duren's trial.
> Appell also filed for and received extensive pre-trial discovery from the
> prosecution.  In addition, Appell obtained a psychological evaluation of Duren
> before trial.
> Based on his pre-trial investigation, Appell concluded that the
> prosecution's case as to Duren's guilt, which included two confessions and an
> eyewitness identification by the surviving victim, was overwhelming and decided
> to focus his efforts on the punishment and sentencing stages of trial. . . .

---

[11]  Judge James Garrett was the initial sentencing judge.

At the guilt stage of Duren's trial, Appell argued, based on Duren's testimony and confessions, that Duren was not guilty of capital murder but rather was guilty of non-capital murder because when he fired the pistol he intended to shoot Charles Leonard and not Kathy Bedsole. When he made this argument, Appell knew that, due to the doctrine of transferred intent, this was not a legally valid defense. Appell presented this defense for several reasons. First, it had been raised by Duren in his confession. Second, after investigation, Appell knew that the prosecution's case was overwhelming and Duren's chances of acquittal or conviction of a lesser included offense were extremely small. Third, Appell knew that, even if this position was not a valid legal defense, a verdict based on this defense would still benefit Duren.

Appell's decision was not unreasonable. The prosecution's case was overwhelming. Appell had rejected intoxication as a defense because he thought Duren's claim was not credible and that such a defense would only prejudice a jury against his client. Appell did not want to alienate or further prejudice the jury at the guilt stage because it would harm his punishment stage defense. Appell's decision to present a defense at the guilt stage that was based on his client's statements was not outside the boundaries of professional representation. . . .

Based on the strengths of the prosecution's case, and the weakness of Duren's alternative defense, intoxication, there is no reasonable probability that, but for Appell's defense strategy, Duren would have been found not guilty of non-capital murder or acquitted.

Appell made a strategic decision after investigation not to present evidence, at either the guilt or penalty stages of trial, purporting to show Duren's intoxication on the night of the murder or Duren's history of drug and alcohol use. . . .

Appell was aware of and investigated Duren's drug and alcohol use before trial. He also had Duren evaluated by a psychologist. Based on that investigation and his own contact with Duren, Appell decided not to present Duren's drug and alcohol use to the jury. Appell had two reasons for this decision. First, he thought, based on the events of the night of the murder and the murder itself, Duren's claimed drug use was not credible. Second, based on his extensive experience as a criminal defense attorney in Jefferson County, Alabama, Appell thought that presenting evidence of Duren's drug use would be harmful because of juror prejudice against drugs and those who use them. Appell knew that any prejudice against Duren at the guilt stage would carry over to the penalty stage and would undercut the effectiveness of his penalty stage defense, that Duren had been subjected to an abusive and troubled upbringing and lacked any criminal history.

Duren was not prejudiced by Appell's strategic decision not to present evidence of Duren's drug and alcohol use because Duren was not intoxicated on the night of the murder. At the evidentiary hearing on his Rule 20 petition, Duren failed to present any credible evidence that he was intoxicated on the night of the murder and the State presented credible evidence that he was not intoxicated on the night of the murder. Further, the evidence at trial, including his confession shortly after the murder, established that Duren was not intoxicated when he

murdered Kathy Bedsole.

Duren's two witnesses to his drug and alcohol use presented contradictory testimony and their testimony was not credible. Teresa Hardigan contradicted her testimony at trial, where she was called as a defense witness, and, given her obvious bias in favor of Duren, the inherent incredibility of her testimony, and her demeanor at the Rule 20 hearing, her testimony is not worthy of belief. Charles Christian's account of Duren's activities on the day of the murder contradicted Hardigan's. Further[,] to Christian's knowledge Duren only drank and smoked marijuana on the day of the murder and did not take any other drugs, including LSD, that Duren claimed to abuse. Christian contradicted even this testimony because, based on his experience as a friend and drinking companion of Duren, when Duren was drunk[,] he was withdrawn and inactive but when sober would do things and not just sit around. Based on Christian's testimony, Duren was not intoxicated on the night of the murder.

Duren's claimed intoxication was also contradicted by the testimony of Deputies Radigan and Galloway. Each was in Duren's presence for a significant period of time following Duren's arrest which in turn had occurred shortly after the murder. Each are, and were, experienced in dealing with persons under the influence of drugs and alcohol. Neither observed any indication that Duren was intoxicated. Based on their testimony Duren was not intoxicated when he robbed and murdered Kathy Bedsole.

This finding is also supported by the evidence at Duren's trial. Duren and his accomplice sought out their victims in order to use their car in a robbery. After binding their victims with a rope brought for that purpose and placing them in the car's trunk, Duren and his accomplice drove to a restaurant where Duren's accomplice bungled the robbery. Duren successfully fled after the robbery attempt and drove to a remote area he selected. Duren then shot his victims to prevent them from identifying him, killing Kathy Bedsole. Duren then abandoned the victims' car, disposed of and concealed the murder weapon, and, after recognizing that police were interested in his car, attempted to flee the area on foot. Duren's ability to plan and carry out a crime of this complexity and duration is conclusive proof that he was not intoxicated. Additionally, Duren's ability to recall the circumstances of the crime, including his own mental state, in great detail in his confession, taken shortly after the murder, shows that Duren was not intoxicated. .
. .

Duren v. State, CC-83-0382 at 4-10 (Cir. Ct. Jeff. Co. July 27, 1989). On the failures of

Mr. Appell to object to various errors at the trial, the Rule 20 court concluded that these

did not give rise to an ineffective assistance of counsel finding.

The petitioner contends that the findings of the Rule 20 court are illegitimate.

According to the petitioner, after the Rule 20 court held the evidentiary hearing, it

permitted each side to submit briefs and proposed findings to the court. The petitioner

maintains that, while he submitted proposed findings with specific references to the

transcript supporting those findings, the State submitted its findings without any reference to the record. The Rule 20 court then adopted the State's submissions wholesale by signing a seventeen-page order prepared by the State, without making a single change or, allegedly, conducting an independent review of the record. Consequently, contends the petitioner, the Rule 20 court failed to fully consider the evidence submitted to it.

## B. Appeals.

On appeal, the petitioner concentrated on his ineffective assistance of counsel claims and his claims concerning the alleged failure of the trial and appellate courts to conduct a proper proportionality review. Also, the petitioner challenged the Rule 20 court's decision to exclude certain evidence from the hearing.

The Alabama Court of Criminal Appeals addressed the ineffective assistance of counsel claims on the merits and found them lacking. Duren v. State, 590 So.2d 360, 362-68 (Ala. Crim. App. 1990). The Court of Criminal Appeals also concluded to be proper the Rule 20 court's decision to exclude certain evidence from the evidentiary hearing. Id. at 367. Finally, the appellate court accepted the Rule 20 court's finding that all other claims were procedurally barred. Id. at 368-69.

Mr. Duren petitioned the Alabama Supreme Court for writ of certiorari on January 22, 1991. On September 13, 1991, the Alabama Supreme Court affirmed the judgment of the Alabama Court of Criminal Appeals as to the ineffective assistance of counsel claim, Ex parte Duren, 590 So.2d 369, 375 (Ala. 1991), and, on denying rehearing, affirmed the findings of the trial court. Id. at 375. The Supreme Court of the United States denied Mr. Duren's petition for writ of certiorari. Duren v. Alabama, 112 S.Ct. 1594, 1594-95 (1992).

## VI. Habeas Petition and Magistrate Judge's Report and Recommendation.

In his petition for writ of habeas corpus and his requests for leave to conduct discovery and for an evidentiary hearing, the petitioner asserts that:

1.      He was deprived of his right to a fair trial under the Sixth, Eighth and

Fourteenth Amendments because Jurors Jones and McFrancis were not impartial;

2.  He was deprived of his right to a fair trial under the Sixth, Eighth and Fourteenth Amendments because the trial judge did not grant a change of venue because of the pre-trial publicity;

3.  He was deprived of his right to a fair trial under the Sixth, Eighth and Fourteenth Amendments because the trial court admitted six photographs of Ms. Bedsole taken at the scene of the shooting and slides prepared by the coroner of Ms. Bedsole's body that were highly prejudicial and inflammatory;

4.  He was deprived of his right to a fair trial under the Sixth, Eighth and Fourteenth Amendments because the prosecution improperly commented:

   A.  At the guilt stage, that the only reason that Mr. Duren would have kept Ms. Bedsole alive would be to use her sexually;

   B.  At the sentencing stage,

      i.   that the jury would be responsible for future murders by Mr. Duren or others like him if it rendered a sentence other than death;

      ii.  on the victim's character; and,

      iii. that announcing a death sentence would be akin to stopping the very crime that Mr. Duren committed, thereby encouraging vigilantism;

5.  He was deprived of his right to a fair trial because the trial court denied him funds with which to employ a psychiatrist or psychologist, a polling expert, a jury selection expert, a criminal investigator, and a pre-sentence investigation expert;

6.  He was denied due process of law by the substitution of judges after the jury sentencing hearing;

7.  He was denied due process of law because no meaningful proportionality review of his sentence was done either at the trial or at the appellate level;

8.  He was denied a fair sentencing hearing because, one, the trial court instructed the jury that it was obligated to return a penalty of death if it determined that the aggravating circumstances outweighed the mitigating circumstances, and thereby neglected to instruct the jury

on the prerogative of mercy and; two, the court repeatedly informed the jury that its role was solely advisory; and,

9.     He was deprived of his right to effective assistance of counsel under the Sixth, Eighth and Fourteenth Amendments at trial and on appeal because of his prejudicial and unreasonable representation by Mr. Appell.[12]

In his Report and Recommendation, the Magistrate concluded that all of the petitioner's claims, except claims 5, 6 and 9, were procedurally defaulted and, in the alternative, meritless. The Magistrate determined claims 5, 6 and 9 not to be procedurally defaulted, but nonetheless without merit. The Magistrate therefore recommended denial of the petition and requests for discovery and for an evidentiary hearing.

# Analysis

A state prisoner "in custody in violation of the Constitution or laws or treaties of the United States" may petition the federal courts for a writ of habeas corpus to obtain release from his or her unlawful confinement. 28 U.S.C. § 2254(a).[13]  See, Brown v. Speller, 344 U.S. 443, 485 (1953). The writ exists as the sole means for a prisoner to challenge the "fact or duration" of his confinement. Wilson v. Foti, 832 F.2d 891, 892 (5th Cir. 1987). In addition, because the Supreme Court hears only a limited number of cases on direct review from state court criminal trials or commitment proceedings each year, application for writ of habeas corpus provides, in most cases, the only federal forum in which "final" federal adjudication of federal questions arising in a state criminal proceeding (or civil commitment proceeding) can be had. Also see, e.g., Larry W. Yackle,

---

[12]  The court will not here list all of the various ineffective assistance of counsel claims stated by the petitioner. These claims will become apparent as the opinion is more fully developed.

[13]  28 U.S.C. § 2254(a) reads:

The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

Explaining Habeas Corpus, 60 N.Y.U. L. REV. 991, 998-1040 (1985) (arguing that an interest in liberty of the person does little to justify modern habeas corpus doctrine and that a better justification for the writ of habeas corpus lies in the idea that a federal forum should have at least one attempt at the resolution of issues of federal law). At the same time, however, the petition for writ of habeas corpus in a federal court is a collateral attack on the state court proceedings. In re Kaine, 55 U.S. (14 How.) 103, 113-14 (1852). Therefore, review of a state court judgment is to be somewhat limited in scope because of concerns over the finality of judgments and because of a reasonable adherence to principles of federalism. See, Coleman v. Thompson, 501 U.S. 722, 748 (1991) (" '[T]he Great Writ entails significant costs.' . . . The most significant of these is the cost to finality in criminal litigation that federal collateral review of state convictions entails . . . "); Stone v. Powell, 428 U.S. 465, 494 n.35 (1976) ("Despite differences in institutional environment and the unsympathetic attitude to federal constitutional claims of some state judges in years past, we are unwilling to assume that there now exists a general lack of appropriate sensitivity to constitutional rights in the trial and appellate courts of the several States. State courts, like federal courts, have a constitutional obligation to safeguard personal liberties and to uphold federal law."); Frank v. Mangum, 237 U.S. 309, 329 (1915) ("[W]here . . . a criminal prosecution has proceeded through all the courts of the state, including the appellate as well as the trial courts, the result of the appellate review cannot be ignored when afterwards the prisoner applies for his release on the ground of a deprivation of Federal rights sufficient to oust the state of its jurisdiction to proceed to judgment and execution against him. This is not a mere matter of comity, as seems to be supposed. The rule stands upon a much higher plane, for it arises out of the very nature and ground of the inquiry into the proceedings of the state tribunals, and touches closely upon the relations between state and Federal governments.").[14]

---

[14] The scope of habeas review of state court judgments has been both broadened and contracted through the present century. At the beginning of the century, review was confined solely to issues of "jurisdiction." Frank v. Mangum, 237 U.S. 309, 326 (1915). This notion of jurisdictional challenges also encompassed challenges to the underlying constitutionality of the statute under which the prisoner was convicted. For example, see, Minnesota v. Barber, 136 U.S. 313 (1890) (petitioner released from state

To obtain a writ of habeas corpus on a federal claim, a petitioner must overcome a number of procedural and substantive hurdles. First, the petitioner must not have procedurally defaulted his federal claims in the state courts. Wainwright v. Sykes, 433 U.S. 72, 86-87 (1977). Procedural default occurs when the claim is not raised such that it could receive full review allowed by the courts of the state. Second, the petitioner must exhaust the claim in the courts of the state before the district court can address the claim. See, Rose v. Lundy, 455 U.S. 509, 516 (1982); Also see, Ex parte Royall, 117 U.S. 241, 250-53 (1886).[15] A claim is exhausted where it either had been addressed by or was before the highest appellate court of the state authorized to hear the claim on its merits. Rose v. Lundy, 455 U.S. at 515-16. As a more substantive matter, in addressing the habeas claim, the district court must generally defer to the factual findings of the last state

---

court conviction under statute in violation of the interstate commerce clause). Starting with Brown v. Allen, 344 U.S. 443 (1953) in the fifties and extending into the mid-seventies, the Supreme Court greatly broadened the scope of habeas review beyond its previous boundaries. In the past decade, judicial concerns on the issue of state sovereignty and, more recently, Congressional frustration over the sluggish pace at which executions were being carried out have led to a reduction in the scope of habeas corpus review. For insight on judicial perspectives of habeas corpus, see, Larry W. Yackle, Explaining Habeas Corpus, 60 N.Y.U. L. REV. 991, 993 n.13 & 994 n.14 (1985). For an interesting discussion of the growth of habeas corpus in the nineteenth century, see, Marc M. Arkin, The Ghost at the Banquet: Slavery, Federalism, and Habeas Corpus for State Prisoners, 70 TUL. L. REV. 1 (1995).

[15]  Adverting to the argument that where a defendant has been regularly indicted, tried, and convicted in a state court, his only remedy was to carry the judgment to the state court of last resort, and thence by writ of error to this court, [Mr. Justice Bradley] said: "This might be so if the proceeding in the state court was merely erroneous; but where it is void for want of jurisdiction, habeas corpus will lie, and may be issued by any court or judge invested with supervisory jurisdiction in such case. Ex parte Lange, 18 Wall. 163." [Ex parte Bridges, 2 Woods 428.] It was further observed, in the same case, that while it might appear unseemly that a prisoner, after conviction in state court, should be set at liberty by a single judge on habeas corpus, there was no escape from the act of 1867, which invested such judge with power to discharge when the prisoner was restrained of his liberty in violation of a law of the United States.

Ex parte Royall, 117 U.S. at 253. As review of state court decisions on petition for writ of habeas corpus has expanded to cover issues of constitutional error in the state trial courts, the above cited proposition of Mr. Justice Bradley in Ex parte Bridges has borne fruit in a fully developed exhaustion doctrine.

court to address the claim.  See, for example, 28 U.S.C. § 2254(e)(1).[16]  Depending on whether the amendments to the habeas statute made by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") apply, only rarely can new evidence be introduced to support a habeas petition.  28 U.S.C. § 2254(e)(2).[17]  Also, it is now debatable whether the district court may review de novo constitutional issues resolved by the state court or whether it must substantially defer to state court interpretations of Federal law because of the recent passage of AEDPA.  See, 28 U.S.C. § 2254(d)(1);[18] See, Drinkard v. Johnson,

---

[16] 28 U.S.C. § 2254(e)(1) reads:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

Whether the present provisions § 2254 are to be applied retroactively to habeas petitions pending at the time of the enactment of the Anti-Terrorism and Effective Death Penalty Act is a matter of some dispute in the courts.  Prior to the enactment of the AEDPA, similar deference to state court findings of fact was required, except in certain outlined circumstances.  Sumner v. Mata, 449 U.S. 539, 551 (1981).  On the applicability of the AEDPA to the present petition, see, infra, at 29-31.

[17] 28 U.S.C. § 2254(e)(2) reads:

If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

(A) the claim relies on—

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

For a determination of whether this section of the new habeas statute applies to the present case, see, infra, at 29-31.

[18] 28 U.S.C. § 2254(d)(1) reads:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable interpretation of, clearly established Federal law, as determined by the Supreme

97 F.3d 751, 766-69 (5th Cir. 1996); and Lindh v. Murphy, 96 F.3d 856, 868-74 (7th Cir. 1996).[19]

As the Magistrate notes in his Report and Recommendation, central to Mr. Duren's petition for writ of habeas corpus is the claim that his attorney, Mr. Roger Appell, did not provide him effective assistance of counsel at the criminal trial and on direct appeal.

# I. On the Issues of Procedural Default and Exhaustion, Generally.

## A. Procedural Default.

### 1. Establishing Procedural Default.

A federal court usually cannot upset a decision of a state court based on a possibly wrongly decided federal issue if an adequate and independent state law ground exists to support the state court judgment. See, Eustis v. Bolles, 150 U.S. 361, 366 (1893).

> It is . . . settled law that, where the record discloses that if a question has been raised and decided adversely to a party claiming the benefit of a provision of the Constitution or laws of the United States, another question, not Federal, has been also raised and decided against such party, and the decision of the latter question is sufficient, notwithstanding the Federal question, to sustain the judgment, this court will not review the judgment. . . .

Id. Thus, were a Federal court to find Federal constitutional error in a judgment,

---

Court of the United States. . . .

[19] Chapter 154 of Title 28 of the United States Code (as recently enacted through the AEDPA) creates additional barriers to the grant of habeas relief in death penalty cases, such as additional limitations on exception to procedural default and exhaustion, time limits on the amount of time that federal courts may allocate to resolution of habeas claims and limitations on the manner in which a district court is to allocate its caseload. All of Chapter 154's provisions are to be applied retroactively to death penalty cases pending in the federal courts. Pub. L. 103-132 § 221. However, for Chapter 154 to apply, the state in which the petitioner was convicted must provide "by statute, rule of its court of last resort, or by another agency authorized by State law, a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State post-conviction proceedings brought by indigent prisoners whose capital convictions and sentences have been upheld on direct appeal to the court of last resort in the State or have otherwise become final for State law purposes. The rule of court or statute must provide standards of competency for the appointment of counsel." 28 U.S.C. § 2261. However, as this court noted in its opinion in Neeley v. Nagle, CV 96-PT-1381-M, at 37, the State of Alabama does not provide standards for the appointment of counsel to indigent defendants and a unified appeals system. Therefore, the provisions of Chapter 154 do not apply to the instant petition for writ of habeas corpus.

resolving that error would result in a purely advisory opinion of the court if an alternative state law ground for the judgment exists. Herb v. Pitcairn, 324 U.S. 117, 126 (1945). "The principle applies not only in cases involving substantive grounds, Murdock v. City of Memphis, 20 Wall. 590, but also in cases involving state procedural grounds . . . " Henry v. Mississippi, 379 U.S. 443, 446 (1965). The principle also extends to constitutional issues raised in a petition for a writ of habeas corpus:

> The federal judiciary has no power to sit in judgment upon a determination of a state court unless it is found that it must rest on a disposition of a claim under federal law. This is so whether a state adjudication comes directly under review in [the Supreme] Court or reaches us by way of the limited scope of habeas corpus jurisdiction originating in a District Court.

Irwin v. Dowd, 359 U.S. 394, 407-08 (1959) (J. Frankfurter, dissenting). See also, Wainwright v. Sykes, 433 U.S. 72, 81-82 (1977). A petitioner who has failed to satisfy adequate state procedural rules in preserving his federal claims such that an appellate court of the state would rule against the petitioner solely on the independent basis of those procedural grounds, without reaching the federal issue, will, therefore, have procedurally defaulted on having those claims addressed on the merits in district court. Wainwright v. Sykes, 433 U.S. at 82.

Generally, a federal claim that is procedurally barred from final appellate review in the state courts cannot be examined on the merits by a district court. This will not always be the case, however. If the procedural rule serves no legitimate state interest, it will not bar review of the federal claim on habeas. Henry v. Mississippi, 379 U.S. 443, 448-49 (1965). Likewise, default of a federal claim in state court will not prevent review in a federal habeas forum where "the procedural requirement has been novel or sporadically applied." Spencer v. Kemp, 781 F.2d 1458, 1470 (11th Cir. 1986). See, Hill v. Jones, 81 F.3d 1015, 1023 (11th Cir. 1996); Upshaw v. Singletary, 70 F.3d 576, 579 (11th Cir. 1995); and Wheat v. Thigpen, 793 F.2d 621, 626-27 (5th Cir. 1986). Nor will a procedural bar prevent habeas review of a federal claim where the last appellate court authorized by state law to hear the claim decided it on its merits, Ulster County Court v. Allen, 442 U.S. 140, 152-54 (1979), or where it is unclear whether the claim was resolved

on a procedural basis or on the merits. Harris v. Reed, 489 U.S. 255, 265 (1989); Caldwell v. Mississippi, 472 U.S. 320, 327 (1985). Accordingly, where the resolution of a federal claim by a state appellate court involves primarily a discussion of the merits of the claim, the state appellate court must provide a clear and express statement that its resolution of the claim is based upon the procedural default, if it is to be barred from review in the district court. Coleman v. Thompson, 501 U.S. 722, 735 (1991). However, where the state court clearly addresses the merits of the federal claim in the alternative to the procedural default, the federal claim will be barred from habeas review. Pelmer v. White, 877 F.2d 1518, 1520 (11th Cir. 1989). Finally, if the state's court of last resort affirms a lower court's decision without comment, the claim will not be barred from review on the merits in the habeas court unless the lower court's decision rested on procedural default. Ylst v. Nunnemaker, 501 U.S. 797, 802 (1991).

## 2. Overcoming Procedural Default.

If a petitioner defaults on his federal claim in state court, he can nonetheless present that claim to the federal habeas court if he "can show 'cause' for the default and 'prejudice attributable thereto,' Murray v. Carrier, 477 U.S. 478, 485 [] (1986), or demonstrate that failure to consider the federal claim will result in a 'fundamental miscarriage of justice.' Id., at 495 [], quoting Engle v. Issac, 465 U.S. 107, 135 [] (1982)." Harris v. Reed, 489 U.S. 255, 262 (1989).   See, Wainwright v. Sykes, 433 U.S. at 90-91. Under the cause and prejudice exception to procedural default, cause can normally be proven through the existence of "some objective factor external to the defense [that] impeded counsel's efforts to comply with the state's procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986). An objective factor external to the defense can be defined as a factor that cannot be attributed to the petitioner. Coleman v. Thompson, 501 U.S. at 753. Objective factors include the novelty of the asserted federal claim[20] and any interference by

---

[20] Although as a result of Teague v. Lane, 489 U.S. 288 (1989), this would only be applicable where the Supreme Court either decided a novel claim while the petitioner's case was on direct appeal, where the Supreme Court made the ruling retroactive on collateral review or where the rule was of the

the state that made compliance with the procedural rule impracticable. <u>Murray v. Carrier,</u> 477 U.S. at 488. One example of an interference by the state that would create cause is ineffective assistance of counsel at the criminal trial. <u>Id.</u>[21] (However, deficient counsel at the post-conviction stage cannot create cause for a procedural default. <u>Coleman v. Thompson,</u> 501 U.S. at 756-7.) In this vein, the Supreme Court has suggested that any constitutional error that could make compliance with a procedural rule impracticable would be an interference by the state resulting in cause for default. <u>Id.</u> at 754.[22]

Demonstrating prejudice under the <u>Wainwright v. Sykes</u> cause and prejudice standard requires a showing of "actual prejudice [resulting] from the alleged constitutional errors . . . " <u>Alexander v. Dugger,</u> 841 F.2d 371, 374 (11th Cir. 1988); <u>See, United States v. Frady,</u> 456 U.S. 152, 170 (1982).

> To establish actual prejudice, a petitioner must show "not merely that the errors at this trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." [<u>United States v. Frady,</u> 456 U.S. 152, 170 (1982)]. . .

<u>Hollis v. Davis,</u> 941 F.2d 1471, 1480 (1991), <u>cert. denied,</u> 503 U.S. 938 (1992).

A means of overcoming a procedural default other than demonstrating cause and prejudice is showing that keeping the petitioner in custody will result in a "fundamental miscarriage of justice." <u>Smith v. Murray,</u> 477 U.S. 517, 537-38 (1986); <u>Murray v. Carrier,</u> 477 U.S. at 495-96. A "fundamental miscarriage of justice" occurs "in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent . . . " <u>Id.</u> at 496. A "fundamental miscarriage of justice" can occur where the petitioner is actually innocent either of the crime allegedly

---

"watershed" variety.

[21] Ineffective assistance of counsel has been described by the Supreme Court as a form of error imputable to the state. <u>Coleman v. Thompson,</u> 501 U.S. at 754.

[22] For example, if state officers were to improperly seize a prisoner's notice of appeal before it could be filed, the Fourth Amendment constitutional error would likely be cause for the procedural default.

committed or of the penalty being exacted.[23] Sawyer v. Whitley, 505 U.S. 333, 339-40 (1992). To prove actual innocence of the crime on habeas review, it is not enough to show that evidence exists that would demonstrate by a preponderance of the evidence that no (reasonable) juror could find the petitioner guilty beyond a reasonable doubt. Schlup v. Delo, ___ U.S. ___, 115 S.Ct. 851, 867 (1995). The petitioner must also demonstrate that, absent independent constitutional error, he or she would likely have been found actually innocent of the crime. Id. at 861.

A petitioner who is not actually innocent of the crime committed may still be actually innocent of the penalty to be exacted. In a case in which a petitioner alleges that he or she is actually innocent of the death penalty, he must, by clear and convincing evidence, demonstrate that, but for the alleged constitutional error, no (reasonable) juror could have found him or her eligible for the death penalty. Sawyer v. Whitley, 505 U.S. at 348-49 (1992). If the habeas court finds the petitioner to have been eligible for the sentence, it is not to consider whether mitigating factors would have (or should have) given rise to a different sentence. Id. at 345. As the Eleventh Circuit Court of Appeals stated in Johnson v. Singletary, 938 F.2d 1166, 1183 (1989):

> [A] petitioner may make a colorable showing that he is actually innocent of the death penalty by presenting evidence that an alleged constitutional error implicates all of the aggravating factors found to be present by the sentencing body. That is, but for the alleged constitutional error, the sentencing body could not have found any aggravating factors and thus the petitioner was ineligible for the death penalty. In other words, the petitioner must show that absent the alleged constitutional error, the jury would have lacked the discretion to impose the death penalty; that is, that he is ineligible for the death penalty.

## B. Exhaustion.

In Rose v. Lundy, 455 U.S. at 522, the Supreme Court stated that, out of respect for principles of comity and federalism, a district court must decline to rule on a petition for writ of habeas corpus in which the petitioner has failed to exhaust in state court any of

---

[23] Actual innocence of the penalty being exacted usually occurs in the death penalty circumstance, but it is conceivable that one could be actually innocent when some other penalty is involved, if the person is ineligible to receive that penalty.

the federal claims he or she presents to the district court. See, 28 U.S.C. § 2254(b)(1)(A); Ex parte Royall, 117 U.S. 241, 251 (1886). A claim is considered exhausted either if it has been addressed by the highest court authorized to hear the claim on review, Rose v. Lundy, 455 U.S. at 515, or if the issue was properly before the state court for review (even if not addressed). Smith v. Digmon, 434 U.S. 332, 333-34 (1978).[24] A petitioner is not required to exhaust his or her remedies either where "there is an absence of state corrective process" or where "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(B)(i)&(ii).[25] See, Ex parte Hawk, 321 U.S. 114, 118 (1944).

A "habeas petitioner must have 'fairly presented' to the State courts the 'substance' of his federal habeas corpus claim." Anderson v. Harless, 459 U.S. 4, 6 (1982)(per curiam) (citing Picard v. Connor, 404 U.S. 270, 277-78). Only those particular claims previously presented to the state courts can the petitioner present to the district court. Picard v. Connor, 404 U.S. 270, 277 (1971). It is not enough to simply provide the state courts with the factual basis for a federal claim; the federal claim itself must be presented. Anderson v. Harless, 459 U.S. at 7. The petitioner must therefore provide the state courts with a "fair opportunity" to apply controlling federal law to the facts. Id.

A claim presented on habeas will not be considered presented (and exhausted) in the state courts if that Federal claim "is so clearly distinct that it may fairly be said that the state courts have had no opportunity to pass on them." Humphrey v. Cady, 405 U.S. 504, 516 n.18 (1972); See also, Duncan v. Henry, 115 S.Ct. 887 (1995) (holding that a claim apparently based upon state law evidence rules did not give state court any idea that a due process claim was waiting in the wings and therefore there was no exhaustion) and Riggins v. McGinnis, 50 F.3d 492 (7th Cir. 1995) (mere mention of "due process" with respect to

---

[24] This may have changed, at least in some capital cases. Under 28 U.S.C. § 2264, a district court is only permitted to address claims "that have been raised and decided on the merits in the State courts." However, because Chapter 154 of Title 28 does not apply to the present case, its provisions need not be addressed.

[25] This provision, whether applicable or not, merely restates the present law on exceptions to the exhaustion requirement.

a claim in petitioner's brief as a state appellant did not present constitutional due process claim before the state courts where the state inferred a state issue).[26] If a federal court cannot determine if a claim has been heard in the state courts, comity requires that the state courts be given the chance to address the claim. Echerraria v. Bell, 579 F.2d 1022, 1025 (7th Cir. 1978) (citing Tyler v. Swenson, 527 F.2d 877[,] 880 (8th Cir. 1976) (citing Fay v. Noia, 372 U.S. 391[,] 420 [] (1963))).[27]

Although an entire petition is to be dismissed if a single non-exhausted claim exists in it, courts have held that if the non-exhausted claim is meritless, the habeas court can deny the claim on its merits in order to reach the merits of the exhausted claims. See, for example, Hendricks v. Zenon, 993 F.2d 664 (9th Cir. 1993). It has also been held that if the non-exhausted claim would be procedurally defaulted if returned to state court, the habeas court can deny that claim in order to reach the merits of other non-exhausted claims. Subsequent to these decisions, the AEDPA was enacted. Although this portion of the new habeas statute may or may not have retroactive effect, new exhaustion requirements stated in the AEDPA may have altered the district court's ability to address non-exhausted claims in a petition. 28 U.S.C. § 2254(b)(2) states:

> An application for writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

## II. Examination of the Petitioner's Claims.

In his Report and Recommendation, the Magistrate found a number of the plaintiff's claims to have been procedurally defaulted in State court. However, in finding

---

[26] This holding is questionable in light of Ylst v. Nunnemaker, 501 U.S. at 804: "The maxim is that silence implies consent, not the opposite. . . ." Presumably, where a claim has both a federal and state aspect, when the state court only addresses the state aspect of the claim, the silence on the federal aspect is to imply silent consideration and denial of the federal claim on its merits, not that the defendant failed to present his claim to the state courts.

[27] However, if the claim would be procedurally defaulted upon return to the state courts, the claim should probably be addressed by the federal habeas court. See Ylst v. Nunnemaker, 501 U.S. at 804.

each of the claims to have been defaulted, the Magistrate provided little explanation other than a statement that the Rule 20 court found the claims to have been "defaulted" and that, therefore, so should the Federal court. Apparently, the Magistrate presumed that the preclusionary rules contained in Temporary Rule 20.2(a) were rules for the creation of procedural default. Therefore, under the Magistrate's apparent reasoning, a claim precluded from being raised in a coram nobis proceeding would be procedurally barred from review in a subsequent habeas petition. In addition, the Magistrate made a blanket assertion denying generally the existence of cause and prejudice or of a "fundamental miscarriage of justice" with respect to the claims which were procedurally defaulted, independent of the petitioner's ineffective assistance of counsel claims. The Magistrate also found all of the claims of the petitioner, whether defaulted or not, to be without merit.

In the following, the court will group the petitioner's claims for aid in analysis. In analyzing each group of claims, infra, the court will discuss in more detail the Magistrate's recommendations, first with respect to procedural default and then with respect to the merits.

## A. On Claims Raised by Mr. Appell on Direct Appeal from the Trial Court and Subsequently Raised by Petitioner in the Rule 20 Petition.

Two of the petitioner's claims, that the trial court erred in failing to provide adequate funds for the petitioner to hire a jury selection expert, etc., and that it erred in not providing a new jury sentencing hearing after Judge Jasper was replaced with Judge Garrett, were raised in the appeal from the criminal trial. The Magistrate found that, because they were raised on direct appeal, these claims were not procedurally defaulted. This court sees no reason to reject the Magistrate's determinations on this subject.[28] The

---

[28] However, the Magistrate's conclusions are questionable in light of his professed reasoning for announcing procedural default on other claims, that Rule 20 precluded their being addressed. Under Alabama Temporary Rule 20.2(a)(4), a Rule 20 court was precluded from considering a claim that was addressed at trial and on appeal. If the Magistrate's reasoning for precluding the claims is to be taken at face value, the claims raised on direct appeal would be procedurally defaulted. But, quite rightly, they are not. Why they are presentable on habeas in spite of the Rule 20 bar will be explained in section II.B, infra,

court will now consider each of these two claims on the merits.

**1. On the Argument that the Trial Court Improperly Denied the Petitioner Funds with which to Hire a Psychiatrist or Psychologist, &c in Violation of the Due Process Clause of the 14th Amendment.**

In his Report and Recommendation, the Magistrate adopted the determinations of the Alabama Court of Criminal Appeals in concluding that the petitioner was not improperly denied funds with which to hire a psychiatrist or psychologist, a polling expert, a jury-selection expert, an expert on death-qualified juries, a criminal investigator and a pre-sentence investigation expert for use at trial. The petitioner contends that the Magistrate erred in finding without merit his claims that the trial court improperly denied him funds with which to employ all of the experts necessary for him to have had a fair trial.[29]

*i. On the Employment of a Psychiatrist or Psychologist.*

*a. On Whether Mr. Appell Demonstrated That a Psychiatrist or Psychologist Was Required for Guilt-Phase Assistance.*

The Magistrate found that, with respect to the request for funds to employ a psychiatrist or psychologist, the petitioner did not seek to employ a psychiatrist or psychologist for purposes of demonstrating his sanity (or lack thereof) at trial to impugn a finding of guilt, but instead, that the petitioner wished the services of a psychiatrist or psychologist for purposes of demonstrating mitigating circumstances. The Magistrate also found that, in asserting the need of a psychologist or psychiatrist, the petitioner did not assert why the experts were necessary in order for him to satisfy the mitigating circumstances. The petitioner responds that the funds were necessary for a demonstration that he could not have formed the requisite intent to commit the murder of Ms. Bedsole

---

at pp. 38-51.

[29] The court notes, at the outset, that Teague v. Lane, 489 U.S. 288, 310 (1989), prohibits the court from considering changes in the criminal procedure favorable to the petitioner that were announced after the petitioner's sentence has become final, unless the rule is of the "watershed" variety.

and to aid in the demonstration of mitigating factors at sentencing.

> Supreme Court precedent establishes the principle that the due process clause of the fourteenth amendment requires that the state, upon request, provide indigent defendants with the "basic tools of an adequate defense . . . when those tools are available for a price to other prisoners." Britt v. North Carolina, 404 U.S. 226, 227 [] (1971); see also Ake v. Oklahoma, 470 U.S. 68, 77, 83 [] (1985); Ross v. Moffitt, 417 U.S. 600 [] (1974); Griffin v. Illinois, 351 U.S. 12 [] (1956) (plurality). The state need not provide indigent defendants all the assistance their wealthier counterparts might buy; rather, fundamental fairness requires that the state not deny them "an adequate opportunity to present their claims fairly within the adversary system." Ross, 417 U.S. at 612 []; see also Ake, 470 U.S. at 77 [].

Moore v. Kemp, 809 F.2d 702, 709 (11th Cir. 1987). The Supreme Court has also stated:

> Meaningful access to justice has been the consistent theme of these cases. We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense.

Ake v. Oklahoma, 470 U.S. 86, 77 (1985). These concerns have been found to justify providing psychiatric assistance to indigent defendants in certain circumstances. Id. at 80. For example, "when the State has made the defendant's mental condition relevant to his criminal culpability and to the punishment he might suffer, the assistance of a psychiatrist may well be crucial to the defendant's ability to marshal his defense." Id. "In addition, a State's refusal to provide the defendant psychiatric assistance in presenting mitigating evidence at his sentencing proceeding, where the State presents psychiatric evidence against the defendant, also violates due process. [Ake v. Oklahoma, 470 U.S. at 84]." Bowden v. Kemp, 767 F.2d 761, 763 (11th Cir. 1985). Therefore,

> . . . when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

Ake v. Oklahoma, 470 U.S. at 83.

In Caldwell v. Mississippi, 472 U.S. 320, 323 n.1 (1985), the Supreme Court, while reviewing the conviction of a petitioner who claimed to have been improperly sentenced to death by a jury that had been told that responsibility in sentencing the

petitioner to death lay with the appellate court that would review the sentence, noted a series of secondary claims by the petitioner concerning the trial court's failure to provide him with a variety of experts. In response to those claims, the Court stated:

> Petitioner also raises a challenge to his conviction, arguing that there was constitutional infirmity in the trial court's refusal to appoint various experts and investigators to assist him. Mississippi law provides a mechanism for state appointment of expert assistance, and in this case the State did provide expert psychiatric assistance to Caldwell at state expense. But petitioner also requested appointment of a criminal investigator, a fingerprint expert, and a ballistics expert, and those requests were denied. The State Supreme Court affirmed the denials because the requests were accompanied by no showing as to their reasonableness. For example, the defendant's request for a ballistics expert included little more than "the general statement that the requested expert 'would be of great necessarius witness.'" [Caldwell v. Mississippi,] 443 So.2d 806, 812 (1983). Given that petitioner offered little more than undeveloped assertions that the requested assistance would be beneficial, we find no deprivation of due process in the trial judge's decision. Cf. Ake v. Oklahoma, 470 U.S. 68, 82-83 [] (1985) (discussing showing that would entitle defendant to psychiatric assistance as matter of federal constitutional law). We therefore have no need to determine as a matter of federal constitutional law what if any showing would have entitled a defendant to assistance of the type here sought.

Id. In Bowden v. Kemp, 767 F.2d 761, 765 (11th Cir. 1985), the Eleventh Circuit Court of Appeals took the language in Caldwell as relevant to the determination of when the defendant's sanity constitutes such a "significant factor" at trial requiring the state to provide the defendant with the assistance of a psychologist or psychiatrist. "Where a defendant offers 'little more than undeveloped assertions that the requested assistance would be beneficial, we find no deprivation of due process in the trial judge's decision.' Caldwell v. Mississippi, 472 U.S. 320, [323] n. 1 [] (1985)." Bowden v. Kemp, 767 F.2d at 765. In the later case of Moore v. Kemp, 809 F.2d at 712, the Eleventh Circuit Court of Appeals explained the relation between Ake and Caldwell more thoroughly:

> Ake and Caldwell, taken together, hold that a defendant must demonstrate something more than a mere possibility of assistance from a requested expert; due process does not require the government automatically to provide indigent defendants with expert assistance upon demand. Rather, a fair reading of these precedents is that a defendant must show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial. Thus, if a defendant wants an expert to assist his attorney in confronting the prosecution's proof—by preparing counsel to cross-examine the prosecution's

experts or by providing rebuttal testimony—he must inform the court of the nature of the prosecution's case and how the requested expert would be useful. At the very least, he must inform the trial court about the nature of the crime and the evidence linking him to the crime. By the same token, if the defendant desires the appointment of an expert so that he can present an affirmative defense, such as insanity, he must demonstrate a substantial basis for the defense, as the defendant did in Ake. In each instance, the defendant's showing must also include a specific description of the expert or experts desired; without this basic information, the court would be unable to grant the defendant's motion, because the court would not know what type of expert was needed. In addition, the defendant should inform the court why the particular expert is necessary. We recognize that defense counsel may be unfamiliar with the specific scientific theories implicated in a case and therefore cannot be expected to provide the court with a detailed analysis of the assistance an appointed expert might provide. We do believe, however, that defense counsel is obligated to inform himself about the specific scientific area in question and to provide the court with as much information as possible concerning the usefulness of the requested expert to the defense's case.

Id. See also, Williams v. Collins, 989 F.2d 841, 845-46 (5th Cir. 1993)(asserting same standard for determination of a "significant factor").

The Alabama Court of Criminal Appeals stated, in considering the constitutionality of the trial court's refusal to provide Mr. Duren with funds for a psychologist or psychiatrist:

The defendant did not demonstrate to the trial judge that his sanity at the time of the offense was to be a significant factor at trial. . . . Although the defendant initially entered a plea of not guilty by reason of mental disease or defect, that plea was withdrawn before trial. Prior to trial, the trial court offered "to order the State psychiatrist to examine the defendant." Defense counsel rejected that offer and stated, "No, sir, we don't wish that at this time."
      In the sentencing proceedings, both before the jury and the judge, the prosecution presented no new evidence but merely relied upon what had already been presented at trial. At trial, the State presented no expert psychiatric evidence. Here, as in Bowden, "[u]nlike the sentencing situation in Ake, . . . [the] prosecutor had no need to present psychiatric evidence to show an aggravating factor and he presented none. The dangers and inequities which concerned the Court in Ake consequently did not exist." Bowden, 767 F.2d at 764, n. 5. Again, the defendant failed to exhibit to the trial judge that his mental condition at the time of the offense was to be a significant factor at the proceedings.

Duren v. State, 507 So.2d 111, 119-20 (Ala. Ct. Crim. App. 1986).

By the time of trial, the petitioner's plea of not guilty by reason of mental disease or defect was withdrawn. Had the trial court denied the request for funds for a psychologist

or psychiatrist at the time the plea was withdrawn, the trial court's decision, at least with respect to the guilt phase of trial, would have been incontrovertibly proper. However, the facts of the trial court's denial of funds for a psychologist or psychiatrist are a bit more convoluted.[30]

In his motion requesting funds for various experts, the petitioner stated:

> The Alabama capital punishment sentencing scheme permits a defendant to present evidence in mitigation which relate, inter alia, to three specifically enumerated mitigating circumstances.
>
> 1.  The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.
> 2.  The defendant acted under extreme duress or under substantial domination of another person.
> 3.  The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
>
> In addition, the defendant is constitutionally permitted to present evidence in mitigation such as mental retardation or low IQ.
>
> The defendant's counsel are unable to ascertain the existence of any mitigating circumstances relating to defendant's mental state or capacity without professional help. They believe that such exist but are unable to prove their existence without the assistance of an independent psychologist and psychiatrist who can interview and test the defendant. . . .

DAR at 841-42. In a motion hearing on February 10, 1985, the petitioner's attorney, Mr. Appell, testified as to his need for a psychologist or psychiatrist. In the transcript of the hearing it is clear that the trial court considered the motion for funds to hire a psychologist or psychiatrist not only with respect to mitigation, but also in regard to the petitioner's plea of not guilty by reason of mental disease or defect.

> [Mr. McDonald, Deputy District Attorney]: There is not any special plea in this case, is there?
>
> [Mr. Appell]: Well, yes, we did enter a plea of not guilty by reason of mental defect.
>
> [Mr. McDonald]: And have you had the defendant examined up there?

---

[30] The court, in examining this claim, does not contradict or dispute any of the Alabama Court of Criminal Appeals's factual findings. At best, this court only fills in gaps in the appellate court's discussions from the record.

[Mr. Appell]: Yes, I have.

[Mr. McDonald]: By - - - -

[Mr. Appell]: The family raised as much money as they could.

[Mr. McDonald]: Who is the doctor?

[Mr. Appell]: Do I have to answer that?

> THE COURT: Yes, sir, you are asking for funds for one. I have to know if you have already hired a doctor. . . .

DAR at 12-13.

> THE COURT: Mr. Appell, [d]o you wish to have the Court order the State psychiatrist to examine this defendant? I notice you entered a plea of not guilty by reason of mental disease or defect, but there has been no motion filed by the defendant to have him examined by the State - - -
>
> MR. APPELL: No, sir, we don't wish that at this time.
>
> MR. McDONALD: Your Honor, we will get such a motion to the Court.
>
> THE COURT: Well, there is nothing pending before this Court at this time.
>
> McDONALD: I know. I realize that.

DAR at 17. The trial court denied the motion for funds. It was later that the petitioner withdrew his plea of not guilty for reason of mental disease or defect.

Two aspects of the petitioner's claim are oresented for review: (1) whether the trial court's denial of funds for a psychiatrist or psychologist constituted error, given that, at the time that the motion for those funds was being decided, the petitioner had entered a plea of not guilty by reason of mental disease or defect; and (2) whether the denial of those funds constitutes error when the petitioner's attorney had stated the purpose of the funds with respect to mitigating evidence and had stated that, absent those funds, those mitigating circumstances could not be investigated or demonstrated by the petitioner.

The petitioner requested the funds for a psychologist or psychiatrist at a time when he had pled not guilty by reason of mental disease or defect. Demonstrating the petitioner's mental capacity certainly would have been a significant factor in the petitioner's trial, if not the only factor, had not the petitioner later abandoned that plea. But, at the time the plea was entered, the trial court had no apparent reason to think that

the plea would be abandoned. A superficial application of Ake v. Oklahoma, 470 U.S. at 83, would yield the conclusion that the petitioner was improperly denied funds for a psychiatrist or psychologist.

However, the trial court also inquired of the petitioner's attorney whether it should order the State psychiatrist to examine the defendant. The State psychiatrist most likely would have satisfied the Ake requirement to provide the petitioner with a psychiatrist when his mental state would be a significant aspect of the trial. In Magwood v. Smith, 791 F.2d 1438, 1443 (1986), the petitioner, Billy Joe Magwood, had been examined by six doctors with regard to his mental state at the time he allegedly committed the crime of which he was charged. The Eleventh Circuit Court of Appeals found that, although the State had denied Magwood funds with which he could retain his own psychiatrist, the review of his case by the various doctors, during which some of the doctors had determined that the petitioner suffered from an abnormal mental condition, constituted sufficient access to a psychiatrist for purposes of Ake. Id. Similarly, in the present case, the State was not required to give Mr. Duren, at the time that he requested it, any psychological assistance beyond an appointed State psychiatrist. That the petitioner's attorney declined the opportunity to have the petitioner evaluated relinquished the petitioner's access to the only psychological help that the State, at that point, was required to give.

Further, even if providing the petitioner with a State psychiatrist would have been ultimately insufficient — for example, if the psychiatrist's position had been wholly with the prosecution — that the State psychiatrist would eventually aid the State in its case against the petitioner would have provided the petitioner a firm basis on which to acquire funds for a consultative psychologist. See Moore v. Kemp, 809 F.2d at 712. At the point in the proceedings at which the request for a psychologist or psychiatrist was raised, however, the petitioner's motion for funds was premature. When the petitioner requested the funds, all that he was required to receive (at least insofar as was related to the guilt

phase of trial) was the State-provided psychiatrist.[31]

Finally, even if it were constitutional error to have not provided the petitioner with a psychologist or psychiatrist to aid during the guilt phase of trial, the error is nonetheless harmless. A failure to provide a defendant with a psychological or other expert is has been held to be a type of trial error and that failure cannot lead to the reversal of a conviction unless the error was not harmless. Starr v. Lockhart, 23 F.3d 1280, 1291 (8th Cir. 1994). In a habeas action, a constitutional error will be found harmless unless the error " 'had substantial or injurious effect or influence in determining the jury's verdict.' " Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). This standard requires a petitioner to demonstrate "actual prejudice." Id.

The petitioner cannot show any actual prejudice during the guilt phase of his trial resulting from his not having a psychological expert or psychological assistance. Prior to trial, the petitioner abandoned his plea of not guilty due to mental disease or defect and entered a plain "not guilty" plea. Hence, even if the petitioner were to have had expert assistance at trial, it would have been of no consequence, because its purpose would have been to prove something not at issue in the trial, the petitioner's sanity.[32]

### b. On Whether the Failure to Provide Funds with which to Obtain a Psychologist or Psychiatrist for Assistance at the Sentencing Phase of Trial was Error.

The second purpose for which the petitioner sought a psychologist or psychiatrist was to demonstrate mitigating circumstances at the sentencing phase of trial. The Alabama Court of Criminal Appeals reasoned that the petitioner could demonstrate the need of a

---

[31] It may be the case that the only use to which the State psychiatrist was to be put was the determination of the petitioner's competency to stand trial, if so, then the State psychiatrist may have been insufficient for other purposes. However, for the final reason stated above, the failure to appoint a psychological expert is innocuous.

[32] It is arguable that the failure to have a psychologist or psychiatrist appointed may have resulted in the petitioner abandoning his plea of not guilty by reason of mental disease or defect. That may have had a substantial effect in the determining of the jury's verdict, in that the plea was never before the jury to consider. However, the court, in determining prejudice, is not to consider what the subject matter of the trial would have been had the psychological expert been appointed, but whether the expert would have affected the jury's conclusions when added to the actual events occurring at trial.

psychological expert only if the prosecution intended to use a psychological expert in demonstrating aggravating circumstances.

During the sentencing phase of trial, the defendant not only must try to rebut any aggravating circumstances argued by the prosecution, but must also affirmatively present any mitigating circumstances applicable to him. Denial of a psychological expert solely on the grounds that such is not needed to rebut an aggravating circumstance therefore may be error.

The recently enacted AEDPA imposes additional limitations upon the depth of review a habeas court can conduct over a state court's determinations of federal law and application of those determinations. The revised § 2254(d)(1) prohibits a habeas court from granting relief on a claim unless the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. . . ." 28 U.S.C. § 2254(d)(1).[33] The court must therefore consider what ramifications this has on the present petition.

### α. On Whether § 2254(d)(1) Is to Be Applied Retroactively.

Recently, the Eleventh Circuit Court of Appeals, in <u>Hunter v. United States</u>, 101 F.3d 1565, 1573 (11th Cir. 1996), held that the § 2253 certificate of probable cause provisions could be applied retroactively to habeas petitioners, but was, however, silent on whether § 2254 was to be applied similarly. It also stated that, in certain instances, provisions of the AEDPA could not be applied retroactively. <u>Id.</u> at n.6. The circuit courts are split on the issue of whether certain provisions, or all, of the AEDPA is to be applied retroactively to cases on habeas review before enactment of the statute. With respect to the particular provision at issue, § 2254(d)(1), the Seventh and Fifth have held that the

---

[33] Prior to this revision, there were no statutorily imposed limitations upon a federal court's power to review a state court's determination of and application of federal law. Under the pre-AEDPA scheme, apart from <u>Teague</u> concerns, review of state court determination of and application of federal law was <u>de novo</u>.

AEDPA does apply retroactively, see Lindh v. Murphry, 96 F.3d 856 (7th Cir. 1996), cert. granted, 117 S.Ct. 726 (1997), and Drinkard v. Johnson, 97 F.3d 751 (5th Cir. 1996), while the Second, the Ninth and the Tenth have held that it does not. See Boria v. Keane, 90 F.3d 36 (2d Cir. 1996); Jeffies v. Wood, 103 F.3d 827 (9th Cir. 1996); and Edens v. Hannigan, 87 F.3d 1109, 1112 n.1 (10th Cir. 1996). Also see, Berryman v. Morton, 100 F.3d 1089, 1101-03 (3d Cir. 1996) (refusing to resolve the issue).

The analysis for whether a statute is to be applied retroactively is provided in Landgraf v. USI Film Products, 511 U.S. 244 (1994). In Landgraf, the Supreme Court first pointed out a presumption against retroactive application of a statute, but then gave a series of analytical factors which would provide justification for overcoming the presumption. Id. at 273. First is whether Congress has stated that the statute is to be applied retroactively. Id. at 273. Second, the presumption is overcome if the statute only authorizes or affects the propriety of prospective relief. Id. at 273-74. Third, the presumption can be overcome if the statute is one conferring or ousting jurisdiction of the court. Id. at 274. Fourth, if a change is in a procedural rule, the presumption against retroactivity will normally be overcome. Id. at 275. However, this sometimes depends upon the effects the change in the procedural rule precipitates. Id. at n. 29. Just what kind of effects seems to be the question. The Eleventh Circuit Court of Appeals in Hunter stated that the question is resolved (at least in part, because the Supreme Court stated that it was not constricting its limitation on retroactivity to whether a "vested right" was affected or not) by asking whether the procedural rule "'would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.'" Hunter v. United States, 101 F.3d at 1570. This theory is related to Justice Story's expressions on the issue:

> "Every statute, which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already part, must be deemed retrospective . . ."

Landgraf, 511 U.S. at 269 (citing Society for Propogation of the Gospel v. Wheeler, 22 F.Cas. 756 (Cir. Ct. N.H. 1814)).

Also to be considered is whether the rule in issue falls into a category created by the following statement: "A new rule concerning the filing of complaints would not govern an action in which the complaint has already been properly filed under the old regime, and the promulgation of a new rule of evidence would not require an appellate remand for a new trial." Landgraf, 511 U.S. at 275 n. 29. The Landgraf analysis can be entirely avoided if a statute can be interpreted such as to avert any retroactivity concerns. Lindh v. Murphy, ___ S.Ct. ___, 1997 WL 338568 at *3 (U.S. June 23, 1997).

The opinion of the Seventh Circuit in Lindh v. Murphy, 96 F.3d 856 (7th Cir. 1996) rev'd ___ S.Ct. ___, 1997 WL 338568 (U.S. June 23, 1997), is thorough and interesting. The Court of Appeals in Lindh chose not to apply in a straightforward manner the Landgraf analysis, instead stating that the issue of the application of § 2254(d) was not one of retrospectivity at all. The means utilized by the Seventh Circuit in deciding that the statute applied retroactively were the same that are used in determining whether the effects of retrospective application of a procedural rule are such as to disallow retrospective application of the statute.[34] In a nutshell, the Seventh Circuit found that because § 2254(d) does not affect the calculations of criminals in deciding to commit criminal acts and it does not regulate the primary conduct of the defendant, it is purely procedural. It does not operate retroactively.

Stating that "subsection (d)(1) is easily classified as procedural in nature," the Fifth Circuit Court of Appeals in Drinkard v. Johnson 97 F.3d 751, 766 (5th Cir. 1996), stated that, like other procedural rules, § 2254(d)(1) could apply to a suit filed prior to enactment of the AEDPA barring an impairment on the previously established rights of the defendant. The Court of Appeals stated that those rights were not impaired:

> Here, the change in procedural rules governing federal habeas review raises no concerns of retroactivity. Because the new rules involve federal standards of review of state court decisions, Drinkard must be able to show that he relied to some extent on the former federal standards of habeas review in making strategic, tactical, or other decisions during the state court litigation. Although during his

---

[34] A curious consequence of this is that purely procedural rules cannot be said to ever apply retroactively and that any rule that does have effects upon a party's "vested" rights, loosely speaking, is not procedural.

state post-conviction proceedings, Drinkard may well have expected that the federal courts would review claims adjudicated on the merits in those proceedings de novo, "[a] statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based in prior law." 511 U.S. at ----, 114 S.Ct. at 1499 (internal citation and footnote omitted). In short, Drinkard cannot argue credibly that he would have proceeded any differently during his state post-conviction proceedings had he known at the time of those proceedings that the federal courts would not review claims adjudicated on the merits in the state court proceedings de novo. Because the new standards of review do not have a retroactive effect, we hold that they apply to our review of Drinkard's appeal from the district court's denial of his petition for writ of habeas corpus. We thus turn to the task of applying these new standards to Drinkard's appeal.

Drinkard, 97 F.3d at 766.

The Second Circuit Court of Appeals has weighed in against retrospective application of § 2254(d). In Boria v. Keane, 90 F.3d 36, 38 (2d Cir. 1996), the Court of Appeals determined that, in light of other sections of the statute specifically mandating retroactive application, the silence of Congress on the retroactive application of § 2254(d) was "striking." Id. The Second Circuit held that the roaring silence, in combination with the presumption against retroactive application of the statute, mandated against retroactive application.

All of these cases are now irrelevant to the resolution of the present issue. The Supreme Court, in Lindh v. Murphy, ___ S.Ct. ___, 1997 WL 338568 (U.S. June 23, 1997), reversed the holding of the Seventh Circuit that the revised 2254(d) and 2254(e) applied retroactively to non-death penalty cases and to capital cases not qualifying for expedited review under Chapter 154. Id. at *8. Therefore, the petitioner will receive the benefit of the pre-AEDPA standards of review.

If the law at the time of final review of the petitioner's conviction was clear that a defendant had a right to psychiatric or psychological assistance to prove mitigating circumstances and the petitioner was prejudiced by denial of the right, the petitioner will be entitled to a new sentencing hearing.

In Teague v. Lane, 489 U.S. 288, 310 (1989), the Supreme Court announced that a new rule of constitutional law not in effect at the time the original appeal was perfected

could not be applied retroactively on collateral appeal. Ake and further decisions in the Eleventh Circuit Court of Appeals at the time of the Alabama Supreme Court's affirmance the petitioner's conviction had held that a psychological expert was required for the sentencing phase of trial only where the prosecution was to put on psychological evidence of future dangerousness as an aggravating circumstance. Ake v. Oklahoma, 470 U.S. at 84. However, it could be persuasively argued that the rule that due process requires appointment of a psychological expert where a psychologist is necessary to demonstrate a mitigating circumstance is merely an unsurprising extension of the holding in Ake.

At issue is whether a determination that a psychological expert must be provided if one is needed to demonstrate mitigating circumstances, even absent a claim by the defense that it is using a psychological expert to demonstrate an aggravating circumstance is a "new rule" under Teague and its progeny — that is, was the result "not dictated by precedent existing at the time the defendant's conviction became final." Teague v. Lane, 489 U.S. 288, 301 (1989). Determining whether a "new rule" has been announced involves whether the rule "breaks new ground" or "it imposes a new obligation on the States or the Federal Government." Id. In Graham v. Collins, 506 U.S. 461, 467 (1993), the Supreme Court stated that "unless reasonable jurists hearing petitioner's claim at the time his conviction became final 'would have felt compelled by existing precedent' to rule in his favor" a rule announced is new.

In O'Dell v. Netherland, ___ S.Ct. ___, 1997 WL 331797 at *3 (U.S. June 19, 1997), the Supreme Court stated:

> We have stated variously the formula for determining when a rule is new. See, e.g., Graham v. Collins, 506 U.S. 461, 467 [] (1993) ( "A holding constitutes a 'new rule' within the meaning of Teague if it 'breaks new ground,' 'imposes a new obligation on the States or the Federal Government,' or was not 'dictated by precedent existing at the time the defendant's conviction became final'") (quoting Teague, 489 U.S., at 301 []) (emphasis in original). At bottom, however, the Teague doctrine "validates reasonable, good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions." Butler v. McKellar, 494 U.S. 407, 414 [](1990) (citation omitted). "Reasonableness, in this as in many other contexts, is an objective standard." Stringer v. Black, 503 U.S. 222, 237 [] (1992). Accordingly, we will not disturb a final state conviction or sentence unless it can be said that a state court, at the time

the conviction or sentence became final, would have acted objectively
unreasonably by not extending the relief later sought in federal court.

Although the defendant probably has a right to psychological or psychiatric assistance in
preparing mitigating factors for the sentencing phase of trial, the court by no means finds
that it would be objectively unreasonable for another court acting in 1987 to hold to the
contrary.

A showing of further mitigating factors may have resulted in a life sentence rather
than a sentence of the death penalty. Given that the advisory jury found that the death
penalty should be imposed on an 11 to 1 decision, two more "converts" to the imposition
of a life sentence would have turned the tide. Despite the terrible nature of the acts of the
petitioner, a psychological expert who could have instructed the jury upon additional
mitigating circumstance could have caused some of the jurors to find that the mitigating
circumstances outweighed the aggravating circumstance. However, it is not clear that the
petitioner even qualifies for any of these mitigating factors.

This claim will be denied.


*ii. On the employment of a polling expert.*

The Magistrate determined that the petitioner made an insufficient showing of need
of a polling expert to the trial court and that the petitioner was therefore not entitled to
the expert. This court quoted above the Eleventh Circuit Court of Appeals proposition
"that a defendant must show the trial court that there exists a reasonable probability both
that an expert would be of assistance to the defense and that denial of expert assistance
would result in a fundamentally unfair trial." Moore v. Kemp, 809 F.2d at 712. In
requesting the polling expert, the petitioner's attorney stated:

[A]s far as a change of venue, this case has had an extreme amount of publicity.
We are talking about a very prominent family in the community, and there has
been a co-defendant, who has had extensive pre-trial coverage at a juvenile
hearing. It has been on television a number of times and in the newspaper a
number of times. Without a polling expert to go out and poll the community to
see what their feelings are, what their knowledge of the case is, we cannot present
to this court an adequate change of venue motion for the court to rule on, and
therefore, we need funds in that area.

DAR at 6.  The court finds that there was neither a reasonable probability that an expert would be of assistance to the defense nor was there such a probability that a fundamentally unfair trial would result from denying the petitioner the expert.  In evaluating the petitioner's claim, the Alabama Court of Criminal Appeals stated:

> In Ex parte Grayson (opinion on original submission), our Supreme Court held:
> "Did the statutory limit on state-provided funds for expenses
> prevent defendant from proving actual prejudice in the community
> at large, and thus cause him to lose his request for change of venue?
> "'The proper manner for ascertaining whether adverse publicity
> may have biased the prospective jurors is through the voir dire
> examination,' Anderson v. State, 362 So.2d 1296, 1299
> (Ala.Crim.App.1978), not through extensive and expensive surveys.
> It costs nothing to question the prospective jurors;  thus the limit
> on available funds cannot be said to have prevented defendant from
> showing actual prejudice of the jurors." 479 So.2d at 80.
> In his motion for change of venue, the defendant alleged that "[T]he
> pretrial publicity has created an inherently prejudicial atmosphere making the
> selection of a fair and impartial jury impossible."  Prior to trial, defense counsel
> told the trial judge, "Judge, we have a motion for change of venue, but we have
> not been able to present sufficient evidence to this court because we don't have the
> funds to present any testimony on that."
> As best this Court can determine from the record, the jury venire consisted
> of fifty-four persons.  Twenty-nine of those individuals indicated on voir dire that
> they had read or heard something about the crime.  Each of those twenty- nine
> people was separately interviewed to determine the nature and effect of the
> pretrial publicity to which each had been exposed.  Of these twenty-nine persons,
> the defense counsel challenged only one for cause on the basis of pretrial publicity.
> That particular venireman indicated that he had formed an opinion that the
> defendant was guilty.  That venireman was excused for cause. The remaining
> twenty-eight venire members stated that they could give the defendant a fair trial
> based upon the evidence presented at trial.
> The record contains no newspaper articles about the crime.  There was no
> testimony or evidence presented about the nature of the pretrial publicity. Under
> these circumstances, the defendant has "offered little more than undeveloped
> assertions that the requested assistance would be beneficial" and his request was
> properly denied.  Caldwell, 472 U.S. at 323, n.1 [].

Duren v. State, 507 So.2d at 119.

Even were the assertions fully developed, the petitioner has not demonstrated need. Juror bias due to pre-trial publicity could as easily been detected through juror questioning.  Furthermore, had the polling expert been of use, the denial of funds for a polling expert would not result in a fundamentally unfair trial, as juror questioning easily

could have unveiled any bias imparted through pre-trial publicity.

### iii. On Employment of a Jury Selection Expert and Employment of an Expert on Death Qualified Juries.

The Magistrate stated that the petitioner failed to state a need for either a jury selection expert or an expert on death qualified juries, stating "[the petitioner] was entitled to an impartial jury, not one 'less prone to assess a death penalty,' whatever that means." The court agrees. Although either one of these experts may have been useful to the petitioner in lessening his chances of conviction, or application of the death penalty, his trial is not made fundamentally unfair by the denial of those experts. Fundamental fairness is insured by a jury that is impartial, not one to which the death penalty is an anathema.

### iv. On the Employment of a Criminal Investigator.

In resolving the petitioner's claim that he was entitled to a criminal investigator, the Magistrate stated:

> Duren asserts that he needed a 'criminal investigator' to gather evidence that he was intoxicated at the time of the murder, and that such evidence was relevant on the question of intent to kill. This was not, however, the purpose for the investigation that was stated in the motion. The motion stated that the investigator was needed 'to investigate the facts and the witnesses surrounding the alleged crime.' It is not known what the petitioner contends would have been discovered; it does not even appear that any such investigation of the facts would involve expertise, or, if it did that it was expertise which the attorney did not have. This claim is without merit.

R&R at 34. The court agrees. "[D]efense counsel is obligated . . . to provide the court with as much information as possible concerning the usefulness of the requested expert to the defense's case." Moore v. Kemp, 809 F.2d at 712. A broad assertion that facts need to be uncovered does not specify in any way what the defense expects to be discovered or how what is expected to be found will be useful to the trial defendant. Any intoxication information that the attorney might have uncovered should have been found through the competent legwork an attorney is generally assumed to have done in developing the

defense of a case.

*v. Pre-sentence investigation expert.*

The Magistrate recommended denial of this claim, on the basis that the petitioner gave no indication of what purpose to which a pre-sentence investigation expert was to be put. A defendant must inform a court of why it needs the expert. Moore v. Kemp, 809 F.2d at 712. In this instance, the purpose is, at least in a general sense, clear. However, the petitioner's attorney gave no indication of what, in particular, he sought in hiring the expert. Without such information, the trial court cannot determine how the expert will be necessary to the defense.

## 2. On the Argument that the Trial Court Erred in Not Providing a New Jury Sentencing Hearing after Judge Jasper Was Replaced with Judge Garrett.

In denying the petitioner's claim that the change of judges following the jury's advisory verdict was unconstitutional, the Magistrate stated:

> After the jury recommended a sentence of death, Judge Jasper learned that his deceased wife was Duren's fifth cousin, and that Judge Jasper's children were sixth cousins to Duren. Also following the return of the advisory verdict, the petitioner's grandfather attempted to contact Judge Jasper. These facts were disclosed to the parties. Although an opinion for the Judicial Inquiry Commission stated that recusal was unnecessary, Judge Jasper, at the request of Duren, recused himself. Duren consented to the case being assigned to Judge Garrett, who later became the trial judge for the remaining portion of the sentencing case. Garrett conducted the sentencing hearing before the court and pronounced sentence. Judge Garrett made himself familiar with the trial testimony and trial proceedings prior to the sentencing hearing before the bench, and he heard testimony from witnesses called by the petitioner, as noted by the Alabama Court of Criminal Appeals. . .
>
> In spite of his consent, Duren's counsel made a motion for a new trial or alternatively for a new jury sentencing hearing, on the ground that Judge Garrett had not listened to testimony or observed the demeanor of the witnesses who had testified at the guilt phase and at the sentencing hearing before the jury. The Court of Appeals cited Hill v. State, 455 So.2d 930, 935 (Ala. Crim. App.), affirmed, 455 So.2d 938 (Ala[.]), cert. denied, 469 U.S. 1098 (1984), which held that where the trial judge died, a different judge could sentence the defendant in a capital case after holding another sentencing hearing and after reviewing the records and transcripts of the prior proceedings.
>
> The factual objections made by Appell were inapplicable. The petitioner's

> counsel admitted in opening statement that Duren killed Kathy Bedsole; all that
> was contested was whether Duren intended to shoot Kathy. No witnesses testified
> on behalf of the petitioner at the guilt phase of trial. Thus, there was no testimony
> at the guilt phase favorable to the petitioner that Judge Garrett could have
> considered. With respect to the fact that Judge Garrett had not listened to or
> observed the witnesses who were called on behalf of Duren during the sentencing
> hearing in front of the jury, the petitioner had the opportunity to call any
> witnesses he desired in the sentencing hearing before Judge Garrett. Duren in fact
> called all of his witnesses who had testified in front of the jury, except Shelley
> Davis and Terri Sullivan. Davis' and Sullivan's testimony was cumulative to that
> of Duren's witnesses who testified in front of Judge Garrett. Also, Judge Garrett
> had read Davis' and Sullivan's testimony. . . . This claim is without merit.

R&R at 35-37. The petitioner states that the Magistrate's conclusions are erroneous, first,

because the Magistrate assumed that the petitioner's having the opportunity to present

witnesses at the sentencing hearing was sufficient to comport with the Due Process and

Confrontation Clauses. Instead, the petitioner argues, the sentencing judge was required

not only to hear live testimony from the petitioner's witnesses, but to hear live testimony

from the state's witnesses, on which the sentencing judge relied in coming to his

sentencing determination. The petitioner contends that the sentencing judge did not have

the opportunity to view the demeanor of the state's witnesses either on direct or cross-

examination in making his findings and, therefore, the sentencing judge's decision to apply

the death penalty was not properly supported.

To bolster his argument, the petitioner cites to a series of state and federal cases.

None of the federal cases cited specifically identify the rule which the petitioner contends

mandates a new sentencing hearing. However, some of the state cases to which the

petitioner cites do clearly support the asserted rule that failure of a sentencing judge to

hear live testimony of prosecution witnesses in support of imposition of the death penalty

mandates rehearing.

The first case on which the petitioner relies is Ohio v. Roberts, 448 U.S. 56 (1980).

In Roberts, the defendant was convicted of forgery and receiving stolen property, among

other things. The conviction was based, at least in part, upon the introduction of the

testimony of a witness testifying in a grand jury proceeding, but who was not present for

the defendant's actual trial. The Supreme Court stated that the Sixth Amendment

Confrontation Clause, as incorporated through the Fourteenth Amendment Due Process Clause, requires that, generally, "when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable." Id. at 66. The reason for this limitation on the introduction of hearsay testimony is that the jury should be allowed the opportunity to watch the declarant testify and " 'judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.' " Id. at 64 (citing Mattox v. United States, 156 U.S. 237, 242-43 (1895)). However, even if the declarant is unavailable, testimony can be introduced "if it bears adequate 'indicia of reliability.'" Id. The concern apparently voiced by Mr. Duren is that by not observing the behavior of the prosecution's witnesses on the stand, the sentencing judge could not fairly determine whether those witnesses were worthy of belief.

The petitioner also likens his case to that of the habeas petitioner in Proffitt v. Wainwright, 685 F.2d 1227 (11th Cir. 1982). The habeas petitioner, Proffitt, claimed that after the jury had presented its advisory sentence of death, the sentencing judge suggested that Proffitt be examined by two court-appointed psychiatrists. The two psychiatrists examined the petitioner and submitted reports to the court. Proffitt's attorney requested that he be able to cross-examine one of the psychiatrists about the report. The judge stated that he would later allow such a hearing and make it a part of the record, but sentenced Proffitt without the hearing. Id. at 1250. The Eleventh Circuit Court of Appeals held that accepting the psychiatrists' reports without a hearing violated the Confrontation Clause, on the basis that cross-examination is required to ensure reliability of the testimony and to ensure that the sentencing judge has the opportunity to examine the demeanor of the declarant. Id. at 1251-55. Duren states that although his attorney had earlier cross-examined the witnesses, the sentencing judge was required to be present to examine the witnesses' demeanor and determine if their testimony was reliable.

The petitioner also asserts that other state courts have held that mere review of the transcript of the guilt phase of trial is insufficient to satisfy the requirements of the Confrontation Clause. In Tichnell v. State, 427 A.2d 991, 1001 (Md. 1981), the

Maryland Supreme Court stated:

> Absent agreement of the parties, or a showing of unavailability of the witnesses to testify at the separate sentencing hearing . . . the admission in evidence before a new sentencing jury of the prior recorded trial testimony to prove the existence or absence of aggravating or mitigating circumstances [is not permitted].

See also, State v. Valencia, 645 P.2d 239, 240-41 (Ariz. 1982). The court also notes that Hill v. State, on which the Alabama Court of Criminal Appeals and the Magistrate relied in making their determinations that a new sentencing judge need not hear live testimony from prosecution witnesses is based on interpretations of state law, not federal law.

The court agrees with the petitioner that the failure of a sentencing judge to require live testimony of state witnesses which the judge did not have an opportunity to see testify at the trial prevents the judge from having the opportunity to examine the demeanor of the witness and thereby violates the Confrontation Clause. Some courts have determined Confrontation Clause errors of a similar sort to be structural error, reversible without a demonstration of prejudice. See Chambers v. Mississippi, 410 U.S. 284, 294-95 (1973). See also Proffitt v. Wainwright, 685 F.2d at 1251 and cases cited therein. However, the instant error is not a violation of the Confrontation Clause based upon lack of opportunity to cross-examine witnesses, since the petitioner was afforded the opportunity to challenge the State's witnesses on cross-examination. Instead, the violation of the Confrontation Clause, if any, exists in that the petitioner's confrontation of the State's witnesses did not occur before the sentencing judge, denying the judge the opportunity to evaluate the demeanor of the state witnesses when confronted. Courts faced with similar Confrontation Clause violations have found them to be trial error, subject to harmless error analysis. As a trial error, the failure of the sentencing judge to hear live testimony of the state's witnesses would mandate reversal of the sentence only with a demonstration of prejudice. Brecht v. Abrahamson, 507 U.S. 619, 629-30 (1993).

There is no inference of actual prejudice resulting from the sentencing judge's failure to obtain live testimony from the prosecution witnesses. The subject matter of their testimony was essentially factual and uncontested by the petitioner's attorney. The

aggravating circumstance, that the murder was committed within the scope of the robbery, would not have been changed had the petitioner's attorney had the opportunity to cross-examine the witnesses before the sentencing judge. Further, a negative credibility determination as to the officer's testimony would not have aided the petitioner in establishing mitigating circumstances, given the "tactical" approach of the attorney, Mr. Appell, not to cross-examine the only officer to testify at trial, the officer who taped the petitioner's confession. The claim of the petitioner that his sentence should be overturned due to substitution of judges is therefore denied.

## B. On Claims Either Not Raised at Trial or Not raised on Appeal and Subsequently Raised in the Rule 20 *Coram Nobis* Proceeding.

The Magistrate found almost all of the claims of the petitioner that were not raised at trial or that were not raised on appeal but that were subsequently raised in the Rule 20 petition to have been procedurally defaulted.[35] However, the Magistrate did not give a rationale for why these particular claims were procedurally defaulted other than that the claims were precluded from being addressed in the Rule 20 proceeding and that the preclusion was a sufficient basis for procedural default in a petition for writ of habeas corpus. There is a question as to whether this can squared with the Magistrate's finding that the claims clearly presented to the Alabama courts on direct review from the criminal trial were not procedurally defaulted even though they too were precluded under Rule 20.2.[36]

The respondent first asserts that the failure of a petitioner to raise his or her claim at trial is a procedural default under Alabama law. In support of this position, the State cites two Eleventh Circuit Court of Appeals cases, <u>Magwood v. Smith</u>, 791 F.2d 1438,

---

[35] These claims were the claims that pre-trial publicity necessitated a change of venue, that slides and photographs were improperly admitted, that remarks of the prosecutor were unconstitutional, that the trial court failed to make proper proportionality findings, and that the trial judge improperly instructed the jury that its penalty verdict was solely advisory. It is unclear whether the Magistrate found to have been defaulted the claim that the trial judge erred in failing to instruct the jury on mercy.

[36] <u>See</u>, <u>supra</u>, at p. 22.

1444 & 1447 (11th Cir. 1986), and Palmes v. Wainwright, 725 F.2d 1511, 1524-26 (11th Cir. 1984), cert. denied, 469 U.S. 873 (1984). In Palmes, the court found that, under Florida law, failure to raise the claim on direct review constituted procedural default of that claim on collateral review. Palmes v. Wainwright, 725 F.2d at 1525. Because of the procedural default, the petitioner was barred from exhausting his claims on either direct or collateral review and, therefore, he was defaulted from seeking relief in a habeas proceeding. In Magwood, the Court stated that "Alabama has contemporaneous objection rules that preclude appellate review of issues that could have been raised at trial, . . . and coram nobis review of issues that could have been raised on direct appeal." Magwood v. Smith, 791 F.2d at 1444. Central to both cases is the proposition that if a matter cannot be exhausted either through direct review or collateral review due to noncompliance with a state's procedural rules, the claim is defaulted.

> The respondent continues:
>
> Alabama law precludes appellate review of issues that could have been but were not raised at trial. Magwood v. Smith, supra, 791 F.2d at 1444; see, e.g., Walker v. State, 416 So.2d 1083, 1097 (Ala. Crim. App. 1982), cert. denied, 416 So.2d 1083 (Ala. 1983); Moore v. State, 415 So.2d 1210, 1217 (Ala. Crim. App. 1982). Further, Alabama law precludes collateral review of issues that could have been but were not raised at trial. Rule 32.2(a)(3), Alabama Rules of Criminal Procedure; Jackson v. State, 501 So.2d 542, 544 (Ala. Crim. App. 1986) cert. denied, 501 So.2d 542 (Ala. 1987); Dunkins v. State, 489 So.2d 603, 612 (Ala. Crim. App. 1985), cert. quashed, 489 So.2d 603 (Ala. 1986).

Respondent's Answer to Petition for Writ of Habeas Corpus, ¶ 23(a). The statement that Alabama law precludes the appellate review of claims not raised at trial should not be taken at face value, however. First, Magwood accepted without comment the proposition that, under Alabama law, failure to raise a claim at trial resulted in a procedural default on direct review that could not be corrected through a subsequent coram nobis proceeding. Magwood v. Smith, 791 F.2d at 1444. In its reasoning, the Eleventh Circuit Court of Appeals relied on Wood v. State, 416 So.2d 794, 799 (Ala. Crim. App. 1982), Moore v. State, 415 So.2d 1210 (Ala. Crim. App. 1982), cert. denied 459 U.S. 1041 (1982), and Fagan v. State, 412 So.2d 1282 (Ala. Crim. App. 1982), to conclude that a failure to follow trial court contemporaneous objection rules with respect to a claim would result in

a forfeit of the claim on direct review. However, none of these cases is a death penalty case. Wood v. State, 416 So.2d at 795 (life imprisonment); Moore v. State, 415 So.2d at 1211 (imprisonment of fifty years); and Fagan v. State, 412 So.2d at 1283 (imprisonment of fifty years). Thus, even though Magwood involved a habeas petition in a death penalty case, it is clear that the Eleventh Circuit Court of Appeals did not consider any procedural rules peculiar to Alabama death penalty cases. The other case stated by the respondent for its conclusion, Walker v. State, 416 So.2d 1083, 1097 (Ala. Crim. App. 1982), cert. denied, 416 So.2d 1083 (Ala. 1983), also did not involve the death penalty but a twenty-year imprisonment sentence. Id. at 1086.

Citing Magwood, King v. Strickland, 714 F.2d 1481, 1491-92 (11th Cir. 1983), Douglas v. Wainwright, 714 F.2d 1532, 1547 n. 18 (11th Cir. 1983), vacated, 468 U.S. 1206, reinstated, 739 F.2d 531 (11th Cir. 1984), cert. denied, 469 U.S. 1208 (1985), and Ford v. Strickland, 696 F.2d 804, 824-25 (11th Cir. 1983) (en banc), the respondent also argues that failure to appeal as to an issue raised at trial will result in a procedural default. However, aside from Magwood, all of the cases cited arose out of convictions in the State of Florida. King v. Strickland, 714 F.2d at 1485; Douglas v. Wainwright, 714 F.2d at 1535; and Ford v. Strickland, 696 F.2d at 808. None of them is therefore determinative of procedural default of claims in an Alabama death penalty case.

As this court noted above, in death penalty cases, the appellate courts of Alabama have the duty to examine the record of the trial to uncover and address any plain error. Section 12-22-240 of the Alabama Code of 1975 states:

> In all cases appealable to the Court of Criminal Appeals, the court must consider all questions apparent on the record or reserved in the circuit court and must enter such judgment as the law demands.

Alabama Rule of Appellate Procedure 45A states:

> In all cases in which the death penalty has been imposed, the court of criminal appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.

Finally, Alabama Rule of Appellate Procedure 39(k) states:

> In all cases in which the death penalty has been imposed, upon review of the opinion of the Court of Criminal Appeals on certiorari, the Supreme Court may notice any plain error or defect in the proceeding under review, whether or not brought to the attention of the trial court, and take appropriate appellate action thereof, whenever such error has or probably has adversely affected the substantial rights of the petitioner.

The respondent contends that

> [w]hile Alabama has a plain error rule in death sentence cases which permits review of some matters even absent an objection at trial, Alabama Rules of Appellate Procedure 39(k) and 45A, this claim was not reviewed pursuant to either of those rules on direct appeal and is not within the scope of those rules. See, Cochran v. State, 500 So.2d 1161 (Ala. Crim. App. 1984), 500 So.2d 1179 (Ala. 1985), remanded, 500 So.2d 1188 (Ala. Crim. App. 198_), aff'd, 500 So.2d 1064 (Ala. 1986). A plain error rule which is applicable on direct appeal does not permit collateral review of a claim not addressed on direct appeal. See, United States v. Frady, 456 U.S. 152, 163-65 (1982); Andrews v. Shulsen, 802 F.2d 1256, 1262-63 (10th Cir. 1986); see, also, Magwood v. Smith, supra, 791 F.2d at 1444, 1447 (procedural bar applied in Alabama death penalty case).

Respondent's Answer to Petition for Writ of Habeas Corpus, ¶ 23(a). It is unclear whether Cochran v. State supports the proposition for which it is cited. The only mention of a State appellate court's ability to review a trial court decision is in the offhand statement that the Alabama Criminal Appeals "Court has searched the record for error as required by Alabama Code § 12-22-240 and A.R.A.P. 45A, and found no error which 'has or probably has adversely affected the substantial right of the appellant.' A.R.A.P. 45A." Cochran v. State, 500 So.2d at 1178.

In United States v. Frady, 456 U.S. 152 (1982), the United States Supreme Court held that the "plain error" rule that applies on appeal from federal criminal trials does not translate into a plain error exemption to federal criminal procedural default rules on § 2255 federal habeas review. Id. at 164. As the Court stated, "Once the defendant's chance to appeal has been waived or exhausted . . . we are entitled to presume he stands fairly and finally convicted, especially when, as here, he already has had a fair opportunity to present his federal claims to a federal forum." Id. In Frady, the Supreme Court was concerned with the possibility of a district court sitting over a court of appeals's determination of "plain error," effectively turning the chain of review on its head. Id. at 165. Because the petitioner in Frady had a full and fair federal hearing on his federal

claims and on determinations of plain error in the district court and on direct appeal, no recourse to a federal habeas proceeding based on plain error was needed.

The concerns governing the Supreme Court's decision in Frady do not dictate a similar result when a district court is reviewing a state court decision. Recognition by a district court of the procedural default of a claim in state court is primarily justified by a respect for state procedural rules. So long as those procedural rules are generally afforded respect, the district court has not overstepped its boundaries in considering federal claims previously presented to the state court. By distinction, in a § 2255 habeas petition, there is no concern about respecting the decisions of the another sovereign body. Concerns over the propriety of allowing plain error habeas review of final federal court decisions involves such considerations as preventing a federal habeas court from becoming another appellate court (upsetting decisions of federal appellate courts), insuring the finality of judgments and developing, pragmatically, the structure of the federal courts system.[37]

Frady made much of the fact that a habeas petitioner under § 2255 had already had his or her federal claims, and, presumably, his or her plain error claims adjudicated in a federal forum. Id. at 164. In a § 2254 petition, a claimant will not yet have had federal adjudication of his or her federal claims. Concern about repetitious access to federal forums therefore does not exist in this aspect of the § 2254 habeas corpus setting.[38]

---

[37] Similar efficiency concerns guide state court limitations on review of other state court proceedings.

[38] Given the Supreme Court's recent jurisprudence on the "fundamental miscarriage of justice" as an exception to procedural default, there has been a minimal retreat on the unwillingness of the Supreme Court to allow § 2255 habeas petitioners to raise claims of "plain error." The federal plain error rule, FED. R. CRIM. PROC. 52(b), has been interpreted to allow Courts of Appeals in federal criminal prosecutions to review the record to correct "miscarriages of justice." United States v. Frady, 456 U.S. at 163. Using similar language in Smith v. Murray, 477 U.S. 517, 537-38 (1986), the Supreme Court recognized that a habeas court could examine a procedurally defaulted claim on the merits if not to would result in a "fundamental miscarriage of justice." However, the concept of a fundamental miscarriage of justice is merely a part of the concept of a plain error miscarriage of justice. In United States v. Olano, 507 U.S. 725, 736 (1993), the Supreme Court held that although a Court of Appeals could review an unaddressed issue on appeal from the District Court as plain error if a fundamental miscarriage of justice would result, its plain error review power is not "only warranted in cases of actual innocence." Nevertheless, the core of the plain error concept, that a miscarriage of justice might have occurred, is largely reflected in the fundamental miscarriage of justice exception to default of federal procedural rules. (Both are concerned with maintaining fairness and integrity in judicial proceedings.)

The respondent has also cited <u>Andrews v. Shulsen</u>, 802 F.2d 1256, 1262-63 (10th Cir. 1986), in support of its position that Alabama's plain error rule does not permit consideration of procedurally defaulted issues on a habeas review.  However, <u>Andrews</u> does not state that a claim which could have been addressed by a State appellate court under its plain error rule was nonetheless defaulted on collateral review in a federal habeas court.  The only mention of the plain error rule comes in the following sentence: "Furthermore, the [Utah Supreme Court] considers prejudicial errors which are neither assigned nor argued. . . ."  <u>Id</u>. at 1262.  Procedural default is mentioned in an entirely different section of the opinion, without reference to the issue of Utah's plain error rule. <u>Id</u>. at 1263.  It is difficult to see how this case compels the conclusion that a state's plain error rule has no effect upon whether a claim was defaulted for purposes of habeas review.

This court takes note of three other Court of Appeals opinions that apparently advance positions similar to that of the respondents, <u>McCown v. Callahan</u>, 726 F.2d 1 (1st Cir. 1984), <u>Julius v. Johnson</u>, 840 F.2d 1533 (11th Cir. 1988), <u>modified on other grounds</u>, 854 F.2d 400 (11th Cir. 1988), <u>cert</u>. <u>denied</u>, 488 U.S. 960 (1988) and <u>Kornahrens v. Evatt</u>, 66 F.3d 1350 (4th Cir., 1995).  In <u>McCown</u>, the First Circuit Court of Appeals stated:

> <u>Wainwright</u> [<u>v. Sykes</u>] holds that a defendant's failure to object to a claimed judicial error (even one of constitutional dimensions) at a state trial constitutes an adequate and independent state ground sufficient to uphold a conviction against the claim of "federal error" if at least 1) the state in fact has a "contemporaneous objection" rule;  2) the state enforces and does not waive the rule;  and 3) the defendant fails to show both "cause" for and "prejudice" from, not having complied with the rule.  Where these conditions are present, federal habeas courts typically will not reach the merits of the federal constitutional claim. <u>See Wainwright v. Sykes</u>, 433 U.S. at 87 [];  <u>cf.</u> <u>Francis v. Henderson</u>, 425 U.S. 536, 542 [] (1976) (discussing "cause" and "prejudice").
>
> Massachusetts has a "contemporaneous objection" rule. <u>Commonwealth v. Fluker</u>, 377 Mass. at 131, 385 N.E.2d at 261.  Petitioner shows no "cause" excusing his lack of objection.  Thus, the <u>Wainwright</u> issue here is whether Massachusetts "waived" its procedural rule.  After all, as the Supreme Court has pointed out, the purpose of the "adequate state ground" exception to habeas review is "to accord appropriate respect to the sovereignty of the States in our own federal system ....  [If the state courts do not] indicate that a federal constitutional claim is barred by some state procedural rule, a federal court implies no disrespect for the state by entertaining the claim." <u>Ulster County Court v. Allen</u>, 442 U.S. 140, 154 [] (1979).
>
> Petitioner seeks to find "waiver" in the fact that the Commonwealth courts

considered the substantive merits of his claim. The Supreme Judicial Court indeed discussed the merits of petitioner's claim, but it did so while applying a special standard of review for capital cases (contained in Mass. Gen. Laws Ann. ch. 278, S 33E)—a standard that allows it to overlook the lack of contemporaneous objection provided that there is a substantial likelihood that a miscarriage of justice has occurred. Commonwealth v. Tavares, 385 Mass. 140, 148, 430 N.E.2d 1198, 1203-04 (1982); see also Commonwealth v. Perry, 385 Mass. 639, 647, 433 N.E.2d 446, 452 (1982) (quoting Commonwealth v. Tavares, 385 Mass. at 148, 340 N.E.2d at 1203-04); Commonwealth v. Garcia, 379 Mass. 422, 439-40, 399 N.E.2d 460, 471 (1980) (quoting Commonwealth v. Roberts, 378 Mass. 116, 123, 389 N.E.2d 989, 994 (1979)) ("showing of grave prejudice or substantial likelihood that a 'miscarriage of justice has occurred'"); Commonwealth v. Roberts, 378 Mass. at 123, 389 N.E.2d at 994 (same). We have held that review by the Supreme Judicial Court under a "miscarriage of justice" standard does not automatically waive the state's "contemporaneous objection" rule, for in conducting the review the state court typically applies state, not federal, law. Gibson v. Butterworth, 693 F.2d 16, 17 (1st Cir.1982); Zeigler v. Callahan, 659 F.2d 254, 271 n. 11 (1st Cir.1981).

Underlying Gibson's holding is a practical fact: the Supreme Judicial Court, in conducting "miscarriage of justice" review, may not conduct the detailed examination of federal law and federal cases often necessary to decide a specific question of federal law; indeed, it need not do so as long as it determines that a "miscarriage of justice" is unlikely. If federal habeas courts were too ready to find that state "miscarriage of justice" review constitutes "waiver" of the state's procedural rules, the state either would have to convert what is often a speedy reviewing task into a full scale detailed examination of federal law or it would have to abandon "miscarriage of justice" review altogether. The latter alternative seems highly undesirable. The former conflicts with the theory of Wainwright. That is to say, a state's efforts to stop gross miscarriages of justice should not suddenly force it to grapple with complex federal issues that its procedural rules would otherwise lawfully bar. Thus, Gibson insists upon a fairly clear showing that the state waived its procedural objection. The Gibson court found no "waiver" despite the fact that the state and federal standards for resolving the substantive issue (challenges to instructions related to "reasonable doubt") were likely very similar, to the point where the Supreme Judicial Court had initially referred to a federal Supreme Court case in describing the standard. See Gibson v. Commonwealth, 377 Mass. 539, 542, 387 N.E.2d 123, 125 (1979).

Deciding whether or not we have "waiver" in the case before us is difficult because the case is borderline. On the one hand, petitioner finds support in a pre-Gibson case, Lussier v. Gunter, 552 F.2d 385 (1st Cir.), cert. denied, 434 U.S. 854 [] (1977), where this court found "waiver" when the Supreme Judicial Court, conducting a 33E-type review, said in a footnote that the trial judge's

> remark would raise serious questions as to the infringement of the defendant's Fifth Amendment right to remain silent, see Griffin v. California, 380 U.S. 609, 611[] (1965) ... were it not for that portion of the judge's charge [that explained fully about defendant's right not to testify].

Commonwealth v. Lussier, 364 Mass. 414, 424 n. 3, 305 N.E.2d 499, 506 n. 3 (1973). Certain facts of this case point towards Lussier's "waiver" conclusion. The Supreme Judicial Court here examined the two federal cases that petitioner cited to it. It also discussed the standard for resolving the "reasonable doubt" issue in language that could apply to either federal or state law.

On the other hand, the state court's references to federal rights and federal legal principles are less clear in this case than in Lussier. The Supreme Judicial Court's conclusion here clearly rests upon state cases that it cites. There is no indication that the court researched, examined in depth, or intended to rely upon, federal law in the area. We conclude that the circumstances here are too similar to those of Gibson for us to reach a different result. Applying Gibson, we believe the state courts did not "waive" the procedural defect. And, if Gibson applies, so does Wainwright, for petitioner has shown no "cause" for failing to object.

McCown v. Callahan, 724 F.2d at 3-4. In McCown, the "miscarriage of justice" rule was treated as a waiver of the contemporaneous objection requirement rather than as a part of a system of State procedural rules governing procedural default. Important to such treatment was the fact that review of otherwise defaulted claims under the "miscarriage of justice" rule could be exercised at the option of the Massachusetts Supreme Judicial Court. Id. at 3. Refusal to exercise the option to review for a miscarriage of justice would allow the procedural default of the petitioner to stand. However, exercise of that option would 'lift' the procedural bar. Thus, in some sense, by exercising the option to review, the Massachusetts Supreme Judicial Court could be said to have removed or "waived" any procedural default imposed by other procedural rules. Where the Massachusetts Supreme Judicial Court refused to exercise the option at all, it could not be said that the contemporaneous objection rule had been waived.

Further, in McCown, the issue addressed by the court was not whether a "miscarriage of justice" rule could render null the procedural default of the federal claim; it could. The issue that principally concerned the First Circuit Court of Appeals was whether the claim addressed by the State court under the "miscarriage of justice" rule was a state or federal law claim.[39] On that issue, the Court presumed the claim addressed on

---

[39] The issue was whether the state claim or the federal claim had been exhausted. If it was a state claim, then the federal claim had not been exhausted because it had not been presented to the state courts. Further, if it had not been exhausted, it could not be exhausted on the merits, and was, therefore, defaulted. If the claim addressed had been a federal claim, that claim would have been exhausted and the issue of procedural default would not have been raised.

the merits to have been a state claim absent a clear statement otherwise. In that respect, the holding of the case, that absent a clear statement or strong evidence that the state court was relying on federal law, the state court will be presumed to have relied on state law, id. at 4, is apparently no longer good law. In Michigan v. Long, 463 U.S. 1032, 1040-41 (1983), the Supreme Court held that in a case in which federal and state law discussion of an issue is intertwined, a federal court will be allowed to review the issue absent a clear and express statement that the basis for the state court's holding is state law. A procedural bar will not prevent habeas review of a federal claim where it is unclear whether the last court to hear the claim addressed the claim on the merits and it is unclear whether it was resolved on the basis of state or federal law. Harris v. Reed, 489 U.S. 255, 265 (1989); Caldwell v. Mississippi, 472 U.S. 320, 327 (1985).

The most pertinent case on the issue of the plain error rule under Alabama law is Julius v. Johnson, 840 F.2d 1533 (11th Cir. 1988). See, Weeks v. Jones, 26 F.3d 1030, 1046 (11th Cir. 1994)(reciting Julius's statement on Alabama's plain error rule). In discussing the relevance of Alabama's plain error rule to procedural default, the Eleventh Circuit Court of Appeals stated:

> The Alabama appellate courts are under a duty in capital cases to "notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has adversely affected a substantial right of the appellant." Ala. R. App. P. 45(a) (Alabama Court of Criminal Appeals), 39(k) (Alabama Supreme Court). In affirming Julius' conviction, the Alabama Court of Criminal Appeals stated that it had searched the record for prejudicial errors and had found none. 455 So.2d at 982. The Alabama Supreme Court made a similar finding in its opinion. 455 So.2d at 987.
> According to Julius, the state courts' statements that there were no plain errors at trial indicates their belief that the issues raised in this petition are meritless. Adoption of this position would preclude a finding of procedural default in virtually every Alabama capital case. Thus, Julius' argument questions the correctness of our decision in Magwood v. Smith, 791 F.2d 1438 (11th Cir.1986), where we held several of petitioner's claims to be barred by procedural default. Although the "plain error" issue was not discussed in Magwood, we note that the state appellate court opinion in that case contained the same language Julius points to in this case. See Magwood v. State, 426 So.2d 918, 928 (Ala. Crim. App. 1982) ("We have searched the record for error prejudicial to the rights of appellant and have found none."), aff'd, 426 So.2d 929 (Ala.), cert. denied, 462 U.S. 1124, [](1983).

Since <u>Magwood</u> was silent about the non-effect of Alabama's plain error rule on procedural default issues, we will be explicit: the <u>mere existence</u> of a "plain error" rule does not preclude a finding of procedural default; moreover, the assertion by an Alabama court that it did not find any errors upon its independent review of the record does not constitute a ruling on the merits of claims not raised in that court or in any court below. <u>Unless there is some indication that the state court was aware of this issue, we cannot say that the court rejected the merits of petitioner's constitutional claim.</u> A contrary rule would encourage the "sandbagging" of state courts criticized in <u>Wainwright v. Sykes,</u> 433 U.S. 72 [] (1977). <u>See Murray v. Carrier,</u> 477 U.S. 478 [] (1986) (possibility of "sandbagging" exists on appeal "since appellate counsel might well conclude that the best strategy is to select a few promising claims for airing on appeal, while reserving others for federal habeas review should the appeal be unsuccessful."). Accordingly, we reject Julius' argument.

<u>Julius v. Johnson</u>, 840 F.2d at 1546 (emphasis added). The Eleventh Circuit Court of Appeals did not entirely foreclose the option of a district court reviewing a claim on habeas that was the result of a plain error in the trial proceeding. What <u>Julius</u> did foreclose was an entire exemption to procedural default based upon failure to enter a contemporaneous objection at trial. Further, the Eleventh Circuit Court of Appeals held that procedural default was not waived where the state court found that no error existed on the face of the record. Only when the issue was one of which the Alabama appellate courts presumably were aware could the merits be addressed in a habeas setting. <u>Id.</u> Therefore, Alabama's plain error rule does not excuse every procedural default occurring in a case in which a death sentence is returned.

In <u>Kornahrens v. Evatt</u>, 66 F.3d 1350 (4th Cir. 1995), the Fourth Circuit Court of Appeals discussed <u>Julius</u> with respect to South Carolina's "practice of in favorem vitae (in favor of life) review of the record of death penalty cases." <u>Id.</u> at 1362. The Court stated that the Eleventh Circuit Court of Appeals

sounded concerns similar to those we have expressed . . . ; namely, that to review effectively a state-court judgment, we must be assured that the state court had an opportunity to confront the federal constitutional issue on the merits. Otherwise, our review would not be a "review" of the state court judgment, but rather would be another avenue of direct appeal.

<u>Id.</u> at 1363.

For a claim to have been procedurally defaulted, (1) it must not have been

exhausted on the merits in state court and (2) any future attempts to exhaust the claims on the merits would be procedurally barred. Thus, a claim exhausted on the merits cannot subsequently become procedurally defaulted. Further, a claim which could be exhausted on the merits in state court, but was not, is not procedurally defaulted, but is simply not exhausted. The primary concern with a plain error rule is whether a state (appellate or trial) court has "had the opportunity to confront the federal constitutional issue on the merits." Kornahrens v. Evatt, 66 F.3d at 1363. See also, Julius v. Johnson, 840 F.2d at 1546 (stating that limitations on the plain error rule are motivated primarily with a concern about "sandbagging" in the state courts). The issue then is not whether a valid federal claim is procedurally hindered from being addressed by the state court under the plain error rule; it clearly is not. The issue is whether the state courts even recognized or addressed the claim. Therefore, the problem with the plain error rule as a means of presenting a federal claim in a habeas court is not so much one of procedural default as it is one of exhaustion. It is only after a determination that a claim has not been exhausted through state court review that the issue of procedural default becomes relevant.

When a petitioner brings a claim in a habeas petition that he clearly failed to present to the state (trial or appellate) court, the habeas court is first to consider the claim (presumptively) exhausted. When a petitioner brings a claim in a habeas petition which might have been presented to a state court, the habeas court is to examine whether the issue was fairly before the state court for review, whether properly addressed by the state court or not. Smith v. Digmon, 434 U.S. 332, 333-34 (1978). If it was presented, the claim is exhausted. Id. In the plain error circumstance, although a claim brought in a habeas petition may not have been addressed by a state court, the issue remains open whether it was properly before the state appellate court for review. If so, then any such plain error claim is fully exhausted and properly before the federal habeas court for review.

A claim on which there existed plain error can be said to have been fairly presented to the state courts for purposes of exhaustion only if (1) not only the factual basis of the federal claim which constituted plain error on the trial court record would have been

apparent to the state courts but also the federal claim's legal grounds; and (2) the claim presented to the federal habeas court would be the same as the claim presented to the state courts.

For two reasons it would seem that the federal law basis for a claim presented as plain error would be before the state courts reviewing the claim. First, for purposes of determining whether an issue was resolved on a federal law or state law basis in the state courts, a federal court is to assume that the issue was resolved on the basis of federal law, absent a clear and express statement otherwise. Michigan v. Long, 463 U.S. at 1041. In the unaddressed plain error context, there will never be such a clear and express statement. Initially, this would indicate that federal law should be assumed to be the basis of the claim. However, this assumes, one, that a legal basis for the claim was (or could have been) found in the state courts; and, two, that, even if a such a legal basis was (or could have been) found, that the claim was decided on a mixed basis. Thus, this reason for contending that federal law was (or could have been) the legal basis for resolution of the plain error claim must be buttressed by a second reason.

Whether a claim is found under the plain error rule depends on whether a group of facts apparent on the record would cohere into a clear legal claim not through the efforts of an attorney offering a claim on appeal, but through the state court's recognition of a legal claim. Recognition of a claim requires not only notice of facts, but notice of the law that draws those facts together into a claim. The existence of a claim presented through plain error review will therefore implicate some law through which the facts of the claim are recognized as being elements of a claim.

Presumably, the law through which the claims are to be recognized in state court is state law. Alabama courts are primarily involved in applying and interpreting Alabama law. Thus, in reviewing the record for plain error we can assume that the Alabama courts are likely to use (or would have used) state law to make their decisions as to the existence of valid claims. Often, therefore, a determination (explicit or tacit) of the validity of a claim raised on a plain error basis will be done on adequate state law grounds, unreviewable by the federal habeas court.

However, some state law determinations implicate an interpretation of federal law. Federal constitutional law forms the floor of constitutional protection for individuals, beneath which state law protections cannot go.[40]  Thus, a state cannot interpret its constitutional law to provide protections less than those provided in the Federal Constitution. A state court construction of its constitution that potentially falls below the level of protection required by the Federal Constitution of necessity implies a narrow construction of federal law. Thus, the decision of a state court (explicitly or tacitly) denying a claim under its plain error review where such denial would be the result of a construction of state law that possibly falls below the level mandated by the Federal Constitution could be reviewed because the state court, of necessity, was required to consider the Federal Constitutional requirements and read those requirements narrowly. This is the second reason why, in some (albeit rare) cases, a federal claim which constituted plain error in the trial court can be considered fairly presented to the state courts, even though unaddressed. This explanation also bolsters the first reason, in that, in such instances, the federal law issues are intertwined with the state law issues that were (or should have been) resolved in the state courts.

The issue of whether a federal claim presented to a habeas court through a state's plain error rule could be said to have been the same claim before the state court is largely resolved by the plain error rule itself and the requirement that the plain error be in a claim requiring a construction of federal law. A plain error issue of this sort, will have been presented (as required under the Alabama rules of appellate procedure) to the state appellate courts in the first instance whether addressed or not. Claims not satisfying these requirements cannot be said to have been exhausted before the state courts, because they (likely) could not have been addressed under the plain error rule.

The Alabama Court of Criminal Appeals and the Alabama Supreme Court are both

---

[40] See, e.g., U.S. CONST. AMEND. XIV, Sect. 1 (1865):
No state shall make or enforce any law which shall abridge the privileges and immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

required to scan the record in death penalty cases for plain error. As such, any federal claim on which plain error appears in the record is properly before the appellate court for review. Neither Alabama appellate court is allowed to disregard a plain error because it is procedurally prohibited from reaching the merits of the issue. On this reasoning, there could be no procedural default on plain error federal claims that the appellate courts are required to examine.

However, other considerations exist to limit the ability of the habeas court to review any "startlingly" plain error that exists in the record. First, the language in Julius is constrictive: It requires that the reviewing appellate court have be actually aware that the claim exists. To the habeas court, this would be evidenced either through references to the claim or the record sections giving rise to the claim occurring in the brief of the defendant on appeal or through indications given by the appellate court in its opinion that it actually noticed the claim, whether or not the claim was actually resolved.

Where the federal claims raised in a petition for writ of habeas corpus could not have been considered on "plain error" review by the appellate courts of the state, those claims can not have been addressed on the merits by the appellate court of the state (absent some sort of express waiver like the one employed by the Massachusetts Supreme Judicial Court discussed in McCown v. Callahan, 724 F.2d at 3-4.) . These claims, therefore, would be barred from appellate review in the appellate courts and could not be presented for exhaustion on the merits in a later collateral proceeding. Procedural default would, therefore, deny the federal habeas court the authority to review those claims.

That the petitioner in the instant case was precluded from raising the "plain error" claims in the Alabama coram nobis proceeding may not be a bar to those claims being raised in the federal habeas court, as the respondent asserts.[41] There are three reasons for

---

[41] See Ex parte Hawk, 321 U.S. 114, 116 (1944):

Nebraska recognizes and employs the common law writ of error coram nobis which, in circumstances in which habeas corpus will not lie, may be used by the trail court as a remedy for infringement of constitutional right of the defendant in the course of trial, Carlsen v. State, 129 Neb. 84, 94-98, 261 N.M. 339. Until that remedy has been sought without avail we cannot say that petitioner's state remedies have been exhausted.

Id.

there being a question as to the application here: First, if the respondent's position on the procedural effect of Rule 20.2 preclusion rules is correct, not only would claims not before the Alabama Supreme Court for decision on direct review be defaulted, but <u>so would those claims actually attended to on the merits by the Alabama Supreme Court on direct review</u>.[42]

Second, preclusionary rules are not procedural bars. Preclusionary rules "maintain" the judgment of the last court to have heard or been presented with the issues, requiring courts of the same state to respect the determinations of law and fact made by other courts of the state. A petitioner cannot "default" on a preclusionary rule — the rule prevents <u>relitigation</u> of the determinations of the other state court regardless of the failure of a petitioner to take some action in a prior proceeding or in pressing for collateral review. Instead, because the state has advocated a policy against having claims already fully litigated revisited in another court and because the state seeks finality of judgment on all issues previously litigated, civil and criminal, it requires those other courts to abide by the conclusions and the reasoning of the prior court. It will only be where a preclusionary rule perpetuates the effect of an earlier procedural bar that a procedural bar will be had in a subsequent federal proceeding on a petition for writ of habeas corpus. Where no earlier procedural default exists, a preclusionary rule will perpetuate a determination (or a failure to make a determination) on the merits.

Finally, even if the preclusionary rules in Temporary Rule 20.2(a) were procedural bars, with only Rule 20.2(a)(4) governing claims on which the Alabama appellate court have ruled being excluded as not a procedural bar but as merely a preclusionary rule, as the respondents evidently attempt to do, this does not end the inquiry. Rule 20.2(a)(4) precludes review of claims "raised or addressed on appeal . . ." This statute would seem to contemplate claims before the appellate courts that were brought before the appellate court but were not addressed. Also, it does not, on its face, exclude claims raised of their own force, such as those raised through plain error review. This reading of Temporary

---

[42] No one contests that claims reviewed on the merits in the state courts (or properly before the state courts for review on the merits) are assailable on habeas review.

Rule 20.2(a)(4) appears to be in tune with Alabama law on the subject as well. In State v. Freeman, 605 So.2d 1258 (Ala. Ct. Crim. App. 1992), the state insisted that a claim that, if noticed, would have been a plain error was precluded from review under Rules 32.2(a)(3) or (5). Id. At 1259. However, the Alabama Court of Criminal Appeals, reviewing the claim, found that it would have been resolved as a plain error issue on the merits, had it been on the record, and in the end, resolved the issue as being not barred under Rule 32.2(a)(4)&(5). Id.

By contrast, there is the case of Brownlee v. State, 666 So.2d 91, 97 (Ala. Crim. App. 1995), in which a claim that a witness at trial had not been sworn was raised. The Alabama Court of Criminal Appeals concluded that the failure of appellant to assert the claim on direct appeal precluded him from obtaining relief on it in a collateral petition under Rule 32.2(a)(3) and (5). Id. at 97. This claim would well have been "plain error" on the face of the record. But, in that case, no issue was raised as to whether the failure to swear in the witness was, in fact, plain error. In fact, the only comment by the Court of Criminal Appeals on the issue concluded that a failure of the defendant to object to the failure to swear in the witness was that the failure to object waived the requirement that the witness be sworn, not that it violated a contemporaneous objection rule that could only be overcome through a "plain error" analysis. Id. at 97 (citing Schut v. State, 548 So.2d 638, 639-40 (Ala. Crim. App. 1989) (holding that, as with other claims that a witness does not have the capacity to testify, failure to object to the witness because of incapacity waives the impediment of incapacity)).[43]  For these reasons, the Magistrate's conclusion that preclusion under Rule 20.2(a)(3)&(5) is the source of any bar to the present claims is likely incorrect.

This court must now investigate each of the petitioner's claims that were raised in the Rule 20 hearing to determine if any of them would have constituted a plain error (under Alabama law), noticed by or presented to the appellate court, the resolution of

---

[43] As the Supreme Court has noted, waiver is different from forfeiture of a right.  United States v. Olano, 507 U.S. 725, 733 (1993).  "Whereas forfeiture is the failure to make timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" Id.

which would necessarily involve a construction of federal law.

## 1. On the Petitioner's Argument that Pre-Trial Publicity Necessitated a Change of Venue.

The petitioner claims that the denial of a change of venue based upon pre-trial publicity violated his rights to a fair trial. In reviewing this claim, the Magistrate found that it had been procedurally defaulted in the state court, because the petitioner's attorney failed to object to the denial of his motion for a change of venue at trial. In addition, the Magistrate found that, even had the claim been properly preserved, the pre-trial publicity was not so pervasive as to deprive the petitioner of his right to a fair trial. The petitioner disputes the Magistrate's finding, stating that voir dire of the potential jurors "revealed that they had been excessively exposed to pre-trial publicity adverse to Petitioner. . . ." Petitioner's Objections to Magistrate Judge's Report and Recommendation at 11.

This court does not agree that the petitioner's pre-trial publicity claim is procedurally defaulted because of Mr. Appell's failure to object to denial of the motion at trial. Although not presented by the Mr. Appell, the claim was noticed by (though not resolved by) the Alabama Court of Criminal Appeals on direct review of the petitioner's conviction. Duren v. State, 507 So.2d 111, 119 (Ala. Crim. App. 1986). However, although the petitioner's claim is of the type that would constitute plain error under Alabama law such as to avoid procedural default, no constitutional error exists.

In announcing how to evaluate plain error under Alabama law, the Alabama Supreme Court has said:

> "'The Alabama Supreme Court has adopted federal case law defining plain error, holding that '"[p]lain error' only arises if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings," Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986 [] (1983) (quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir.1981)).'
> "Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, [507] U.S. [925] [] (1993). '[T]he plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."' United States v. Young, 470 U.S. 1, 15 [] (1985), quoting United States v. Frady, 456 U.S. 152, 163 [] (1982). To find plain

> error, an appellate court must find that 'the claimed error not only
> seriously affected "substantial rights," but that it had an unfair prejudicial
> impact on the jury's deliberations.' Young, 470 U.S. at 18 []."
> George v. State, [Ms. CR-94-0387, April 19, 1996] --- So.2d ----, ---- (Ala.Cr.App.
> 1996).

Ivery v. State, 686 So.2d 495, 500 (Ala. Crim. App. 1996). Therefore, in determining

whether a claim is plain error under Alabama law, we look to interpretation of Federal

Rule of Criminal Procedure 52(b), the federal plain error rule. In United States v. Olano,

507 U.S. 725 (1993), the Court stated that to review a claim as plain error,

> There must be an "error" that is "plain" and that "affect[s] substantial rights."
> Moreover, Rule 52(b) leaves the decision to correct the forfeited error within the
> sound discretion of the court of appeals, and the court should not exercise that
> discretion unless the error "'seriously affect[s] the fairness, integrity or public
> reputation of judicial proceedings.'" United States v. Young, 470 U.S. 1, 15 []
> (1985) (quoting United States v. Atkinson, 297 U.S. 157, 160 [] (1936)).

Id. at 732. Following Olano, the Eleventh Circuit Court of Appeals has stated factors that

must be proven before a claim not raised at trial can be the basis for reversal of a

conviction:

> The Court held that the defendant seeking a reversal for plain error must establish
> (1) an error, (2) which was plain, and (3) which affected "substantial rights." Even
> if these requirements are met, the reviewing court is left with discretion to correct
> the error, and should not correct the error unless it seriously affects the fairness,
> integrity or public reputation of judicial proceedings.

United States v. DeCastro, 104 F.3d 1289, 1294 (11th Cir. 1997) (footnotes omitted). In

Olano, the Court stated, "The first limitation on appellate authority under Rule 52(b) is

that there indeed be an 'error.'" Olano, 507 U.S. at 732. An error is a decision by a court

that violates an unwaived legal rule. Id.[44] Next, the reviewing court must find that the

error is "plain." A plain error is one that is "'clear' or, equivalently, 'obvious.'" Olano,

507 U.S. at 734 (citations omitted).

Courts have treated the determination of whether an error is plain, clear or obvious

in both an objective and subjective manner. Utilizing an objective test for plain error,

---

[44] The court notes that the rule arguably violated must be a state created rule which covers the
claim necessarily because of the construction of federal law. See, supra at ___. Stripped of its trappings,
this means that the rule violated must be the result of a required construction of federal law.

Courts of Appeals have held an error to be plain if the legal rule violated either was clearly
in existence at the time the rule was violated or was mandated by other precedent
interpreting federal law in the Supreme Court, Circuit Court of Appeals or Supreme Court
of the state in whose courts the defendant was convicted.  See, United States v. Gaudin, 28
F.3d 943, 952 (9th Cir.. 1994).  This test for "plainness" or "obviousness" of error has
been extended such that an error is objectively plain if it became law while on direct
appeal.  See, United States v. Kramer, 73 F.3d 1067, 1074 n.16 (11th Cir. 1996).  At the
same time, the Eleventh Circuit Court of Appeals has been willing to treat the requirement
that error be plain as a subjective determination:

> We agree with the government that Rickard's failure throughout the trial to argue
> even indirectly the basis he now asserts for the statements' admission, despite
> repeated opportunities to do so, indicates that the error, if any, is not plain.  This
> is not a situation where, due to lack of attention or the pace of events, ground was
> skipped over.  Instead, Rickard's counsel focused considerable energy on getting
> King's post-arrest statements into evidence, and in her arguments to the district
> court she thoroughly plowed the ground for admissibility, but did not raise the
> basis she now asserts.  The district court heard from counsel before trial, correctly
> rejected every basis of admissibility she argued, invited her to return to the matter
> as it arose during the trial, heard from her again, and again correctly rejected every
> proffered basis for admissibility. If the error in not admitting the hearsay
> statements had been "plain," as the plain error rule requires, then Rickard's
> counsel, who is quite experienced in federal criminal defense work, and who
> focused at some length upon the matter, would have recognized the basis for
> admissibility and brought it to the attention of the district court.  She did not.  To
> apply the plain error exception to the contemporaneous objection rule in such
> circumstances would lead to the exception swallowing the rule, much to the
> detriment of the important values protected by the rule. Accordingly, we hold that
> the district court did not commit plain error in refusing to admit the statements.

United States v. King, 73 F.3d F.3d 1564, 1572 (11th Cir. 1996).  The case announces a
subjective standard: An error is not clear if the attorney, who is skilled in the practice of
criminal law, could have objected to the error, but did not do so.  It is not apparent how
this subjective prong of the "plainness" analysis is to interact with the objective prong.[45]
The court will treat each test as providing sufficient criteria; error is to be considered plain

---

[45] This may be an example of an explication that sinks the rule.  The plain error rule was perhaps
meant to overcome procedural mishaps like these when it was plain error to the court (not plain error to a
similarly placed competent attorney) that the substantial rights of the defendant had been neglected.

if it meets either prong of the analysis.

Third, the reviewing court must find that the error affects the substantial rights of the defendant. Normally, the phrase "affecting substantial rights" means nothing more than "that the error must have been prejudicial:  It must have affected the outcome of the district court proceedings." Olano, 507 U.S. at 735.  Prejudice is demonstrated if the error "'had substantial or injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  The Alabama Court of Criminal Appeals has also indicated that "[a]lthough the failure to object does not preclude review in a capital case, such failure weighs against any claim of prejudice." Dill v. State, 600 So.2d 343, 352 (Ala. Crim. App. 1991).

Finally, the Supreme Court announced a standard by which a court is to determine if it should exercise its discretion to overturn plain error:

> [T]he standard that should guide the exercise of remedial discretion under Rule 52(b) was articulated in United States v. Atkinson, 297 U.S. 157[] (1936).  The Court of Appeals should correct a plain forfeited error affecting substantial rights if the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Id., at 160 [].  As we explained in Young, the "standard laid down in United States v. Atkinson [was] codified in Federal Rule of Criminal Procedure 52(b)," 470 U.S., at 7 [], and we repeatedly have quoted the Atkinson language in describing plain-error review, see id., at 15 []; Frady, 456 U.S., at 163, n. 13 []; Silber v. United States, 370 U.S. 717, 718[] (1962) (per curiam); Johnson v. United States, 318 U.S. 189, 200 [] (1943); United States v. Socony-Vacuum Oil Co., 310 U.S. 150 [] (1940);  see also Connor v. Finch, 431 U.S. 407, 421, n. 19 [](1977) (civil appeal).  An error may "seriously affect the fairness, integrity or public reputation of judicial proceedings" independent of the defendant's innocence.  Conversely, a plain error affecting substantial rights does not, without more, satisfy the Atkinson standard, for otherwise the discretion afforded by Rule 52(b) would be illusory.

United States v. Olano, 725 U.S. at 736; See Dill v. State, 600 So.2d at 352.[46]

The claim is, however, devoid of merit.  The petitioner could have negated any effects of pre-trial publicity by weeding out those prejudiced jurors during voir dire.

---

[46] The court also notes that because of the petitioner's ineffective representation on this issue, cause and prejudice would also be a source of over coming any procedural default.

**2. On the Petitioner's Claims that the Introduction of Graphic Slides and Photographs Resulted in an Unfair Trial in Violation of the Due Process Clause.**

The petitioner claims that the introduction of autopsy slides prepared by the coroner and of six photographs of the victim's body taken at the scene of the shooting resulted in a fundamentally unfair trial. After determining the claim to be defaulted, the Magistrate disagreed on the merits, stating that federal courts are only empowered to correct the erroneous admission of evidence at a state criminal trial if the error in the ruling on the matter of evidence renders the trial fundamentally unfair. It is unclear whether the Court of Criminal Appeals, reviewing the Rule 20 Court, found the claim procedurally defaulted or whether it addressed the claim substantively. Ex parte Duren, 590 So.2d 360, 366-68 (Ala. Crim App. 1990).[47] However, this court need not address the procedural default issue because the claim is invalid on the merits. Because evidence properly admitted under state law cannot be considered fundamentally unfair and because the slides and photographs were properly admitted under Alabama law with the express consent of defense counsel, they did not violate the Due Process rights of the petitioner.

**3. On the Argument that Closing Remarks Made by the Prosecuting Attorney at the Guilt Phase and Sentencing Phase of Trial Deprived the Petitioner of a Fair Trial.**

The petitioner claims that closing remarks made by the prosecutor at both the guilt stage of trial and at the sentencing stage rendered his trial fundamentally unfair. As with the petitioner's claim regarding the introduction of slides and photographs, it is unclear whether the Alabama Court of Criminal Appeals, in its opinion adopted by the Alabama Supreme Court reviewing the Rule 20 Court's decision, found the claim to have been procedurally defaulted or whether it addressed the claim on the merits. The Magistrate found that the petitioner's claim was procedurally defaulted and meritless. The petitioner objects, stating that the following comments were improper:

1.     At the guilt stage,

---

[47] The Alabama Supreme Court adopted the Court of Criminal Appeals opinion on this subject. Ex parte Duren, 590 So.2d 369, 375 (Ala. 1991).

  a.  remarks that the only reason that Mr. Duren would
     have kept Ms. Bedsole alive would be to use her
     sexually;

  b.  comments that the jury would be responsible for future
     murders by Mr. Duren or others like him if it rendered
     a sentence other than death;

  c.  comments on the victim's character and on the impact
     of Ms. Bedsole's killing on her family; and

  d.  remarks encouraging vigilantism.

2.  At the sentencing stage,

  a.  comments that the jury would be responsible for future
     murders by Mr. Duren or others like him if it rendered
     a sentence other than death;

  b.  remarks that the only reason that Mr. Duren would
     have kept Ms. Bedsole alive would be to use her
     sexually;

  c.  comments on the impact of Ms. Bedsole's killing on her
     family; and,

  d.  comments that announcing a death sentence would be
     akin to stopping the very crime that Mr. Duren
     committed, thereby encouraging vigilantism.

*i. Comments Made During the Guilt Phase.*

  *a. The Prosecutor's Comment that Mr. Duren's Sole Motivation for Keeping Ms. Bedsole Alive Would Be to Use Her Sexually.*

  During closing argument at the guilt stage of the petitioner's trial, the prosecutor said the following in rebuttal to Mr. Appell's closing argument that the petitioner did not intend to kill Ms. Bedsole:

> But, if it were so [that intending to shoot another person instead of the one shot obviated the intent requirement of murder], if he didn't intentionally kill you like Mr. Appell said, you have to use your common sense. And if he is going to kill one person because they went out there and robbed somebody or just attempted robbery, not robbed, and took a car and is afraid of one person being a witness to that, then for goodness sakes, what makes sense about him not killing the second witness?
> And if it were and if you say that at all, that she was unintentionally killed,

> it was only for that time. <u>Because the only reason they would not have taken her life at that time is to use her sexually.</u> If there was any mistake — but why would you want to get rid of half of your witnesses and leave the other half to tell about not only the aborted robbery, the attempted robbery, and the theft of the car but tell about the new one, the murder?  Does that make any sense to you?

DAR at 527-28 (emphasis added).  The Magistrate found the comment permissible, asserting:

> [J]uries are not so pliable or unthinking that they take to heart everything they hear in a courtroom.  "[S]tatements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict."  <u>Bankhead v. State</u>, 585 So.2d 97 (Ala. Crim. App. 1989).  In judging the prosecutor's statements to the jury, the standard is whether his argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986).  Additionally, the prosecutor in opening statement told the jury that nothing he said was evidence.

R&R at 23-24.

### b. Remarks That the Jury Would Be Responsible for Future Murders by Duren or Others Like Him If It Returned a Not Guilty Verdict

At the guilt stage of trial, the prosecutor made the following remark:

> Use my life for something, to save other lives.  And if you will give the proper punishment on this occasion, it will save other lives. . . .

DAR at 537.  The Magistrate found the comment not to have resulted in a fundamentally unfair trial, stating that "it is proper for a prosecutor to urge the sentencing authority to consider deterrence in sentencing deliberations; the sentencer properly acts as 'the conscience of the community.'  Moreover, the court instructed the jury as to the law on the consideration of deterrence in sentencing."  R&R at 26-27 (citations omitted).

### c. Allegedly Inappropriate Comments on the Victim's Character and Comments on the Impact of the Victim's Death on Her Family.

In commenting on the victim's character at the guilt phase of the petitioner's trial, the prosecutor said:

> And you saw that pretty girl after she was washed up.  She didn't look that pretty

with the first photographs we passed around but you saw her on that screen. What a doll.

DAR at 526-27. The prosecutor also made the following observations on the impact of Ms. Bedsole's death on her family:

> She is a minus to her daddy. She is a minus to her mother. She is a minus to her sister. She is a minus to her friends and neighbors. . . .
>
> Picture, if you will, a chair, an empty chair around some dining room table that Christmas and the Christmas after. A lot of families and a lot of homes and it's empty, the place for a little daughter. And the family, somebody the family, sister saying Mama, I wish Kathy were here. Some of the family. And the mama having to say, that's all right Sis. There was a jury back in Birmingham on March the 8[th] that gave the stamp of approval to this and we have to go by that. Otherwise, your sister would be here today.[48]

DAR at 537.

In deciding that these statements and others by the prosecution were permissible, the Magistrate stated:

> With respect to the prosecutor's comments concerning Kathy Bedsole's looks and the impact of her death on the members of her family, the petitioner does not assert that victim impact arguments per se are unconstitutional, but that those remarks unconstitutionally inflamed the emotions of the jury to the extent that the verdict returned was not a fair verdict, that the verdict was unduly influenced by the jury's inflamed emotions. Booth v. Maryland, 482 U.S. 496 (1987) held that only the defendant's blameworthiness was relevant to the capital sentencing decision, and therefore evidence of the personal characteristics of the victim and the emotional impact on the victim's family should not be considered, and South Carolina v. Gaithers, 490 U.S. 805 (1989) held that a prosecutor may not make comment[s] on such matters. In Payne v. Tennessee, 501 U.S. 808, 830 (1991), however, the United States Supreme Court held that Booth and Gaithers had been wrongly decided and overruled them. The Payne Court held that the Eighth Amendment did not bar consideration of victim impact evidence in sentencing, and that, if such evidence in a particular case was so unduly prejudicial that the trial was rendered fundamentally unfair, the due process clause of the Fourteenth Amendment would afford relief. It is opined that these remarks did not violate the Fourteenth Amendment.

R&R at 27-28.

---

[48] This comment could also be treated as a request for the jury to either engage in vigilantism or to render its verdict as a deterrent. On this matter, the comment will be discussed in part i.d., infra.

### d. *Remarks Made Allegedly Encouraging Vigilantism.*

The remarks of which the petitioner complains are produced above at *i.c.* In determining the claim without merit, the Magistrate stated that the comments were not meant to encourage vigilantism, but instead were part of a deterrence argument, permissible under the due process clause.

### ii. *Comments Made by the Prosecuting Attorney at the Sentencing Phase.*

The court will initially treat each remark separately and then will treat them together to determine if, as a whole, the remarks deprived the petitioner of due process at the sentencing.

### a. *Comments that the Jury Would Be Responsible for Future Murders by Duren or Others Like Him.*

At sentencing, the prosecutor made the following remarks:

> He told you that was the law. His law? No. My law? No. Whose law? Yours, yours, yours and yours and yours, yours, yours, yours, yours, yours, yours. You have said it deterred. That's when I put the empty chair out there. Because what deter means is the proper punishment for a heinous crime such as this death. It would mean a lot of little sixteen year old girls will not be put to their death early in life when somebody is on a lark.

DAR at 670. Later, the prosecutor said:

> Now, what do you say to the future Kathy Bedsoles, like I put that chair up there today? Leave the other Kathy Bedsoles? Leave those chairs empty and say, well, well, on March the 8th now, somebody cried for him and he asked for leniency so we went lenient and you future Kathy Bedsoles will be future Kathy Bedsoles and your lives will be taken because we didn't have the guts or the fortitude to take a full step.
>
> I'm laying it on the line. You may not like me for it but that's exactly what your law says, the law you made, because it says it does deter and it says there will be those empty chairs because this jury took a-half step and failed to give the proper sentence or the proper punishment.

DAR at 673-74. Soon after, the prosecutor returned to this theme:

> You saw that child on that scene. And I say again and I hate to repeat but she wants to become a positive. She says let other little girls like me live and your law, Mr. and Mrs. Adult, says that if you get my killer and do right and give him

the ultimate punishment, then some little girls like me are going to go through those nice things that I never lived through.

DAR 676. Finally, the prosecutor commented:

See, used to, years ago, on ships if a shipper did wrong they flogged him on shipboard and maybe everybody attended so it would be a lesson to deter others. That's the reason they did it. They didn't want to see this man kill back. They wanted to deter mutiny or whatever. Years later, they used to hang people in the square so that people could see, but we became more sophisticated. We had newspapers to come along and then radio and then TV and then the word gets out.

You believe me, the word gets out. You believe me, that the voice of this jury is going to be heard as far as our newspapers carry it. As far as our TV carries it, it's going to be heard and it's going to deter if it's proper. That's a promise.

DAR at 676-77. The Magistrate found that these comments did not render the petitioner's trial fundamentally unfair, reasoning that deterrence is a proper argument at sentencing.

*b. Assertion that the Only Reason Mr. Duren Would Have Kept the Petitioner Alive Was to Use Her Sexually.*

The prosecution, arguing that Mr. Duren's alleged lack of intent to kill Ms. Bedsole was not an excuse for mercy stated:

If he wanted to save her life, he wouldn't have had them tied together. If he wanted to save her life, as I said earlier in the other argument, it would have been just temporarily, just temporarily to use her sexually.

DAR at 677. As stated above in section *i.a.*, the Magistrate found the words to have been uttered in the heat of debate and not to have so infected the trial as to have rendered it fundamentally unfair.

*c. Comments on the Impact of Victim's Death on Her Family.*

The prosecution made the following comments to the jury concerning the result of the victim's death on her family:

There is a real victim. There's the parents of the victim who will never see their child again and never see her go through all of the grand things that children go through from a parent's eye. Graduation, prom, engagement, college, graduation, another one, marriage, grandchildren. They are the victims and so are

the parents and the aunt of the defendants.

DAR at 673.  Later, the prosecution remarked:

> I told you before that she was a negative statistic.  She wasn't during her life but she is in death.  Her family misses her.

DAR at 676.  The Magistrate found these comments not to have infected the trial with

unconstitutional error.  See, infra, at *i.c.*

### d. Statements that Sentencing the Petitioner to the Death Penalty Would Be Akin to Stopping the Crime that Mr. Duren Committed.

The prosecuted engaged the jury in the following scenario in his closing remarks:

> Now, I want you to go back in your mind and ask yourself, where was I on October 20[th], October 21[st], early morning?  Probably in the bed, sleeping well.  Might have fallen asleep with the TV on, got irritated because I left it on and they started to play the Star Spangled Banner, and they always played that louder and woke you up.  And you never thought what was happening to Kathy, did you?  No, you didn't know.
>
> While you were going through that, she was being driven around in an automobile, tortured and ultimately killed for somebody just being on a lark.  And except for the grace of God there go I because anybody that they had run onto on that night was subject to being tied up and killed.  I don't care who it was.  They said they were looking.  This wasn't the first place they looked.  Anybody.
>
> Now, suppose that you have gotten up that night and you happened to be on Peggy Lee Lane and you came upon that scene where that man had that gun and he was about to raise it to the head of Kathy and Chuck and/or Chuck and he was about to pull the trigger and you had the means to do something about it, what would you have done?  You would have taken his life before you would have let him take Kathy's life, wouldn't you?
>
> If you came upon that scene, you would take his life just as quick as you would have stepped on a roach (indicating) to keep that from happening to that little girl.  Is there one of you that wouldn't have done that?  That if you had the means — I don't mean that you would have gone out there barehanded and undertook to fight two men.  You would have just ended up dead.  But if you had a means by stopping that, by taking his life, he who had the gun, you would.
>
> And the law says you do that very thing when you take his life now.

DAR 674-76.  The Magistrate stated that, on the merits, the petitioner failed to state a

claim:

> The petitioner argues that telling the jurors that if they had been present and had the means to kill Duren in order to prevent him from killing Kathy Bedsole they would have done so, and then immediately telling them that they can "do that very thing when you take [Duren's] life now," was not a deterrence

argument, but an invitation for the jury to engage in "vigilantism." Vigilantism, however, is the taking of the law into one's hands. Outside of a deterrence context, these comments would not make sense, but they were made in the midst of the prosecutor's deterrence argument and should be regarded as such. It is opined that the prosecutor's somewhat cryptic language was not unconstitutional.

The comments of the prosecutor are deeply troubling. However, the court cannot address this claim of the petitioner unless the error was either not procedurally defaulted or the procedural default is overcome by a showing of cause and prejudice. This court initially notes that no contemporaneous objection to the comments were lodged at trial and that on direct review the Alabama Court of Criminal Appeals could only have recognized this claim through exercising its obligation to engage in plain error review of the record.

The Alabama Court of Criminal Appeals did discuss the claim substantively on the appeal from the Rule 20 Court, going beyond the ineffective assistance of counsel claim to state that it "cannot say that these comments deprived the appellant of a fair trial." A procedural bar will not prevent habeas review of a federal claim where the last appellate court authorized by state law to hear the claim decided it on its merits, Ulster County Court v. Allen, 442 U.S. 140, 152-54 (1979), or where it is unclear whether the claim was resolved on a procedural basis or on the merits. Harris v. Reed, 489 U.S. 255, 265 (1989); Caldwell v. Mississippi, 472 U.S. 320, 327 (1985). Further, where the resolution of a federal claim by a state appellate court involves primarily a discussion of the merits of the claim, the state appellate court must provide a clear and express statement that its resolution of the claim is based upon the procedural default, if it is to be barred from review in the district court. Coleman v. Thompson, 501 U.S. 722, 735 (1991). The court will therefore address the petitioner's claim on the merits.

In adjudging comments of a prosecutor improper,

> it "is not enough that the prosecutors' remarks were undesirable or even universally condemned." Darden v. Wainwright, 699 F.2d, at 1036. The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637 [] (1974). Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is "the narrow one of due process, and not the broad exercise of supervisory power." Id., at 642 [].

Darden v. Wainwright, 477 U.S. 168, 181 (1986). In Darden, the prosecutor commented that the defendant was an "animal," that the prosecutor wished that the defendant had had his head "blown off" and that the defendant had done everything to change his appearance but "cut his throat." Id. at 181 n.11&12. In finding the defendant's trial not to have been infected with unfairness, the Supreme Court stated:

> Under this standard of review, we agree with the reasoning of every court to consider these comments that they did not deprive petitioner of a fair trial. The prosecutors' argument did not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent. See Darden v. Wainwright, 513 F.Supp., at 958. Much of the objectionable content was invited by or was responsive to the opening summation of the defense. As we explained in United States v. Young, 470 U.S. 1 [] (1985), the idea of "invited response" is used not to excuse improper comments, but to determine their effect on the trial as a whole. Id., at 13, 105 S.Ct., at 1045. The trial court instructed the jurors several times that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence. The weight of the evidence against petitioner was heavy; the "overwhelming eyewitness and circumstantial evidence to support a finding of guilt on all charges," 329 So.2d, at 291, reduced the likelihood that the jury's decision was influenced by argument. Finally, defense counsel made the tactical decision not to present any witness other than petitioner. This decision not only permitted them to give their summation prior to the prosecution's closing argument, but also gave them the opportunity to make a final rebuttal argument. Defense counsel were able to use the opportunity for rebuttal very effectively, turning much of the prosecutors' closing argument against them by placing many of the prosecutors' comments and actions in a light that was more likely to engender strong disapproval than result in inflamed passions against petitioner. For these reasons, we agree with the District Court below that "Darden's trial was not perfect--few are--but neither was it fundamentally unfair." 513 F.Supp., at 958.

Id. at 181-83. Here, the prosecutor merely speculated in order to proclaim that the defendant's only motivation not to kill Ms. Bedsole was to use her sexually. The jury knew that it was mere argument and not a comment on the evidence. For this reason, the court finds that the petitioner's sentencing hearing before the jury was not rendered fundamentally unfair by the prosecutor's comments.

**4. On the Argument that the Trial Court and the Alabama Court of Criminal Appeals Failed to Make a Proper Proportionality Finding.**

The Magistrate recommended that the petitioner's claim that the trial court failed to make an explicit proportionality finding be denied, due to procedural default. The petitioner agrees. Therefore, the Magistrate's recommendation with respect to the claim will be accepted. The Magistrate also determined the petitioner's claim that the Alabama Court of Criminal Appeals unconstitutionally failed to render a proper proportionality review to be defaulted and, in the alternative, meritless. The petitioner objects to this finding.

The court first notes that this claim was not procedurally defaulted. The petitioner could not have raised the claim on direct review, as it is the reviewing court that is to raise and consider the issue itself. Also, when the petitioner could raise the issue in his Rule 20 petition, he did so. The claim is exhausted and not barred.

On the initial appeal from the ruling of the conviction, the Alabama Court of Criminal Appeals remanded the case back to the trial judge:

> In reviewing the propriety of the defendant's death sentence, our consideration of the questions required by § 13A-5-53 is severely hampered by the failure of the trial court to "enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in section 13A-5-49, each mitigating circumstance enumerated in section 13A-5-51, and any additional mitigating circumstances offered pursuant to section 13A-5-52." § 13A-5-47(d). "Without knowing what the trial judge did, we are unable to properly review his sentencing decision." Ex parte Cochran, 500 So.2d 1179 (Ala.1985).
>
> This cause is remanded to Jefferson County Circuit Judge James S. Garrett with directions that he enter specific written findings concerning the existence or nonexistence of the aggravating and mitigating circumstances based upon the evidence presented at trial, the evidence presented during the sentence hearing, and the presentence investigation report and any evidence submitted in connection with it as directed and required by § 13A-5-47(d). Those findings shall be sent to this Court for review.
>
> The judgment of the circuit court is remanded with directions.

Ex Parte Duren, 507 So.2d 111, 120-21 (Ala. Crim. App. 1986). The trial judge then made the following findings:

> This court finds as an aggravating circumstance the component portions of the capital offense wherein the victim, Kathy Bedsole, was intentionally killed during the course of committing or attempting to commit robbery or kidnapping [sic]. . . .
>
> The aggravating circumstance that has been found which is discussed above is found beyond a reasonable doubt. This aggravating circumstance is the only

circumstance in aggravation considered against the defendant, David Duren. . . .

Duren has no significant history of prior criminal activity. However, the Court is cognizant that on the occasion that this crime occurred that the defendant while the victim was in the trunk of the car attempted to rob a fast-food restaurant but was thwarted in his effort. This was not considered by the Court as an aggravating circumstance or a lack of mitigating circumstance, but the Court wishes to apprise the Appellate Court that the sentencing Court was aware that this circumstance did exist. The totality of the circumstances caused the Court to find that mitigating circumstance under 13A-5-51(1) is present in this case. [The trial judge found no other mitigating factors to have been present.]

After consideration of all the matters that were presented to this Court through the transcript of the trial proceedings and the sentencing hearing before the Court, both in mitigation and by aggravation, taking into consideration all other matters that were properly before this Court as herein above stated in this order and disregarding pleas or references to the Court to consider the sentence on the basis of passion and prejudice, the Court does find and is convinced beyond a reasonable doubt and to a moral certainty that the aggravating circumstance outweighs the mitigating circumstances and is sufficient to uphold the jury's recommendation of punishment at death.

DAR Supplement at 3-5. On return, the Alabama Court of Criminal Appeals stated:

On remand, the trial judge fully complied with the directions of this Court and entered specific written findings concerning the existence or nonexistence of the aggravating and mitigating circumstances.

Our review convinces us that the defendant was fairly and properly convicted of the capital offense charged and sentenced to death. The judgment and sentence of the circuit court are affirmed.

Ex Parte Duren, 507 So.2d at 121. During none of these reviews of the petitioner's sentence was an explicit proportionality review performed.

The petitioner contends that because the Court of Criminal Appeals failed to determine whether in other crimes similar to the one for which the defendant was found guilty, the death penalty was regularly applied, the death sentence was applied to him unconstitutionally. The Magistrate considered this claim, first, to be a claim stating a deprivation of due process under the Fourteenth Amendment because the state law procedures were not performed. Rightly, the Magistrate seems to have concluded that there is no due process clause violation for a deprivation of a state-created procedure. Second, the Magistrate noted that because the claim is that the state failed to apply its own procedures, it is a state law claim, not addressable on habeas review:

Generally, a state court's interpretation or application of its own laws is not

reviewable by a federal court. The Eleventh Circuit has stated:

> "In a federal habeas corpus proceeding, a federal court is bound by the
> state court's interpretation of a state criminal statute." Bronstein v.
> Wainwright, 646 F.2d 1048, 1050 (5th Cir. Unit B, 1981). Here, the
> federal district court, citing state appellate decisions, held that the
> interpretation of state law pressed by the state and already upheld by a
> state appellate court was wrong. Even if the state appellate court on
> Garcia's direct appeal misinterpreted Florida's law, "[w]e cannot treat a
> mere error of state law . . . as a denial of due process; otherwise, every
> erroneous decision by a state court on state law would come here as a
> federal constitutional question." Gryger v. Burke, 334 U.S. 728, 731 []
> (1948). "[A] state's interpretation of its own laws provides no basis for
> federal habeas relief since no question of a constitutional nature is
> involved." Beverly v. Jones, 854 F.2d 412, 416 (11th Cir. 1988).

Garcia v. Perringer, 878 F.2d 360, 362 (11th Cir. 1989); Jackson v. Ylst, 921 F.2d
882 (9th Cir. 1990). A failure of a state court to follow its own rules will support
habeas corpus relief only if the deficiency is of such magnitude as to result in a
denial of federal due process. Hines v. Enomoto, 658 F.2d 667, 672 (9th Cir.
1981).

R&R at 39-40. The petitioner does not dispute these statements by the Magistrate.

Instead, the petitioner argues that an explicit proportionality review by the appeals court is

necessary to raise the procedural requirements of due process in death penalty cases to the

bare, constitutionally mandated minimum:

> The United States Supreme Court requires that States having the death penalty
> establish a process and procedures to ensure that the penalty is not imposed
> arbitrarily or irrationally and that the individuals who receive the death penalty
> are distinguishable from those who do not. The statutorily-mandated
> proportionality review is part and parcel of the process and procedures adopted by
> Alabama to carry out the Supreme Court's mandate. If those procedures are
> abandoned, there are no assurances that the death penalty is being properly
> imposed on only the most deserving convicted criminals.
>     The authority cited by the Magistrate Judge in support of his ruling misses
> the point raised by the Petitioner. Petitioner does not assert that an explicit
> proportionality review is constitutionally required in every death case across
> America. Such a review may not be necessary where a State has erected other
> procedures and safeguards to guarantee the constitutional imposition of the death
> penalty. The procedures and safeguards to guarantee adopted by the State of
> Alabama, however, specifically rely upon an explicit proportionality review of
> each death sentence to render such sentences valid under the Constitution. The
> proportionality review is not a superfluous procedure above and beyond what is
> constitutionally required — it is an essential step toward attaining the bare
> constitutional minimum.

Petitioner's Brief in Opposition to Magistrate's Report and Recommendation at 16-17. The Magistrate, largely addressed this issue when he quoted the holding of the Eleventh Circuit Court of Appeals in Lindsey v. Smith, 820 F.2d 1137, 1154 (11th Cir. 1987), cert. denied, 489 U.S. 1059 (1989), that the Constitution does not require the Alabama courts to have an explicit proportionality review. The petitioner disputes this, stating that an explicit review is the only manner in which to ensure that the state court does conduct a proportionality review. The court agrees with the Magistrate that no explicit proportionality review is required.

### 5. On the Claim that the Judge's Instructions to the Jury Were Unconstitutional.

The petitioner contends that Judge Jasper, in charging the jury, made two unconstitutional errors. First, argues the petitioner, the judge's allegedly mandatory death instruction was improper. Second, "characterization of the jury's verdict as only advisory . . . rendered the sentencing hearing unfair." Petitioner's Objections to Magistrate's Report and Recommendation at 18. The Magistrate found the claims to be procedurally defaulted and, alternatively, without merit.

At the sentencing phase of trial, Judge Jasper stated to the jury that:

> Whatever decision you will make will be advisory only. Having returned a verdict of guilty of the capital offense, the only punishment for a capital offense is the state of Alabama is death by electrocution or life imprisonment without parole. Any verdict that you would arrive at as to the punishment in this sentence is advisory only, and I will read to you in a few moments the actual statute that sets up this and explain it to you as we go.

DAR at 680. Later, the sentencing judge charged the jury:

> Now, if you are convinced beyond a reasonable doubt and to a moral certainty that the aggravating circumstances in fact did exist, then you must weigh them against the mitigating circumstances, and as I stated to you earlier, that the mitigating circumstances need only be proven to your reasonable satisfaction and not beyond a reasonable doubt and to a moral certainty.
>> The mitigating circumstances -- and I'm going to read them in their entirety from the statute. Mitigating circumstances shall include but not be limited to the following: That simply means that you may consider anything in mitigation that has been presented to you here during this sentence phase.
> The statutory mitigating circumstances are: One, that the defendant has no

significant history of prior criminal activity. Two, the capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance. Three, the victim was a participant in the defendant's conduct or consented to it. Four, the defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor. Five, the defendant acted under extreme duress or under the substantial domination of another person. Six, the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. And, seven, the age of the defendant at the time of the crime.

Those are the statutory mitigating circumstances which you must weigh if you find that any of them exist against the aggravating circumstances.

A person's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law is not the same as his ability to know right from wrong generally or to know what he is doing is wrong. A person indeed knows that doing the acts which constitute a capital offense is wrong and still not appreciate its wrongfulness because he does not fully comprehend or is not fully sensitive to what he is doing or how wrong it is.

Further, for this mitigating circumstance to exist, the defendant's capacity to appreciate it does not have to have been totally obliterated. It is enough that if it was substantially lessened or substantially diminished. Finally, this mitigating circumstance would exist even if the defendant did appreciate the criminality of his conduct if his capacity to conform to the law was substantially impaired since a person may appreciate that his actions are wrong and still lack the capacity to refrain from doing it.

Again, the defendant need not wholly lack all capacity to conform. It is enough that such capacity as he might otherwise have had was substantially lessened or substantially diminished. And, as I told you, the age of the defendant at the time of the crime.

In addition to the mitigating circumstances that I have just read to you from the statute, you may also consider as mitigating circumstances any aspect of the defendant's character in light of the circumstances of the capital offense which tend to indicate that the defendant should not be sentenced to death. The mitigating circumstance does not have to be included in the list which I have read to you in order for you to consider those circumstances. Mitigating circumstances considered by you should be based on the evidence that you have heard during the trial itself and during the sentence phase.

If you are satisfied from the evidence presented during the guilt stage of the trial or during the sentence hearing that a mitigating circumstance exists, in that case, you may consider the mitigating circumstance in that it need only be proven to you reasonable satisfaction and not beyond a reasonable doubt and to a moral certainty. And I have already defined those for you during my charge on the guilt phase portion of these proceedings.

Only aggravating circumstances must be proved beyond a reasonable doubt and to a moral certainty. And as I stated to you before, the burden is on the state of Alabama to convince you from the evidence beyond a reasonable doubt and to a

moral certainty that the aggravating circumstances did exist.

In reaching your findings concerning the aggravating and mitigating circumstances in this case, and in determining what punishment in this case should be, ladies and gentlemen, you must avoid any influence of passion, prejudice or any other arbitrary factor. Your deliberation and verdict should be based on the evidence you have seen and heard and the law as I have instructed you. There is no room for the influence of passion, prejudice or any other arbitrary factor.

While it is your duty to follow the instructions which the Court has given you, no statement, question, ruling, remark or other expression that I have made at anytime during that trial, whether it be during the guilt phase or the sentence phase of these proceedings, is intended to indicate to you any opinion of what the facts are or what the punishment should be. It is your responsibility to determine the facts and pick an advisory verdict as to what the punishment should be.

Ladies and gentlemen, as I told you, I wanted to read your responsibility under the statute and I'm going to read it to you verbatim as I have been reading many things verbatim from the statute. And quoting from the statute, after deliberation, the jury shall return an advisory verdict as follows. We are referring only to the sentence phase of these proceedings. The guilt phase portion is over with, your having found the defendant guilty unanimously of the capital offense.

So to your responsibilities, one, if the jury determines that no aggravating circumstances as defined in Section 13A-5-49 exist -- and was that the aggravating circumstances that I have read to you before -- it shall return an advisory verdict recommending to the court that the penalty be life imprisonment without parole. Two, if the jury determines that one or more aggravating circumstances as defined in Section 13A-5-49 exist, but do not outweigh the mitigating circumstances, it shall return an advisory verdict recommending to the court that the penalty be life imprisonment without parole. Three, if the jury determines that one or more aggravating circumstances as defined in Section 13A-5-49 exist and that they outweigh the mitigating circumstances, if any, it shall return an advisory verdict recommending to the trial court that the penalty be death.

The next subsection deals with the decision of the verdict to return -- the jury to return an advisory verdict recommending a sentence of life imprisonment without parole must be based on a vote of a majority of the jurors. Now that differs from the guilt phase in that, as I told you before, you could return a verdict of guilty as to any of the offenses during the guilt portion of these proceedings that your verdict must be unanimous. Under this statute, your advisory verdict as to punishment if it be life without parole need only be a majority of you jurors. The decision of the jury to recommend a sentence of death must be based on a vote of at least ten jurors. That means that ten of your number must vote for death before you can return a verdict of death or it could be a unanimous verdict of all twelve of you jurors. The verdict of the jury must be in writing and must specify the vote.

DAR at 683-89. After discussing all of the arguments made by the petitioner, the court will treat them as a whole.

*i. On the Argument that the Judge Made a Mandatory Death Instruction That Was Improper.*

The Judge's instruction of a mandatory death sentence was improper, states the petitioner because it failed to present the jury with the option of exercising mercy on the petitioner. The Magistrate disagrees, stating:

> The respondent contends, alternatively, that the claim is without merit. The petitioner calls the court's attention to  Moore v. Kemp, 809 F.2d 702 (11th Cir. 1987), but he does not cite Moore v. Kemp as authority for the proposition that, regardless of the jury's findings as to aggravating circumstances, it still has the option of returning a verdict of life without parole. Moore does not stand for that proposition. In that case, the jury was improperly charged that if an aggravating circumstance was found to exist the proper verdict would be death. The Moore jury was correctly instructed, however, in other places in  the court's charge, that if the jury found one or more aggravating circumstances, the legal basis for imposing the death penalty was created, but mitigating circumstances should be considered in deciding whether the death penalty should be imposed. The Moore court held that the instructions, taken as a whole, were contradictory and confusing as to the jury's function if it determined that an aggravating circumstance existed, that "an average juror could easily have gotten the impression that the existence of an aggravating circumstance necessitated a death sentence." Id[.] at 733.
> The trial court's instructions referenced by the petitioner followed verbatim the statutory requirements as to the treatment of aggravating and mitigating circumstances by the jury. Ala. Code, 1975, § 13A-5-46. Judge Jasper over and over instructed the jury that aggravating and mitigating circumstances should be weighed against each other, and he  instructed the jury as to the proper manner of such weighing.

R&R at 44-45.

*ii. On the Argument That the Judge's Instructions That the Jury's Role in the Sentencing Process Was Solely Advisory Was Improper.*

The Magistrate, in his Report and Recommendation, stated that informing the jury that its role was solely advisory was not an error under Caldwell v. Mississippi, 472 U.S. 310 (1985):

> The Supreme Court held in Caldwell that argument by the prosecutor that responsibility for determining the appropriateness of a death sentence rested  not with the jury,  but with the appellate court which reviews the sentence, took away the reliability of the  appropriateness of the death sentence and thus was unconstitutional. In applying Caldwell, the Eleventh Circuit stated that "a Caldwell violation should include some affirmative misstatement or misconduct

that misleads the jury as to its role in the sentencing process. <u>Caldwell</u> does not mandate reversal if an advisory jury is told that its role is to advise or to recommend." <u>Harich v. Dugger</u>, 844 F.2d 1464, 1473 (11th Cir. 1988). . . . A reading of the court's charge shows that the court carefully and in detail explained to the jury aggravating and mitigating circumstances, explained that they should be weighed against the other, explained the burden and the standard of proof, and instructed that the jury should not allow passion , prejudice, or any other arbitrary factor to play a part in its deliberations. There was no <u>Caldwell</u> violation in the court's instructions concerning the advisory nature of the jury's verdict.

R&R at 46-47. Both claims were procedurally defaulted. The court agrees with the Magistrate that, even were there cause and prejudice forgiving the default, the petitioner's <u>Caldwell</u> claim is without merit for the reasons stated by the Magistrate.

## C. On the Claims Not Raised at the Rule 20 *Coram Nobis* Proceeding.

Two sets of claims were not raised at the Rule 20 <u>coram nobis</u> proceeding. The first, that two jurors at the petitioner's trial were biased could have been raised at the trial and on direct review from the conviction, but were not. Later, they were not raised in the Rule 20 petition. The second claim is that Mr. Appell, Mr. Duren's attorney at trial and on direct appeal rendered ineffective assistance of counsel on appeal. This claim could not have been raised on direct appeal, but could have been raised in the initial Rule 20 petition, but was not. The court will address each in turn.

## 1. On the Claim that Two Jurors Were Biased.

The court first notes that even were the petitioner to have not defaulted on any of these claims on direct review, failure to raise them before the Rule 20 court, even were they precluded may, on a literalist reading of <u>Ex Parte Hawk</u>, 321 U.S. 114, 116 (1944), render them subsequently defaulted. Whether or not this is the case, however, the petitioner could overcome this default by a showing of cause and prejudice or actual innocence. The petitioner may be able to show the former due to his ineffective assistance of counsel claim. Therefore, the court will examine the claims to determine if they are meritorious.

At the trial, the petitioner argues, two of the jurors, Juror Jones and Juror McFrancis were improperly allowed on the jury because they were both biased against the petitioner. Juror Jones' bias allegedly lay in the fact that she had discussed with other persons prior to trial that the murder of Ms. Bedsole was a "horrible thing" which she found incomprehensible and that she wanted to know what was in the killer's mind to make him do such a thing. The petitioner contends that Juror McFrancis was biased against him because she had once been operated upon by Ms. Bedsole's father, a surgeon.

The Magistrate stated that both claims were defaulted and that even had they not been, they were both meritless. In coming to his conclusions on the merits, the Magistrate noted that impartiality does not require a juror who has absolutely no knowledge of the case and has never formed any past opinion. Instead, impartiality only requires that the juror be willing to set aside any prior formed opinions and come to a verdict on the basis of the evidence presented at the trial. The Magistrate cited the following quote from the Eleventh Circuit Court of Appeals's opinion in United States v. Chandler, 996 F.2d 1073, 1103 (1993):

> A party challenging a juror for cause must demonstrate that the juror in question exhibited actual bias by showing either an express admission of bias or facts demonstrating such a close connection to the present case that bias must be presumed.

The court will review the Magistrate's reasoning for determining each of the jurors to be unbiased.

### i. On the Argument that Juror Jones Was Biased.

The Magistrate reproduces all of the questioning of the witness relevant to the petitioner's claim:

> THE COURT: Mrs. Jones, just have a seat right there, please, ma'am. As you know, we have brought other people in individually other than you and I don't want you to feel we singled you out in any manner concerning this case, but in answer to one of the district attorney's questions, you raised your hand concerning having had some pretrial knowledge of this matter either from the radio, TV or newspaper or that you talked to someone. Will you tell us what you know about this case and —

P. J. JONES:   Well, it has been so long ago, I'm really not that familiar with it anymore.

THE COURT:   What do you recall concerning it?  Just tell us.

P. J. JONES:   Nothing but that there were three teenagers and that the boy and girl were on a lovers' lane or whatever in a car and this — I guess this young man came by and — well, I'm really not sure that I really know that.

THE COURT:   Do you recall any names?

P. J. JONES:   Not — no, no names.

THE COURT:   From what you have read, seen or heard or talked to someone — did you talk to anyone about it?

P. J. JONES:   Yes, at work we talked about it.

THE COURT:   Did you formulate any opinion as to the guilt or innocence of anyone charged?

P. J. JONES:   I don't remember that we did, no.

THE COURT:   Did you?

P. J. JONES:   No.

THE COURT:   If you were chosen to be a juror in this case, could you put aside anything that has transpired up to this day and render a decision based on what the evidence would be introduced in the court and on that evidence alone and give a fair and impartial decision?

P. J. JONES:   Yes, I think I could.

THE COURT:   Could you give that young man a fair trial over there?

P. J. JONES:   I believe I could.

THE COURT:   Okay.  Any questions?

MR. McDONALD:   No questions.

MR. APPELL:   When you talked to your fellow workers, what did you talk about?

P. J. JONES:   We discussed the terrible thing that it was how we couldn't understand why some young person would do something like that to another.

MR. APPELL:  Did you form an opinion as to what punishment should be meted out?

P. J. JONES:   No, huh-uh.

MR. APPELL:  Okay.  You just wanted to know why it happened, is that right?

P. J. JONES:   Right. What was in his mind that he would so such a thing.

MR. APPELL:  Okay.  And you believe that you can give him a fair trial; is that right?

P. J. JONES:   Yes.  I want to know how old he is.

THE COURT:        We are not at liberty at this time to go into that.

P. J. JONES:   Okay.

MR. APPELL:  Would that make a difference in your decision making.

P. J. JONES:   No., I just — my own general information is what I asked for.

MR. APPELL:  All right.  Thank you, Mrs. Jones.

THE COURT:        Any further questions?

MR. McDONALD:    No questions.

THE COURT: Mrs. Jones, please don't discuss with anyone out in the courtroom what transpired back here because we have others we need to talk to.  Thank you. Please have a seat back in the courtroom.

R&R at 13-15, reproducing DAR at 205-07.  The Magistrate found that Juror Jones's promise to render a fair verdict overcame any indication of bias.  The court agrees.


*ii. On the Argument that Juror McFrancis Was Biased.*

During voir dire, the following questions were asked of Juror McFrancis, who had previously been operated upon by Ms. Bedsole's father:

THE COURT: Just have a seat, Mrs. Francis.  And as you know, we are not singling you out.  We have had too many come in before you.  And because you raised your hand in answer to one of the questions concerning any publicity surrounding this case, will you tell us what you recall from either reading in the

newspaper, hearing on television or seeing on television and hearing on the radio or if you talked to someone concerning this case. And the fact that you knew Dr. Bedsole.

P. J. McFRANCIS: I only knew Dr. Bedsole through referral and he operated on me. That was approximately six years ago. I don't know any of the family. And the only thing that I remember discussing was what happened and who the girl was. That she was Dr. Bedsole's daughter. And that's all.

THE COURT: Did you remember any other names other than the Bedsole?

P. J. McFRANCIS: No. No.

THE COURT: Did you formulate an opinion after having read or heard or seen anything on television?

P. J. McFRANCIS: No. No.

THE COURT: Could you put aside --

P. J. McFRANCIS: It was sad, you know. I was sorry to hear it.

THE COURT: Could you put aside all that you have heard, seen or read should you be chosen to serve on this jury and base any decision on the evidence that would be introduced in the courtroom?

P. J. McFRANCIS: Yes, sir.

THE COURT: Can you give that young man a fair and impartial trial?

P. J. McFRANCIS: Yes, sir, I would.

THE COURT: Any questions.

MR. APPELL: You said you did talk to other people about this?

P. J. McFRANCIS: No, other than, you know, in the family.

MR. APPELL: Excuse me?

P. J. McFRANCIS: The family.

MR. APPELL: You did talk to the family?

P. J. McFRANCIS: You know, children.

MR. APPELL: Your family?

P. J. McFRANCIS: Right.

MR. APPELL: Did you form an opinion as to what would be an appropriate punishment for this?

P. J. McFRANCIS: No. No.

MR. APPELL: And you didn't form an opinion as to guilt or innocence?

P. J. McFRANCIS: No.

MR. APPELL: What did your family say to you about the case when you talked to them?

P. J. McFRANCIS: Well, I think their reaction was like mine; you always hate to hear things of this nature.

MR. APPELL: Okay. Do you have children that -- how old are your children.

P. J. McFRANCIS: I have five children. The youngest is twenty-eight. The oldest is forty-two.

MR. APPELL: Okay. So they weren't involved with school and --

P. J. McFRANCIS: Sure, sure.

MR. APPELL: Thank you very much, Mrs. McFrancis.

DAR at 236-38. Without explanation, the Magistrate stated that this claim of the petitioner was without merit.

In Depree v. Thomas, 946 F.2d 784, 788 (11th Cir. 1991), the Eleventh Circuit Court of Appeals stated:

Generally, "a state criminal defendant who can demonstrate that a member of the jury which heard his case was biased ... is entitled to federal habeas corpus relief." Rogers v. McMullen, 673 F.2d 1185, 1189 (11th Cir.1982), cert. denied, 459 U.S. 1110[] (1983). "The decision to excuse a [prospective] juror for cause upon a suggestion of partiality is within the sound discretion of the trial judge." United States v. Taylor, 554 F.2d 200, 202 (5th Cir.1977). The trial judge must consider whether the prospective juror has such a fixed opinion, based on his bias, that he "could not judge impartially the guilt of the defendant." Patton v. Yount, 467 U.S. 1025, 1035 [] (1984). Whether an individual is so partial that he must be disqualified is "plainly [a question] of historical fact." Id. at 1036 []. Thus, on federal habeas corpus review, a state court's determination as to the partiality of a particular juror is entitled to a presumption of correctness. 28 U.S.C. S 2254(d) (1988). In reviewing such a finding, then, we will not set it aside "unless the error

is manifest." Irvin v. Dowd, 366 U.S. 717, 723 [] (1961) (quoting Reynolds v. United States, 98 U.S. 145, 156[](1878)). In other words, "the question is whether there is fair support in the record for the state court['s] conclusion that the jurors here would be impartial."  Patton, 467 U.S. at 1038 [].

In the instant case, the petitioner's attorney failed to object to the juror at trial and the question is only reached on a showing of cause and prejudice.  In this case, the state court did not have the opportunity to make findings of fact on the bias of the juror.  This court must therefore determine this issue de novo.

In Howard v. Davis, 815 F.2d 1429 (11th Cir. 1987), the Eleventh Circuit Court of Appeals refused to recognize juror bias in a case in which the one of the jurors who had been a friend of the victim was not stricken from the jury:

> Howard first challenges the district court's failure to excuse a specific juror for cause, thereby forcing him to use one of his allotted strikes.  Two prospective jurors, Corley and Jones, indicated that they had each been a close friend of the deceased.  The court excused Jones because he stated that he would not "feel right" about sitting on the case.  The court refused to excuse Corley however, because he stated that he could be an impartial juror in spite of his relationship with the victim.  We find no manifest abuse of discretion, United States v. Muller, 698 F.2d 442 (11th Cir.1983), nor do we find that the district court erred in holding that the defendant failed to demonstrate actual identifiable prejudice on Corley's part, United States v. Costner, 646 F.2d 234 (5th Cir. Unit A May, 1981).

Id. at 1431.

United States v. McLeod, 53 F.3d 322, 326 (11th Cir. 1995) dealt with a juror who had known the victim's family and the victim for fifteen years.  The Eleventh Circuit Court of Appeals found no error in the District Court's decision not to strike the juror:

> McLeod finally argues that the district court erred in denying his motion to excuse a juror for cause.  During voir dire, juror Judy Mull stated that she had known the family of the victim, Joe Watson, for fifteen years, but that Watson was merely "an acquaintance" whom she had not seen in five years.  In response to questioning, Mull repeatedly and unequivocally averred that she "could be fair to both parties," and "could make a fair decision based [on] the evidence [she] hear[d]."
> We review the district court's denial of McLeod's motion to excuse Mull for "'manifest abuse of discretion.'" United States v. Simmons, 961 F.2d 183, 184 (11th Cir.1992) (quoting United States v. Muller, 698 F.2d 442, 444 (11th Cir.1983)), cert. denied, --- U.S. ----, 113 S.Ct. 1591 [] (1993).  Because the record amply supports the conclusion that Mull could "lay aside [her] opinion and render a verdict based on the evidence presented in court," Patton v. Yount, 467 U.S. 1025, 1037 n. 12 [] (1984), we conclude that the district court did not abuse its

discretion.

Id.

Finally, in <u>Andrews v. Collins</u>, 21 F.3d 612, 620-21 (5th Cir. 1994), the Fifth

Circuit Court of Appeals addressed a case in which a juror was related to the victim:

> Andrews contends that the trial court erred by not reopening voir dire after defense counsel learned that one of the jurors was related to Joe Granado, the victim. Shortly before trial was to begin, the prosecution informed defense counsel that juror Curtis Tomplait's daughter had been married to the victim's grandson, who was deceased at the time of trial. Defense counsel then moved for a mistrial or, alternatively, to reopen voir dire and question Tomplait as to his relationship to the victim. The trial court denied both requests. Andrews argues that the trial court thus "forced him to present his case before a juror with an apparent bias against him, in violation of ... the Sixth, Eighth, and Fourteenth Amendments." At bottom, Andrews' contention is that we must, as a matter of law, impute bias to juror Tomplait.
>
> As an initial matter, we note that "[t]he Supreme Court has never explicitly adopted or rejected the doctrine of implied bias." <u>Tinsley</u>, 895 F.2d at 527. Moreover, the Court has not looked favorably upon attempts to impute bias to jurors. <u>E.g.</u>, <u>Smith v. Phillips</u>, 455 U.S. 209 [] (1982) (refusing to impute bias to a juror where the juror sought employment with the prosecutor's office during trial); <u>Remmer v. United States</u>, 347 U.S. 227[] (1954) (attempted bribe of juror did not require a finding of implied bias). However,
>
> > there are some extreme situations that would justify a finding of implied bias. Some examples might include a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction.
>
> <u>Smith</u>, 455 U.S. at 222 [] (O'Connor, J., concurring) (emphases added); <u>see</u> <u>United States v. Scott</u>, 854 F.2d 697, 699 (5th Cir.1988) (same).
>
> Based on the record before us, we do not believe that Tomplait's presence on the jury deprived Andrews of his right to present his case to an impartial jury. First, when asked during individual voir dire whether he knew of "any reason [why he] could not be a fair and impartial juror," Tomplait replied that he did not. Second, Tomplait was not at any time directly related to the victim, and his daughter's relationship with the victim's grandson had ended prior to the time of trial. Third, Andrews does not allege that the grandson was alive when the victim was killed. Fourth, the record contains no evidence suggesting that Tomplait, at the time of trial, even knew he had at one time been related to Granado. Finally, there is absolutely no evidence suggesting that Tomplait's "tenuous relationship" — as described by the state habeas court — had any effect on the proceedings. Accordingly, we refuse to impute bias to juror Tomplait. <u>See</u> <u>Jones v. Butler</u>, 864 F.2d 348, 362 (5th Cir.1988) (trial court correctly denied a defense challenge for cause to a prospective juror who "had lived near the victim and knew her by sight, had visited the funeral home to view her body, ..., and had worked [ten] years

earlier as a hospital lab clerk for a doctor who testified for the State"), cert. denied, --- U.S. ----, 112 S.Ct. 8 [] (1991); Howard v. Davis, 815 F.2d 1429, 1431 (11th Cir.) (no new trial when trial court refused to excuse juror who was a "close friend" of the murder victim), cert. denied, 484 U.S. 864[] (1987).

In the present case, the allegedly biased juror was neither a relative, an acquaintance or a friend of the victim, but was instead a merely patient of the victim's father who had never known the victim. In addition, Juror McFrancis stated that she could give the petitioner a fair and impartial trial and that she had not formed an opinion on the subject of Mr. Duren's guilt. The claim of juror bias is both defaulted and meritless.

## 2. On the Argument that the Petitioner's Attorney Rendered Ineffective Assistance of Counsel on Appeal.

The Magistrate found the petitioner's claim that he was denied ineffective assistance of counsel on appeal to have been procedurally defaulted. In addition, the Magistrate found the petitioner's claims to be without merit.

The court disagrees that the claims were procedurally defaulted. Although not specifically raised by the petitioner in his Rule 20 petition, they were taken up and dealt with on the merits by the Rule 20 judge in his opinion on the issue. On review by the Alabama Supreme Court, the Rule 20 judge's findings on the issues not addressed by that court were upheld without comment. The Supreme Court has stated that if a state's highest appellate court affirms a lower court's decision on the merits without comment, the claim will not be barred from review on the merits in the habeas court. Ylst v. Nunnemaker, 501 U.S. 797, 802 (1991).

As explained more thoroughly below, to assert an ineffective assistance of counsel claim, the petitioner must demonstrate both that the representation was unreasonable and that the unreasonable representation had a reasonable possibility of affecting the outcome of the trial. Strickland v. Washington, 466 U.S. 668 (1984).

The petitioner's argument is that Mr. Appell, his attorney, failed to raise numerous issues on appeal. However, except for the argument concerning improper comments by the prosecution, see infra, the failure of Mr. Appell to raise issues on appeal did not

adversely prejudice the defendant, alone or in concert.

## D. On Claims Raised in the Rule 20 *Coram Nobis* Proceeding.

The central claim of the petitioner is that his trial attorney, Mr. Appell, rendered ineffective assistance of counsel at the trial. At trial, states the petitioner, Mr. Appell rendered ineffective assistance of counsel in that (1) he presented an invalid legal defense; (2) he failed to present an intoxication defense; (3) he failed to present intoxication or psychological evidence at the sentencing phase; (4) he failed to challenge for cause or to strike biased jurors; (5) he failed to object to inflammatory slides and photographs of Karen Bedsole's body; (6) he failed to object to the prosecutor's improper closing argument; (7) he rendered ineffective closing argument; (8) he improperly distanced himself from the petitioner; and (9) he failed to seek proper (and object to improper) sentencing charges.

### 1. On Ineffective Assistance of Counsel, Generally.

The Supreme Court has stated that, under the Sixth Amendment, a defendant not only has the right to counsel at a criminal trial, but the right to counsel which provides him or her with effective assistance.  In Strickland v. Washington, 466 U.S. 668 (1984), the Court elaborated the circumstances under which the performance of counsel is so ineffective as to have deprived the defendant of his or her Sixth Amendment right:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

Id. at 687.

To demonstrate the first prong of Strickland, that his counsel was deficient, the

petitioner must show that his counsel's representation of him "fell below an objective standard of reasonableness." Id. at 688. "[S]crutiny of counsel's performance must be highly deferential." Id. at 689. The reasonableness of counsel's decisions should not be viewed with the benefit of hindsight, but must be analyzed on the basis of the facts as should have been apparent to the counsel at the time of his representation. Id.

> Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

Id. at 690. The Eleventh Circuit Court of Appeals has noted that:

> A jury trial is, by its nature, an enterprise that is filled with imponderables from the viewpoint of a trial lawyer. It is an undertaking that calls not only on the lawyer's head, but also on his heart and nerve. At times in the trial arena, audacity or imagination or patience accomplish more than pure logic might suggest is possible. The truth is that it is often hard for even a good lawyer to know what to do. Trying cases is no exact science. And, as a result, we must never delude ourselves that the fair review of a trial lawyer's judgment and performance is an activity that allows for great precision or for a categorical approach. When reviewing whether an attorney is ineffective, courts "should always presume strongly that counsel's performance was reasonable and adequate." Atkins v. Singletary, 965 F.2d 952, 958 (11th Cir.1992). And, "a court should be highly deferential to those choices ... that are arguably dictated by a reasonable trial strategy." Devier v. Zant, 3 F.3d 1445, 1450 (11th Cir.1993).

Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994). Furthermore,

> Because constitutionally acceptable performance is not narrowly defined, but instead encompasses a "wide range," a petitioner seeking to rebut the strong presumption of effectiveness bears a difficult burden. As we have explained:
>> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial.... We are not interested in grading lawyers' performances; we are interested in whether the

adversarial process at trial, in fact, worked adequately.
White v. Singletary, 972 F.2d 1218, 1220-21 (11th Cir.1992).

Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc).

Demonstrating prejudice requires that the petitioner "show that there is a
reasonable probability that, but for counsel's unprofessional errors, the result of the
proceeding would have been different. A reasonable probability is a probability sufficient
to undermine confidence in the outcome." Strickland v. Washington, 466 U.S. at 694.
Thus, the petitioner must demonstrate more than that the unreasonable actions of counsel
"had some conceivable effect on the outcome of the proceeding." Id. at 693. However,
the petitioner "need not show that counsel's deficient conduct more likely than not altered
the outcome in the case." Id.

The test for prejudice under Strickland requires more than that the unreasonable
actions of counsel had a reasonable probability of affecting the outcome of the trial.

> [A]n analysis focusing solely on mere outcome determination, without attention to
> whether the result of the proceeding was fundamentally unfair or unreliable, is
> defective. To set aside a conviction or sentence solely because the outcome would
> have been different but for counsel's error may grant the defendant a windfall to
> which the law does not entitle him.

Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993). Thus, the petitioner must
demonstrate that the outcome of the trial was either unreliable or fundamentally unfair.
The Supreme Court has described this requirement in negative terms: "Unreliability or
unfairness does not result if the ineffectiveness of counsel does not deprive the defendant
of any substantive or procedural right to which the law entitles him." Id. at 372. Outside
of the circumstance in which the unreasonable actions of the attorney resulted in (and was
unreasonable in light of) a conviction in violation of no longer valid law which the
attorney failed to present to the convicting court, unreliability or unfairness is to be
presumed from the reasonable probability of an alteration in the outcome. Id. at 373-74
(J. O'Connor, concurring).

Finally, as this court stated in Neeley v. Nagle, CV 96-PT-1381-M,

> The Strickland standard for ineffective assistance of counsel may be
> different if there is an actual conflict of interest. The Court stated:
> In Cuyler v. Sullivan, 446 U.S., at 345-350, the Court held that prejudice is

presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, see, e.g., Fed. Rule Crim. Proc. 44(c), it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest. Even so, the rule is not quite the *per se* rule of prejudice that exists for the Sixth Amendment claims mentioned above. Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, supra, at 350, 348 (footnote omitted).

Strickland v. Washington, 466 U.S. at 692.

Prejudice from ineffective assistance of counsel may be presumed only where there is an actual or constructive denial of counsel altogether for whatever reason. Strickland, supra, at 692, 104 S. Ct. at 2067; see also U.S. v. Cronic, 466 U.S. 648, 659 n.25, 104 S. Ct. 2039, 2047 n.25, 80 L. Ed.2d. 657, 668 n.25 (1984). Prejudice may be presumed only where there is a fundamental breakdown in the adversarial process. Blake v. Kemp, 758 F.2d 523, 533 (11th Cir. 1980) (noting "the presumption of prejudice would be proper where counsel's representation was so deficient as to amount in every respect to no representation at all." (Emphasis added)). In the absence of such a fundamental breakdown in the adversarial system, the burden rests squarely with the petitioner to demonstrate the alleged prejudice from every conduct by counsel which is deemed to be representation below the objective standard of reasonableness.

This stated, the court now turns to the merits of the petitioner's claims.

## 2. Whether the Presentation of an Illegitimate Defense by Mr. Appell Constituted Ineffective Assistance of Counsel.

At the guilt stage of trial, Appell presented only one "defense," that the petitioner did not intend to murder Ms. Bedsole because he intended to murder Mr. Leonard. Under Alabama law, the defense presented by the petitioner's attorney is invalid because of the doctrine of transferred intent.[49]

In his Report and Recommendation, the Magistrate said:

---

[49] Under the doctrine of transferred intent, that a defendant meant to kill someone other than the victim of the crime is no defense — the intent to kill the other individual is transferred from that individual to the person who is actually killed. Petitioner had given a statement as to his intent. There is a question as to whether his attorney was presenting a "defense" or simply the truth.

Although the fact that an attorney knowingly advanced a theory of law he knew to be invalid ---and the Rule 20 court so found--- is reason to pause, such act could nevertheless constitute trial strategy. "[P]revailing norms of practice as reflected in American Bar Association standards and the like are guides to determining what is reasonable [attorney conduct], but they are only guides..." Strickland v. Washington, 466 U.S. 668, 688 (1984).

R&R at 137 n.28. This constitutes the Magistrate's entire discussion on this particular issue. The Alabama Supreme Court, when addressing this issue, stated that:

> Duren contends that he was denied effective assistance of counsel during his trial because Roger Appell, his attorney, presented a legally invalid defense rather than a legally valid defense based on intoxication.
> Duren contends that Appell violated Disciplinary Rule 7-102, Code of Professional Responsibility of the Alabama State Bar (rescinded effective January 1, 1991), when the Rules of Professional Conduct became effective), which read:
>> "(A) In his representation of a client, a lawyer shall not:
>> "....
>> "(2) Knowingly advance a claim or defense that is unwarranted under existing law, except that he may advance such claim or defense if it can be supported by good faith argument for an extension, modification, or reversal of existing law."
> In Strickland, the United States Supreme Court stated:
>> "Prevailing norms of practice as reflected in American Bar Association standards and the like ... are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. See United States v. Decoster, 199 U.S.App.D.C. [359], at 371, 624 F.2d [196], at 208 [ (1976) ]."
> Strickland, 466 U.S. at 688-89, 104 S.Ct. at 2065.
> Appell testified at the Rule 20 hearing that, after considering the prosecution's strong case against Duren, which included the facts that there was an eyewitness identification of Duren as the one who had committed the murder and that Duren had confessed to the murder on two separate occasions, he felt that he did not have a legally valid defense available. Appell further testified that he had hoped to persuade the jury that Duren did not have the specific intent to kill Kathleen Bedsole and therefore was guilty of murder rather than capital murder. Appell testified that if the jury, despite instructions from the judge on the invalidity of transferred intent as a defense, had believed him about Duren's actual intent and returned a verdict of guilty of murder rather than guilty of capital murder, it would have been in the best interest of his client to present the case in that light. The trial court made the following findings in regard to this issue:
>> "When he made this argument, Appell knew that, due to the doctrine of

transferred intent, this was not a legally valid defense. Appell presented this defense for several reasons. First, it had been raised by Duren in his confession. Second, after investigation, Appell knew that the prosecution's case was overwhelming and Duren's chances of acquittal or conviction of a lesser included offense were extremely small. Third, Appell knew that, even if this position was not a valid legal defense, a verdict based on this defense would still benefit Duren.

"Appell's decision was not unreasonable. The prosecution's case was overwhelming. Appell had rejected intoxication as a defense because he thought Duren's claim was not credible and that such a defense would only prejudice a jury against his client."

We agree with the trial court that Appell's decision was not unreasonable under all the attendance circumstances; consequently, we agree that Duren has not shown that counsel was ineffective in this regard. He was trying to make the most of a bad situation for his client.

Ex parte Duren, 590 So.2d 369, 372-73 (Ala. 1991) (footnote omitted).

In his Objections to the Magistrate's Report and Recommendation, the petitioner argues that Mr. Appell's "knowing reliance upon a clearly invalid defense was unreasonable and prejudicial per se." Petitioner's Brief in Objection to Magistrate's Report and Recommendation at 4. The petitioner contends that the present case falls squarely within the holding of Cave v. Singletary, 971 F.2d 1513 (11th Cir. 1992), that the presentation of an invalid defense amounted to a concession to the jury that the defense had failed to make its case and was therefore both unreasonable and prejudicial per se.

In Cave v. Singletary, 971 F.2d 1513 (11th Cir. 1992), the petitioner claimed that his appointed counsel failed to understand the law under which he was convicted and that the miscomprehension resulted in his being found guilty of felony murder.

Specifically, Cave contends that Steger [the attorney] did not understand that emphasizing Cave's admission of guilt in the robbery, which resulted in the victim's death, would lead to a conviction for first degree murder under Florida's felony murder statute, regardless of the fact that Cave did not shoot Slater.

Id. at 1515. The Eleventh Circuit Court of Appeals held that because of the attorney's lack of awareness of the elements of the crime, her representation of the defendant "fell far below the acceptable standard for competent counsel." Id. at 1518. In addition, the Court of Appeals noted, even if the attorney had been aware of the elements of the crime at the time she acted under the invalid legal theory, her representation would have

nonetheless been unreasonable:

> Even if counsel's misstatements of the law were strategic in nature, we could not consider such a "strategy" to be reasonable under the circumstances because defense counsel may not "encourage[ ] the jurors to ignore the court's instruction and apply the law at their caprice." United States v. Trujillo, 714 F.2d 102 (11th Cir.1983) (holding jury nullification argument improper).

Id. at 1518. Although Cave would likely require the court to overturn the petitioner's conviction due to Appell's discard of a legitimate, if weak, defense of intoxication for a defense that had not other legal conclusion than the guilt of the petitioner, Cave was issued after the petitioner's appeals on the ineffective assistance of counsel claim were completed. Application of a "new" rule, such as the one stated in Cave, on collateral review is expressly forbidden under the reasoning of Teague v. Lane, 489 U.S. 288 (1989). Thus, the court can only overturn the conviction of the petitioner if Appell's failure to present a legally appropriate defense in conjunction with other mistakes in the representation constituted ineffective assistance of counsel based upon the law as applicable at the time the petitioner's judgment became final.

## 3. Whether the Petitioner's Counsel Was Ineffective in Failing to Investigate and Present a Defense that the Petitioner was Intoxicated at the Guilt Stage.

The Petitioner claims that his counsel was ineffective in not investigating and presenting a claim that the petitioner was incapable of forming the intent to commit the murder because of his intoxication at the time of his shooting Ms. Bedsole. In the Rule 20 hearing, the court stated that Mr. Appell's failure to investigate and present evidence of intoxication did not prejudice petitiomer because, he found, the petitioner was not intoxicated at the time that he killed Ms. Bedsole. In addition, the Rule 20 court found that the decision not to investigate the intoxication defense was a reasonable strategic decision. See, infra, at 9-10.

The Magistrate, after stating that the factual findings of the Rule 20 court regarding the witnesses presented to it were reliable, went on to address whether the failure to investigate and present an intoxication defense constituted ineffective assistance of

counsel.  First, as to whether Mr. Appell's representation of the petitioner was
unreasonable, the Magistrate stated:

> Regardless of the findings of the state court, after examining the issues of
> Appell's investigation and decisions concerning the petitioner's drug use, alcohol
> abuse, and psychological problems, and taking the evidence presented in the state
> proceedings and treating that evidence most favorably to Duren's contentions, it is
> opined that Appell reasonably decided that the best way to represent Duren was
> not to put on an intoxication defense or to present such evidence at the penalty
> phase, but rather to make avoidance of the death penalty the ultimate goal of the
> defense, and, along the way, to hope for a conviction of less than capital murder.
> It is also opined that such strategy was reached after reasonable and sufficient
> investigation of Duren's drug and alcohol use and psychological problems.

R&R at 136-37.  In reaching this conclusion, the Magistrate discussed four cases, Baxter
v. Thomas, 45 F.3d 1501 (11th Cir. 1995), Jackson v. Herring, 42 F.3d 1350 (11th Cir.
1995), Cave v. Singletary, 971 F.2d 1513 (11th Cir. 1992), and Gates v. Zant, 863 F.2d
1492 (11th Cir. 1989).

Second, the Magistrate determined that even if unreasonable, the trial attorney's
decision not to pursue intoxication as a defense was not prejudicial to the petitioner:

> The jury was apprised of Duren's alleged unfortunate childhood
> experiences.  As for his experts, they accepted as true what Duren told them about
> his childhood problems and his alcohol and drug use.  Dr. Hooper testified that he
> did not do a complete forensic examination, and that for the evaluation to be
> reliable it should have included a consideration of the testimony of the sheriff's
> deputies who dealt with Duren almost immediately after the murder was
> committed, and Duren's taped statements to police.  In any event, the essence of
> their expert opinions was simply that Duren had an unhappy childhood, and that
> he developed feelings of hostility which, when Duren's normal inhibitions and
> self-control were overcome by the effects of alcohol and drugs, erupted into
> violence.  Because of the relative weakness of the testimony of Duren's experts,
> and for the many reasons stated throughout this report, including Duren's
> planning and methodical execution of the crimes, his acts to conceal the evidence
> of his crimes, and his lucid communication with the police almost immediately
> after the commission of the crimes, it is opined that there is no reasonable
> probability that Duren would not have been found guilty of capital murder if the
> intoxication evidence had been presented.

R&R at 137-38.

Of the Magistrate's Report and Recommendation on this claim, the court will
address (1) whether the Rule 20 court's findings of fact are not entitled to deference either

because they were not developed by the Rule 20 judge, but by the state, or because they are factually unsupported; (2) whether Mr. Appell's representation of the petitioner was unreasonable; and (3) whether Mr. Appell's failure to pursue intoxication as a line of defense was prejudicial.

### i. On Whether the Rule 20 Court's Findings of Fact Are Legitimate.

The petitioner has advanced two theories for why the Rule 20 Court's findings of fact are illegitimate. First, argues the petitioner, the Rule 20 Court failed to make its own specific findings, but instead adopted the proposed findings of the state without comment. Because there is no indication that the Rule 20 Court actually considered the facts presented at the hearing, argues the petitioner, this court should not rely on the Rule 20 Court's findings of fact and re-examine the record to come to its own conclusions. The second argument that the petitioner raises is that even if the state were allowed to draft the factual findings for the Rule 20 Judge, those factual findings were unsupported by the evidence and were unreliable.

### a. Whether the Rule 20 Court's Acceptance of Factual Findings Prepared by the State Renders Those Findings Illegitimate.

In determining that the factual findings of the Rule 20 Court could legitimately be prepared by the State, the Magistrate stated:

> Duren states that the memorandum opinion was totally prepared by the prosecutor. The circumstances of that, if that was the case, have not been stated to this court; that is, whether the trial court announced his findings and conclusions and directed the state to draft an opinion consistent therewith. In any event, the fact that a prosecutor prepared  factual findings and conclusions of law and the trial court adopted them verbatim would not constitute a ground for an appellate or habeas court to reject those findings. "[F]indings, though not the product of the workings of the district judge's mind, are formally his; they are not to be rejected out-of-hand, and they will stand if supported by the evidence. Those drawn with the insight of a disinterested mind are, however, more helpful to the appellate court." U.S. v. El Paso Natural Gas, 376 U.S. 651, 656 (1964) (citations omitted). It was held in Keystone Plastics, Inc. V. C&P Plastics, Inc., 506 F.2d 960, 962-63 (5th Cir. 1975), that the courts have consistently disapproved of the practice of unconditionally adopting findings submitted by one party, but the test is still whether the findings are supported by the evidence. Accord, Weeks v. State, 568

So.2d 864, 865 (Ala. Crim. App. 1989) (in death case trial court adopted
verbatim state's proposed findings and conclusions of law).

R&R at 107-08. The circumstances that were unclear to the Magistrate are a bit clearer to
this court. At the conclusion of the Rule 20 hearing, Judge Garrett requested that each
side submit briefs and proposed findings of fact to the court. The petitioner provided to
the Rule 20 Court proposed findings, referencing specifically to portions of the transcript
supporting those findings. As best the court can tell, the State provided the Rule 20 court
with a seventeen-page order, which presented findings without any reference to the record
and drew conclusions of law. The Rule 20 Court signed the order without comment. The
State has not contested this construction of the facts by the petitioner. Therefore, this
court assumes that the petitioner has demonstrated by clear and convincing evidence that
the Rule 20 court accepted the findings prepared by the State. See Lancaster v. Newsom,
880 F.2d 362 (11th Cir. 1989).

Deference to state court findings of fact is premised in large part on fact that the
state court judge, who initially reviewed the evidence and was present at the proceedings,
can and will make the most informed examination of the evidence before it. That the Rule
20 court accepted the findings of fact prepared by the State without discussion at least
requires that this court carefully review the factual findings presented.

In Stokes v. Singletary, 952 F.2d 1567 (11th Cir. 1992), the Eleventh Circuit Court
of Appeals stated:

[A] presumption of correctness is accorded to factual findings of state trial and
appellate courts following a hearing on the factual issues and an "adequate written
indicia" of the factual determinations, "unless one of the conditions set forth in
Section 2254(d)(1)-(7) is found to exist ... or unless the state-court determination is
'not fairly supported by the record.....'" 28 U.S.C. S 2254(d); Hance v. Zant, 696
F.2d 940, 946 (11th Cir.) (quoting 28 U.S.C. S 2254(d)(8)), cert. denied, 463 U.S.
1210, [](1983), overruled on other grounds, Brooks v. Kemp, 762 F.2d 1383
(11th Cir.1985) (en banc), cert. denied, 478 U.S. 1022 [] (1986); see Endress v.
Dugger, 880 F.2d 1244, 1247 (11th Cir.1989), cert. denied, 495 U.S. 904 (1990)
("Section 2254(d) provides that state court factual determinations 'shall be
presumed to be correct' in a federal habeas corpus proceeding unless one of the
eight enumerated exceptions applies." (quoting 28 U.S.C. S 2254(d)). "If none of
those seven conditions [a]re found to exist, or unless the habeas court concludes
that the relevant state-court determination is not 'fairly supported by the record,'
'the burden shall rest upon the applicant to establish by convincing evidence that

the factual determination by the State court was erroneous.'"[50] Sumner v. Mata, 449 U.S. 539, 550 [] (1981) (Mata I ) (quoting 28 U.S.C. S 2254(d)(8)) (emphasis in original). Additionally, mixed questions of fact and law, like legal conclusions, are not accorded a presumption of correctness. Cuyler v. Sullivan, 446 U.S. 335, 341-42, 100 S.Ct. 1708, 1714-15, 64 L.Ed.2d 333 (1980).

"Of course, the federal courts are not necessarily bound by the state court's findings." Sumner v. Mata, 455 U.S. 591, 597 [] (1982) (per curiam) (Mata II ). After independent review, this court did not give a state appellate court's factual determinations a presumption of correctness because the state appellate opinion "fail[ed] to include several legally significant facts," and thus these factual determinations were not "fairly supported by the record." Dickerson v. Alabama, 667 F.2d 1364, 1368 (11th Cir.) (citing Mata I ), cert. denied, 459 U.S. 878 [](1982). "Factual issues involve 'what are termed basic, primary, or historical facts: facts "in the sense of a recital of external events and the credibility of their narrators. . . ."'" Hance, 696 F.2d at 946-47 (quoting Townsend v. Sain, 372 U.S. 293, 309 n. 6 [] (1963) (quoting Brown v. Allen, 344 U.S. 443, 506 [] (1953))). State-court factual findings which this court explicitly or implicitly has found to have been accorded a presumption of correctness appropriately are specific and well analyzed or documented by the state courts. See, e.g., White v. Wainwright, 809 F.2d 1478, 1481-82 (11th Cir.) (The district court deduced the requisite criminal intent or mens rea by recounting the detailed historical facts found by the Florida Supreme Court.), cert. denied, 483 U.S. 1044 [] (1987); Fitzpatrick v. Wainwright, 800 F.2d 1057, 1063 (11th Cir.1986) (Recognizing that waiver of

---

[50] Here the Court of Appeals inserted footnote 9:

In Sumner v. Mata, 449 U.S. 539 [] (1981) (Mata I ), the Court faulted the Ninth Circuit for disagreeing with the state-court factual findings, accepted by the district court, and granting relief in that habeas corpus case on an issue not raised on direct appeal without explaining the reasoning for concluding that the factual findings came within the exceptions of section 2254(d)(1)-(7) or were not fairly supported by the record in accordance with section 2254(d)(8). In remanding the case, the Court was careful to state that it was not expressing an opinion regarding the Ninth Circuit's conclusion on the merits, but that in order to avoid the presumption of correctness generally given to state-court factual findings, the federal habeas court must explain the reasoning leading it to conclude that any of the seven exceptional situations were present or that the state factual findings were not fairly supported by the record. 449 U.S. at 551, 552 []. Following remand and the Ninth Circuit's adherence to its original opinion on the merits, also without the appropriate section 2254(d)(1)- (8) analysis as instructed by the Court in Mata I, the Court remanded the case again for the requisite analysis and stressed:

> Section 2254(d) permits a federal court to conclude, for example, that a state finding was "not fairly supported by the record." But the statute does require the federal courts to face up to any disagreement as to the facts and to defer to the state court unless one of the factors in § 2254(d) is found.

Sumner v. Mata, 455 U.S. 591, 597-98 [] (1982) (per curiam) (Mata II ). In this case, we have sought to abide by the Court's admonition in Mata I and Mata II by providing a detailed explanation of our disagreement with the state-court factual findings or the failure of the state courts to find legally significant facts and with the district court's making legal conclusions that are not fairly supported by the record.

the Sixth Amendment right to counsel is a mixed question of fact and law, this court reiterated sufficient transcript of the exchange between the trial judge and the habeas corpus petitioner to show that the petitioner understood the meaning of "indigency" in order to accord this "implicit finding" a presumption of correctness.); Peek v. Kemp, 784 F.2d 1479, 1483 (11th Cir.) (en banc) (This court concluded that the state court's explicit factual findings that a juror was physically and emotionally ill, that the foreman informed the trial judge that the juror was ill, and that the prosecution and defense agreed to the substitution of the first alternate were fairly supported by the record.), cert. denied, 479 U.S. 939 [] (1986). Clearly, there is a significant distinction between legal conclusions, to which a presumption of correctness is not accorded, and historical facts, which are given a presumption of correctness unless they are within the excepted situations in section 2254(d), or are not fairly supported by the record.

Stokes, 952 F.2d at 1572-74. Arguably, the Rule 20 court's determination of the facts in this case was based upon a fact-finding procedure that "was not adequate for reaching reasonably correct results." Townsend v. Sain, 372 U.S. 293, 316.

However, the court also notes the Eleventh Circuit Court of Appeals case of McBride v. Sharpe, 25 F.3d 962, 971 n.12 (11th Cir. 1994):

> In the district court, McBride contended that the state habeas court's fact-finding procedure was inadequate because the court adopted a proposed order prepared by the state's counsel. However, in Campbell v. Wainwright, 738 F.2d 1573 (11th Cir.1984), cert. denied, 475 U.S. 1126 [] (1986), we held that a federal habeas petitioner's allegation of improper ex parte contact between a judge and state attorneys in drafting a proposed order in a prior state collateral attack proceeding did not deprive the petitioner of a fair hearing or necessitate an evidentiary hearing when there was "no indication that the judge was doing anything other than receiving the proffered order from the state's attorneys." Id. at 1576. As in Campbell, the state habeas court's adoption of the state's proposed order here did not deprive McBride of a full, fair and adequate hearing.

Although the Rule 20 court's findings are not necessarily infirm because they were the result of an  adoption of the State's proposed findings and order, this court will examine those findings with exceptional care to determine if they are appropriate in light of the arguments and evidence put before the Rule 20 court by the petitioner.

b. Whether the Evidence at the Rule 20 Hearing Is Adequate to Support the Findings of Fact.

In determining whether the findings of fact made by the Rule 20 Court were

adequate and were not rebutted by clear and convincing evidence, the Magistrate first extensively revisited the evidence included in the trial and the Rule 20 hearing that was arguably utilized by the Rule 20 court in coming to the findings of fact.

(i) David Duren's confessions: The surviving victim, Charles Leonard, testified to the facts stated at the beginning of this report, and he identified the petitioner as the shooter, shortly after the crimes were committed. Immediately after he was identified by Charles, Duren made his first of two confessions. M.E. White, a detective sergeant, Jefferson County Sheriff's Department, testified as to those statements. The petitioner told White that on the subject night he and a friend were in the petitioner's car, looking for a car to commandeer and use in a robbery. They came upon Charles Leonard and Kathy Bedsole in Leonard's parked car. Duren had a gun, and his partner, Richard David Kinder, had a knife. They forced Charles Leonard and Kathy Bedsole into the trunk of Leonard's car. With Duren driving the Leonard car and Richard Kinder driving Duren's car, they drove to a Woolco parking lot, where Duren's car was left. The petitioner and Kinder then drove for one and one-half hours, looking for a place to let out Leonard and Kathy, but they found no such place. Duren drove through the drive-through lane of a Mrs. Winner's Chicken restaurant, which they tried to rob, but the attendant, seeing the gun pointed at the window, ducked down, and Duren drove away in haste. He drove to an isolated area, and parked the car. Kathy and Leonard were then taken out of the trunk and tied together, back to back. They were turned so that Leonard was facing the petitioner. From approximately five yards away, Duren shot at Leonard, but hit Kathy, who fell to the ground. Leonard then fell on top of Kathy, and, with Charles laying on top of her, Duren shot him four times. Duren then drove the Leonard car back to the Woolco parking lot, but, when he saw police cars and a wrecker around his car, he drove away. He parked the Leonard car a short distance away, then attempted to wipe fingerprints off the car, and hid the gun in some bushes. Duren and Kinder then walked back to the parking lot. They bought cigarettes in a Food World grocery store, and watched the activity around Duren's car. After Duren's car was towed away, Duren and Kinder began walking back toward the Leonard car. They were spotted and picked up by the police and taken to where Leonard was being treated. Duren tried to hide the forty dollars taken from Kathy's purse by putting it between the back seat of the police car. Leonard identified the petitioner and his companion as the persons who had abducted him and Kathy. Duren stated that it was Leonard's car which had been taken, and he was afraid that Leonard would identify him. Duren stated that he had intended to kill Leonard, but that he had not meant to hurt Kathy. He "wanted to shoot the boy, and figured if [he] shot the boy then she would be too upset to do anything about it." *Trial Transcript,* R-465.

On October 25, the petitioner gave another confession. He stated that he took the rope to

[t]ie somebody up with to keep them from being able to get away anytime soon to get to any police station... Before [Duren] left the apartment, Richard and [he] had sat down and discussed how [they] were going to do

it and sort of planned it out and everything... [They] had already decided
that [they] were going to try to rob a fast food place or something like that.
It had crossed [Duren's] mind that [they] would need something to tie the
victims up with and maybe gag them so they couldn't make any noise."

Trial Transcript, R-475.

Duren also stated that he found a good place to get Leonard and Kathy
out of the trunk. "It had crossed [his] mind that that was a pretty isolated area and
there weren't any houses anywhere close so [he] decided that [they] would go
down there and tie them up there." Trial Transcript, R-477. Duren and Kinder
discussed whether to shoot their captives.

"[Richard] tied them up and [Duren] guess[ed] he stood there about five
minutes and [Richard went] over to [Duren] and asked [Duren] if [he] was
going to shoot them. [Duren] said [he] really didn't want to. Richard said
[they] needed to because they will be able to identify [them]. And [Duren]
asked [Richard] at that time if he wanted to shoot them and he said no.
[Duren] told [Richard] that [he] really didn't want to and [Richard] again
said [they] needed to because they would be able to identify [them].
[Duren] agreed with [Richard] and told him to go ahead and go around the
front of the car and get in the car and [Duren] would shoot them.

Trial Transcript, R-478.

When the shooting started, Leonard tried to turn so that he was facing the
shooting Duren. Duren stated: "The second shot which was the first shot that I
fired at the boy hit him either in the chest or stomach because he lifted up his
knees and tried to double over and I shot again. I think it must have hit him in the
leg. I shot one more, shot one more time and I'm not sure if that one hit him or
not." *Trial Transcript*, R-482. (A total of four shots were fired at Leonard as he
laid on the ground on top of Kathy.) Kinder picked up the empty shells.

(ii) Roger Appell's testimony: Appell testified at the Rule 20 hearing that
he had met with Duren at least ten or fifteen times before trial. Appell testified
that he arranged for Dr. Bair, a psychologist, to examine and evaluate Duren, for
its possible use in an insanity defense or in the sentencing portion of the trial. It
was counsel's opinion that Bair's report could not have helped the petitioner, and
might even have hurt him. Appell testified that Bair told him that Duren "[w]as a
walking time bomb. He told me that in his opinion David was ready to explode,
and if it hadn't been Kathy Bedsole it was going to be somebody else. That he was
capable of killing again." *Rule 20 Record*, R-82. Appell also stated that Duren
expressed much remorse for what he had done and that Duren knew that what he
had done was wrong. In Appell's opinion, these facts were inconsistent with an
insanity defense. Appell further testified that if the defense presented evidence that
Duren had taken LSD that day --- Duren told Appell that he had --- such would
have created a credibility problem for the defense, because in Duren's statements
to the police he had not said that he had taken LSD. Appell asked Duren why
he had not told the police he had taken LSD, and Duren's answer, in Appell's
opinion, indicated that presenting evidence of LSD use would create a strategic
problem which Appell wanted to avoid if possible.

Roger Appell testified as follows on the topic of Duren's drug use.

Q. What steps did you take to determine the nature and extent of Mr.

Duren's past drug use?

A.   I didn't take any particular steps, that I can remember, to find out the extent of his drug use, but I am not sure if I knew or he ever told me the extent of his drug use. I am not denying that he ever did say that. I don't remember. I do remember him telling me that on the day in question he had used LSD.

Q.   What did you do, if anything, to determine what kinds of drugs Mr. Duren had abused up until the time of his arrest?

A.   I don't remember doing anything. Because I don't remember if I knew that. I'm not saying that I didn't, I just don't remember. I only remember that one thing.

Q.   What did you do to determine the nature and extent of Mr. Duren's past abuse of alcohol up until the time of his arrest?

A.   Same answer.

Q.   You don't recall doing anything?

A.   Right.

Q.   I think you just said that you recall Mr. Duren saying that he had taken LSD on the day of the crime?

A.   He said he had taken LSD.

Q.   What did you do to determine the nature and extent of the drugs that Mr. Duren did take on the day of the crime?

A.   No more than what I've just told you.

Q.   And what did you do, if anything, to determine the nature and extent of the alcohol abuse on the day of the crime?

A.   No more than I've told you.

Q.   Do you recall, Mr. Appell, if you ever told Mr. Duren that you were not going to introduce any evidence about his drug or alcohol abuse?

A.   I don't recall saying that to him, but I am not saying that I didn't. I just don't recall.

Q.   Did you give any thought, Mr. Appell, to presenting evidence and arguing that Mr. Duren had diminished capacity at the time of the crime by reason of drug or alcohol abuse?

          MR. GIBBS:          Objection. Diminished capacity is not a defense in Alabama. Object to the question as phrased.

          THE COURT:          I'll overrule. I'll let you cross-examine him on that issue.

A.   It's hard to answer that question because I don't know if I knew the extent of his drug and alcohol use, but I did send or get Dr. Bair for the purpose of exploring an insanity defense in the possibility of helping out in the mitigating and aggravating circumstances. So that is the best way I can answer that.

Q.   Did you give any thought to arguing or presenting evidence that Mr. Duren was intoxicated on the day of the crime?

A.   Yes. Well, the same kind of answer to that is what I've just said as far as the purpose of Dr. Bair was to try to develop that area.

Q.   So that it was your understanding that Dr. Bair didn't give you anything to corroborate that?

A.   Not that I can remember. You know, I remember specific few things that Dr. Bair said to me. I remember that and remember thinking that those things

would hurt in my opinion.

Rule 20 record, R-55-58.

Q.  And did you give any thought to arguing and presenting evidence in mitigation at the time of the sentencing to the effect that Mr. Duren was intoxicated on the day of the crime?

A.  Yeah.  I certainly gave it thought.

Q.  And decided not to do that?

A.  Yes.

Q.  But you hadn't made any inquiry to determine the amount of alcohol he consumed on that day?

A.  I don't remember making that inquiry.  I don't remember making any inquiry about alcohol.  I do remember the LSD was mentioned to me.

Q.  You don't remember a mention of any other drug?

A.  I don't remember the mention of any other drugs, and I am not saying he didn't say it.  I'm just saying I don't remember it.

\* \* \* \*

Q.  And did you make any efforts to determine if you could establish extreme mental or emotional disturbance at the time of sentencing?

A.  I think that is what I tried to establish at the sentencing.

Q.  That is what you tried to establish by the presentation of testimony of various family members?

A.  Yes.

Rule 20 record, R-58-59.

Q.  Mr. Appell, did you yourself make a determination on how you would have to present this to the jury?

A.  Yes.

Q.  And did you give consideration to whether or not you would in effect throw your client to the mercy of the jury?

A.  Yes.

Q.  What did you decide?

A.  Decided that I would throw my client at the mercy of the jury if he was found guilty of capital murder.

Q.  And I think you said earlier that your attempt at the sentencing phase was to show as much about David Duren as you could to try to establish extreme emotional mental distress, disturbance?

A.  Yes.

Q.  And it was your hope to show the jury as much about him and to make them as sympathetic as you thought you could?

A.  Yes.

Rule 20 record, R-60-61.

When Appell was asked what he would have done differently, he stated:

A.  . . . I believe that more should have been developed in the area of drug

use and LSD, and I believe that more should have been attempted in the psychological area. I think we should have tried to get another psychiatrist if possible or psychologist to look at David again. That's basically the areas. Maybe spent more time with the family, tried to develop better background of David than I did.

Rule 20 record, R-68.

Q.  Now, you recall that Mr. Duren specifically told you that he had taken LSD the day of the murder, is that right?
A.  Yes.
Q.  Did you think that based on your experience as a trial lawyer here in Jefferson County that the fact that a defendant was on LSD would generate jury sympathy for that defendant?
A.  I am not sure if that was what I was thinking at the time, but I don't believe that it would have given the jury sympathy at the time.

Rule 20 record, R-81.

Q.  You were aware that intoxication could in certain circumstances constitute a defense?
A.  Yes.
Q.  Was it your opinion after discovering whatever Mr. Duren told you about his drug use, his taking of LSD that day that the intoxication defense would not be a favorable defense to present to the jury in this case?
A.  That was my opinion.
Q.  What was the basis for the opinion?
A.  The only memory that I have of it is when David told me that he did LSD that day I asked him did you tell the police. David said no, that he didn't tell the police that he had been doing LSD, and I asked him why, and he said he felt he was in enough trouble as it was and he didn't need to add to his troubles. And at that point I said to myself I didn't know if a jury would buy that statement. And I didn't want to put on any kind of defense that would show David not telling the truth. I wanted them to be sympathetic towards him.
Q.  You were going to pitch a lot of your defense towards a sincere plea of mercy for Mr. Duren and Mr. Duren's family, weren't you?
A.  Not so much from David, but more from his family.

Rule 20 Record, R-83-84.

Q.  Do you recall whether Mr. Duren or anybody in his family told you that that discharge had been in some way connected with drug abuse?
A.  I don't recall.  They may have, I don't recall.

Rule 20 record, R-89.

Q.  And you have probably second guessed your performance a lot since

that time when the jury came back with that verdict, haven't you?

A. Yes.

Q. I mean, it's only natural for a lawyer to second guess his performance any time he loses, right?

A. Yes.

Q. In a case where you feel as strongly as you do is even stronger tendency to second guess?

A. I would say so.

Rule 20 Record, R-90.

Q. And there were certain tapes, tape recordings made of Mr. Duren's statement to the police. I understand that you received transcripts of those tapes, is that right?

A. Yes.

Q. Did you listen to the tapes?

A. I don't believe I did. I don't remember listening to any tapes.

Q. You told Mr. Gibbs with respect to the statement by Mr. Duren that he had taken LSD that you didn't know if the jury would believe it, is that right?

A. Yes.

Q. You didn't know if the jury would believe that he had taken LSD?

A. Didn't know if the jury would believe that he had taken LSD, correct.

Q. When you reached that conclusion or came to that view did you do anything to see if you could corroborate Mr. Duren's statement that he taken LSD?

A. No.

Rule 20 Record, R-93-94.

THE COURT:   Let me ask you one question, Mr. Appell. Is there anything in your performance as an attorney representing Mr. Duren in this case that you did do or did not do that in your opinion was not in the best interest of Mr. Duren in representing him in this case?

A. Yes.

THE COURT: Go ahead and answer that.

A. I believe that a more extensive background search should have been done on David's past. I believe that more should have been discovered about David's drug use if it was there. I believe that more should have been presented about his activities on the day that this occurred. I believe that if I had had the hindsight that I have now plus the resources that I asked for at the time of trial that more would have been done. And I don't know -- I believe that it would have been helpful in David's case that more extensive evidence been presented to the jury on the issue of sentence than was presented.

Rule 20 record, R-96-97.

Appell told the jury in closing argument that "[i]f you don't have that specific intent to kill that specific person, then you are not guilty of capital murder. You may not like it. I may not like it. But that is the law, and that's

what you have sworn to follow." R 522. (The prosecutor made no objection to that statement.) Appell noted, when making motions for acquittal at the conclusion of the state's case, that the indictment charged Duren with intentionally killing Kathy Duren. The court read the indictment to the jury, which indeed charged that Duren intentionally caused the death of Kathy Bedsole (while engaged in the commission of a theft while armed with a deadly weapon). The court did not in its jury charge expressly state that counsel misstated the law, but the court charged the jury that a person commits murder if with intent to cause the death of another person he causes the death of that person or of another person.

The petitioner called several persons to testify at the Rule 20 evidentiary hearing.

(iii) Teri Hardigan (formerly Teri Sullivan): Hardigan met Duren in July of 1983, when she was seventeen. She saw him almost every day from that time until October 20, 1983, the time of the murder. She testified that she observed him take Quaaludes, Valium, speed, and pot. As to alcoholic beverages, she saw him drink beer, tequila, vodka, whiskey, gin, and rum. Duren partook of drugs or alcohol five or more days per week, five or six hours at a time. He almost always mixed drugs and alcohol. She also testified that he was a nice, caring person who was like a member of her family and he was allowed to help with a baby at Hardigan's home. Hardigan joined Duren in smoking pot. She stated that she could tell when he was intoxicated by "[t]he way he walked and talked. His eyes would be dilated and bloodshot." Rule 20 Record, R-155. He drove under the influence of drugs or alcohol three or four times a week, but his ability to drive was not impaired. Duren left this witness' home in the early evening of the night of the murder. As to being under the influence of drugs or alcohol, "[i]t was apparent that he was under some sort of influence. His eyes were bloodshot, they were half closed, and eyes dilated, and he was staggering." Rule 20 Record, R-157. Hardigan, who also testified at the guilt phase, stated that Appell never asked her anything about Duren's drug or alcohol use. Hardigan was contacted by Duren a few months before her Rule 20 testimony, but stated that her Rule 20 testimony was not discussed.

(iv) Shelby Heath (formerly Duren): Ms. Heath was the petitioner's aunt. She testified at the Rule 20 hearing that Appell wanted her to give testimony concerning Duren's upbringing, specifically "[t]he negligence by his natural mother when he was a baby and his mistreatment in his formative years." Rule 20 Record, R-100. Appell told her that he was going to try to get Duren's military records "[t]o investigate the reason for his discharge and the suspicion that drugs were involved." Id. at 101. She had no first hand knowledge of Duren's drug or alcohol use.

(v) Charles Christian: The petitioner lived with Charles Christian and Christian's wife in the summer of 1982. Christian testified at the Rule 20 hearing that Duren took or used tequila, vodka, rum, pot, Valium, Quaaludes, speed, and placidyls. He and Duren smoked pot and drank almost every day of the week. According to this witness, the petitioner felt badly about himself, was easy going, disliked violence, when he was drunk or high he would just go off by himself and close up, when he was sober he would talk and joke, and he was a careful driver. On the day of the murder, Duren and a friend were in Christian's home, drinking

and smoking pot. In Christian's presence, the petitioner drank a pint of vodka and some rum and smoked about six or seven joints. Duren left Christian's apartment around nine o'clock p.m.

(vi) James Hooper: Dr. Hooper was a psychiatrist and the clinical director for Taylor Hardin Secure Medical Facility. He testified that criminal defendants are examined at Taylor Hardin for competence to stand trial and as to their sanity at the time the offense in question was committed. Nearly five years after the murder, Dr. Hooper met with Duren and conducted a mental status examination, which Hooper testified was one of the most important diagnostic tools. "It [i]s a fairly structured interview that is done by a psychiatrist or a psychologist in which you not only ask questions of a person, but you also evaluate their level of response, their alertness, their facility at which they can answer those questions, their orientation, their short and long-term memory, the entire gamut of their mental capacities as best you can." Rule 20 Record, R-199-200. Hooper testified as to what Duren told him of his history of drug and alcohol abuse:

A. He told me that he had taken LSD, drunk a lot of alcohol and taken a quantity of drugs, that he was very messed up, that he and this friend of his formed this very spontaneous and half-baked plan to rob some unidentified place, then they decided that they would steal a car to prevent identification of their car. They took the car involved, that happened to have two people in it, put those people in the trunk. Rode around for a while trying to decide what store they might rob, and went to rob the store. And as David explained to me, his partner in this episode was messed up enough that he messed up the robbery by pulling out the gun before they got to a point where they could threaten somebody with it. So they finally rode off without actually robbing the place.

And that he was extremely angry and frustrated because he felt like that nothing was going his way and he had just gotten deeper and deeper involved. Then, according to him, the other gentleman suggested that they would have to get rid of the witnesses, and said that David should do it. I don't want to do that. The guy argued with him that he should do it. Said here is the gun, you take care of them.

And David recounted to me that he went out, got them out of the trunk of the car and was standing there weaving back and forth trying to figure out what he should do next because he didn't want to hurt anybody, he didn't want to fight with his partner, he didn't know how to stay out of trouble. He felt like he was in way over his head at this point in time, and he was just in general very confused and upset at that point in time.

Q.  Did he tell you anything about his perceptual ability at the time?

A.  He said he was feeling the effects of the LSD. He tells me that he has never had discrete auditory hallucinations or discrete clear cut hallucinations from LSD, but generally gets a feeling of altered reality. I don't know if I can describe it specifically, but he could feel the effects of the drug somehow.

Q.  Were Mr. Duren's accounts to you of his actions and his perceptions and his emotions on the night of October 20th consistent with an individual who had consumed alcohol and LSD on that day?

A.  Yes.

Q. And in arriving at your conclusion that what Mr. Duren had told you was credible, did you consider the fact that his description of his actual activity and thought process was consistent with someone who had injected those substances?

A. Yes, sir, very definitely.

Tab 66, R-226-28.

Dr. Hooper considered Duren's statement of his drug and alcohol use, and the fact of his military record, as being corroboration of Duren's account to him of his drug and alcohol use. Hooper gave the following testimony concerning drugs and the military:

Q. Let me show you, Doctor, a page from Exhibit 1, and this is part of Mr. Duren's military record headed record of proceedings under Article 15 UCMJ, and it is David M. Duren, and this makes reference does it not, Doctor, to wrongfully having in his possession some amount of marijuana/hashish?

A. Yes.

Q. That is an entry in the military record of Mr. Duren?

A. Yes.

Q. Let me show you another entry which is entitled an ADAPCP client intake record. Again, this comes from Exhibit 1, Mr. Duren's military records. I'm going to ask you to look at the copy that I've put in front of you.

A. Yes, I have seen this before.

Q. If you will keep that in front of you I'll ask you from over here. You reviewed that, didn't you?

A. Yes.

Q. Now, that record shows the date of enrollment of either March or May 31st of 1982, is that right? See in the upper left hand corner?

A. Yes, sir, I agree. It's either March or May.

Q. And down at number eight there is a physician diagnosis basis for enrollment, Cannabis, is that right?

A. Yes, sir. The edge of my paper is cut off. There is a thing that says physician diagnosis.

Q. And that is Cannabis?

A. Yes.

Q. If you look at the drug alcohol usage profile, that is number twenty-six, is that right?

A. Yes, sir.

Q. You had this available to you and reviewed this in reaching your diagnosis that Mr. Duren was a chronic drug and alcohol abuser, is that right?

A. Yes.

Q. And reading along, the first entry is for alcohol, is that right, Doctor?

A. Yes, sir.

Q. Shows the last time used within forty-eight hours?

A. Yes, sir.

Q. Frequency of use, two to six times a week?

A. Yes, sir.

Q. There are other entries that aren't germane. The next entry is

amphetamines?

    A. Yes, sir.

    Q. The last time used, over six months ago?

    A. Right.

    Q. The next entry is barbiturates?

    A. Right.

    Q. Last time used, over six months ago?

    A. Yes, sir.

    Q. On each one of these there is an entry for never used if you had never used them, is that right?

    A. Yes, sir.

    Q. The next is Cannabis product, is that right?

    A. Yes, sir.

    Q. And on how often used on Cannabis, the entry is two to six times a week, right?

    A. Yes.

    Q. Going back to alcohol, the entry was two to six times per week, right?

    A. Correct.

    Q. The next entry is hallucinogens?

    A. Yes, sir.

    Q. How often used, the entry is two to three times a month, is that right, Doctor?

    A. Yes, two to three times a month.

    Q. And the next is methaqualone?

    A. Quaaludes.

    Q. And the frequency of that is less than once a month, is that right, Doctor?

    A. Yes.

    Q. The next is opium, is that right?

    A. Yes, sir.

    Q. Last used one to six months ago?

    A. Right.

    Q. The frequency of use was less than once a month, is that right?

    A. Right.

    Q. The next is other tranquilizer, and it's indicated that he never used them, is that right.

    A. Yes, sir.

    Q. The next entry is --

    A. Phencyclidine, PCP.

    Q. And is indicated that he used that over six months ago?

    A. Yes, sir.

    Q. But at the time of the frequency was two to six times per week?

    A. Right.

    Q. Did you take this data into consideration in reaching your conclusion that Mr. Duren was a chronic drug and alcohol abuser?

    A. Yes, sir, this was one of the pieces of data that backs up to me what I believe he was being truthful about. And, as you know, I asked for his Army

records as a way of trying to support, prove or disprove whether he was being truthful with me about his substance abuse in the military.

Tab 66, R-284-89.

On cross-examination, Dr. Hooper testified as to additional information contained in these particular military records.

Q.  I notice one column on the right side that Mr. Fitzpatrick didn't go over with you, a column says current problem, see it has next to alcohol and N crossed out?

A.  Yes, sir.

Q.  And N for amphetamines and N for barbiturates and N for Cannabis -- I'm sorry Y for Cannabis, and N for the rest of them?

A.  Yes, sir.

Q.  We have a choice between yes and no, and he said he didn't have any problem with any of these drugs except Cannabis, right?

A.  I don't know if that is his statement or whether that is the evaluation of the person that filled out the form.

MR. GIBBS: That's all I have.

On further examination by petitioner's counsel, Dr. Hooper testified:

Q.  Just take another look at that form, if you would, Doctor. And perhaps I'm reading it wrong. Maybe Mr. Gibbs read it right. Look down in the other tranquilizer column under current problem. It appears to me that the yes box is checked. Let me ask you one other question. In your clinical opinion if Mr. Duren were being admitted into some client intake program, and within the previous forty-eight hours he consumed alcohol and was at the time consuming it two to six times a week would you consider that to be a current problem?

A.  Yes, sir, and I think part of that is, for instance, the line above this, patient detoxification necessary or unnecessary, and they have checked unnecessary, meaning that in somebody's opinion he is not likely to have DT's and need in-hospital detoxification. I don't know but what they have checked no as a current problem on alcohol in relation to that, that no, there is no immediate problem related to that or whether Mr. Duren stated that that was not a problem. I don't know how it got filled out. I would consider somebody that drank two to six times a week and had been drinking within the last forty-eight hours to have a significant drinking problem.

Tab 66, R-294-96.

The court questioned Hooper about Duren's use of LSD:

THE COURT:  You mentioned that the defendant had said that he had taken LSD. What did he say the effects of LSD on him were? How did they make him feel?

A.  I asked him about that, and it was difficult for him to give me a precise answer. I asked him specifically if he had clear cut hallucinations, and he stated that he did not, and he had never had those with LSD that he had taken in the past. But he had altered perceptions, that he felt differently, felt, and I can't quote the exact words, fuzzy, different, weird taking the drug. I finally gave up on trying to define that any further because it didn't seem to be a clear way to describe how

he felt.

Tab 66, R-298-99.

Dr. Hooper also testified on re-direct as to the reasons that were actually given for Duren's general discharge from the army, which reasons did not include possession or use of drugs:

Q. Doctor, I left up there with you another page from the records which is something that Mr. Gibbs also reviewed with you, and that is the notification of pending EDP discharge and acknowledgment. Do you have that?

A. Yes, sir.

Q. That is from Exhibit 1?

A. Yes, sir.

Q. This is dated 6th of May, 1982?

A. Yes, sir.

Q. This gives the reasons for general discharge?

A. Yes, sir.

Q. And Mr. Gibbs reviewed them with you?

A. He read them with me.

Q. And they include poor attitude, lack of motivation, lack of self-discipline, inability to adapt socially, inability to adapt emotionally, failure to demonstrate promotion potential, quitter attitude, hostility toward the Army, inability to accept instructions and directions, substandard performance, lack of cooperation with peers and superiors?

A. Yes.

Q. Are some or all of those elements consistent with the history of chronic drug and alcohol abuse?

A. I think the majority of them are . . . .

Tab 66, R-290-91.

Based on his belief in what Duren told him, Dr. Hooper made two diagnoses: atypical personality disorder, and polysubstance abuse disorder. Atypical personality disorder "[d]oes not fit into any of the more specifically defined patterns", Rule 20 Record, R-272, and is not a mental "disease", Rule 20 Record, R-273. Dr. Hooper explained that Duren's "[p]olysubstance abuse is in response to his personality disorder, which is itself predicated on a chaotic childhood and a very poor upbringing," Rule 20 Record, R-218, and that "[t]he atypical personality disorder does not have any bearing on his control of his behavior. It has more to do with his likelihood of abusing substances," Rule 20 Record, R-250. Dr. Hooper concluded that, accepting Duren's account of his history of drug use and his drug use on the day in question, Duren had "very little ability to control his behavior," *Rule 20 Record*, R-219, and that his judgment was "substantially impaired," Rule 20 Record, R-231, because he was "very intoxicated," Rule 20 Record, R-230. Dr. Hooper also opined that Duren's shooting was not willful. He stated:

My conversation with Mr. Duren about the act, my belief that he was being truthful with me in discussing this, the fact that I believe that he was grossly intoxicated at the time, his discussion of his feelings of

*Page 114 of 144*

tremendous dilemma. And at the point in time I understand or believe this young couple was tied up and a young man standing there with a gun pointed at them. They are very frightened, and the young man with the gun was also very confused and frightened, and the couple made a move and David pulled the trigger.

And at that point in time, as he states, he totally lost it because he realized that the girl was obviously dead as soon as the bullet hit her, and he then knew that he had further compounded his troubles by being involved in killing somebody.

Tab 66, R-241-42.

As to the reliability of Dr. Hooper's examination and conclusions, he did not do a complete forensic examination. He also testified that consideration of the following were needed for a reliable examination:  the testimony of Charles Leonard, the testimony of the sheriff's deputies  who dealt with the petitioner almost immediately after the murder was committed, and  the statements of the petitioner himself, which were captured on tape and  given almost immediately after the murder. According to Dr. Hooper, he had no special qualifications to detect whether a person is lying.

(vii) William Lerner: Duren also called to the stand Dr. Lerner, a physician. Dr. Lerner did a residency at Ohio State University from 1967-68, which was followed by two fellowships. His residency was in internal medicine, and his fellowships concerned infectious diseases and immunology of drugs, the latter being the relationship of drugs to the body. At the time of his testimony he was a professor of medicine at the University of Alabama in Birmingham, he was doing research and had a special training contract with the United States government to train residents in substance abuse, he was in charge of substance abuse medicine and had a substance abuse program at the University of Alabama at Birmingham, and he was involved in the treatment of substance abuse patients. Dr. Lerner had extensive experience in substance abuse work and programs before he went to the University of Alabama at Birmingham. He had also lectured on substance abuse, had published numerous papers in the field of substance abuse, and was under contract for a textbook on the subject. He had testified in criminal cases between fifteen and twenty five times, normally as a witness called by the prosecution.

Lerner addressed the effect of alcohol on one's ability to make appropriate judgments. At a blood alcohol level of ".10," almost a hundred per cent of the population has lost some ability to make appropriate judgments.  If one uses alcohol "for weeks and months and years," he becomes tolerant to exceedingly high doses of alcohol, and the usual indications of intoxication --- slurred speech, stumbling --- are not present.  Such person's ability to make judgments, however, is still impaired, and it is impaired whether he has been drinking or not.  Rule 20 Record, R-353.

Most persons who use LSD, a hallucinatory drug, on a regular basis, into their adult years, have many more psychological problems than young persons who stop using the drug when they become adults.  Most persons who use this

drug on a daily basis beyond the age of twenty or twenty one have psychopathology.

Amphetamines give one feelings of hyper-alertness, omnipotence, being in control, and can cause some feelings of hostility and aggressiveness. They were used during World War II in the "so-called C- Rations to get ready for battle." Rule 20 Record, R-355. They were the "absolutely perfect drug" for Japanese kamikaze pilots. Long-term use of such drugs leads "to a lot of acting out paranoid behavior, aggressive, very dangerous in combination with other drugs," Rule 20 Record, R-355, which can lead to a toxic psychosis.

The effects of valium are not much different from marijuana, but valium has a longer effect. It makes one tranquil and unmotivated to do any more than is necessary to get by. Marijuana is a predominantly depressing drug, with some mild hallucinatory properties, which, in young persons, is perceived as highly pleasurable. Hashish is a purified form of marijuana, a high grade of marijuana. Hashish contains almost ninety percent of the active ingredients of marijuana, which is THC. It is a very potent form of marijuana. Where the effects of marijuana might last an hour or two, high grade hashish might last four to six hours.

Quaaludes are depressive agents, so powerful that the world health organization forbids their manufacture. They lead to "very poor judgment, acting out behavior, a lot of difficulties." Rule 20 Record, R-359.

> As to the effect of taking a combination of such drugs, Dr. Lerner stated:
> Well, the frightening aspect is the combination of a drug which alters reality, and that is all of the depressant drugs that we've talked about, the marijuana, the valium and the alcohol, and combining that with a stimulant, speed, is a very dangerous combination because now we have somebody who not only doesn't make good judgments, but is very likely to carry out those bad judgments in an irrational, inappropriate untenable way.

Rule 20 Record, R-359.

In a study of persons arrested after some violent act, an exceedingly high incidence of drugs was found in their urine. In a pilot study at the medical college of Virginia, "[m]otor vehicle accidents and ER presentations from just accidents" were examined; forty six per cent of such persons had a significant level of a psychoactive agent in their blood. Rule 20 Record, R-360. Dr. Lerner testified that he did not know if violent conduct would not have occurred without the presence of such drugs, but that violence does occur with the drug.

Dr. Lerner testified that a conclusion of chronic substance abuse was indicated by the fact that Duren was disciplined in the army for the March 4, 1982, use or possession of marijuana hashish, the fact that the petitioner was enrolled in a program for cannabis, the fact that he reported to the intake person the use of almost every known drug, and Duren's discharge statement. "The only [drug] that [Dr. Lerner] couldn't find that he had used at this point was tranquilizer. There [was] use of alcohol, amphetamines, barbiturates, cannabis products, cocaine, hallucinogens, methaqualone or Quaaludes, opiates, essentially every known drug." Rule 20 Record, R-362. Lerner pointed out Duren's poor

attitude, lack of motivation, lack of self-discipline, inability to adapt socially, inability to adapt emotionally, failure to demonstrate promotion potential, quitter attitude, hostility towards the army, inability to accept instructions and directions, substandard performance, lack of cooperation with peers and superiors.

With respect to a blood alcohol content of .189, as shown in Duren's one driving under the influence charge, Dr. Lerner stated:

A. That is almost twice the legal limit for intoxication, and would suggest that if this individual was able to operate a car he was probably tolerant to some of the effects of alcohol. Most of us in this room at that level would be unable to open a car door and put a key in the ignition at that high level. And again suggests a chronic problem with the use of alcohol.

Rule 20 Record, R-365.

With respect to the effect of the drugs that Duren had allegedly taken in the months before the killing, the following questions and answers were reported:

Q. I'm going to ask you to assume some additional facts, Dr. Lerner, if you would, and ask you what effects these additional facts would have on your opinion as you have stated it. Okay. Let's assume an individual is observed over a several month period starting in the summer of 1982. Observed on a daily basis. Observed to use alcohol, tequila, vodka, rum daily as much as a fifth a day. Let's assume he was observed to use marijuana on a daily basis, several joints per day. Let's assume he popped pills, Valium, Quaaludes, speed, essentially whatever drug was available, let's assume he used acid occasionally. Let's assume he mixed alcohol and drugs. Assume further that he used Valium as often as available, two to three times a week, four to five hits a day, a hundred or so Valium over this total several month period, and he would also use Quaaludes on occasion, a couple per day. He would use amphetamines in pill form three to four times a week, three to four times per day. Do these additional facts have any effect on your opinion?

A. What they tell me essentially is that the problem as well defined in the military continued onward. Also just in considering a fifth of alcohol per day, one fifth of alcohol contains approximately twenty-six ounces, is twenty-six ounces, assuming that a drink is an ounce and a half, those become unbelievable, not unbelievable for people who have a chronic problem, very real but tremendous doses of alcohol on a daily basis, certainly would meet the criteria for acute and chronic alcoholism.

The Valium doses that you are giving are interesting in that the doses of Valium when combined with the alcohol have the effect of about a quarter to a half a pint of alcohol. The dose of Valium on the street is a ten milligram tablet. The milligram tablet of Valium has about the same effect as between a quarter and a half a pint of alcohol. When you put that with the amount of alcohol he is consuming, it's tremendous doses on a daily basis.

You gave me so many different drugs and so many different doses, but, again, the marijuana, we have a huge amount of depressants consumed on a daily and regular basis. You threw in LSD, which alters markedly sensory input and interpretation. And then probably the worst drug with this combination, which would be the stimulants.

Q. Could you elaborate on the effect that would have on the combination?

A. Much more likely to carry out hallucinations, to be aggressive, acting out behavior, see things as highly threatening in an unusual way, much more hostile and aggressive.

Q. We can move forward in time to the spring of 1983, a several month time period leading up to September of that year. He was observed on a frequency of two to three times per week drinking tequila, vodka, whiskey, whatever was available, as much as a fifth, perhaps more, using Valium, LSD at least three occasions, Quaaludes on several occasions, constantly smoking marijuana and using speed on several occasions and using the drug mepergan. This is continuing --

A. Mepergan or meperidine, I can't tell by your pronunciation, but one or the other.

Q. Okay. Let's first assume that this individual had a difficult home life, no steady job and was observed to be depressed.

MR. GIBBS: Your Honor, I object. This hypothetical as being predicated on facts not in evidence.

THE COURT: Sustained.

MR. GORTON: Your Honor, I draw the facts from Mr. Christian's testimony.

MR. GIBBS: Their witness testified that he had a job and went to work every day, among other things.

THE COURT: I don't think there was any testimony about his home life from that witness.

Q. (BY MR. GORTON:) I'll restate the hypothetical. Let's further assume that he had difficulty in his relationship with his family and no steady job, I think that is consistent with the testimony.

MR. GIBBS: I object to the form of the question as being predicated on facts not in evidence.

THE COURT: I'll overrule as to that.

Q. (BY MR. GORTON:) Okay. Do you remember the facts that I gave you?

A. You better do it again for me.

Q. He was observed using -- he was observed on a frequency of two to three times per week drinking vodka, tequila, whiskey, whatever was available, as much as a fifth or more, observed using Valium, using LSD on several occasions, Quaaludes, constantly smoking marijuana and using amphetamines on several occasions, and then the additional fact as we described, no steady job and difficulty with his family.

A. At these doses it would be very difficult for anybody to form a normal relationship with anybody or to be that functional. Certainly they could go to work on a daily basis, but their level of work would not lead one to having a very good job or to being seen as an energetic, good employee. With these levels one would have expected not very good performance, frequent tardiness and not very good effort in either function in a work site or with other normal human beings.

Q. Could you comment on such an individual's ability to control or modulate his behavior?

A. With these drugs on board it would be essentially very difficult to respond in appropriate ways, to get into a lot of trouble over ability to make appropriate judgments.

Q. And would substantial impairment of behavioral controls be one of the consequences?

A. That is correct.

Q. Let's assume that this pattern of drug use continued into the fall of 1983, up until October 20th of that year. Assume that this individual used amphetamines regularly, referred to in street parlance as three fifty-seven pharmaceutical, white crosses, pink hearts, speckled bird, twenty twenty's, and T-51's. Assume that three to four months prior to October 20th, 1983 this individual used LSD on two or three times. Does that add anything to your opinion?

MR. GIBBS:      Your Honor, I object to that hypothetical. There has been not testimony about any of those drugs.

THE COURT:      I think that is concerning another affidavit for which we don't have [sic]. I don't think the witness has been made available on that. It is not shown to the Court that the witness is not available, so I would have to sustain as to that particular question.

Q. (BY MR. GORTON:)   Okay. If we could, let's assume that the pattern of drug use that I related continued into the fall of 1983, and I would like you to assume a few additional facts with respect to this individual's state on October 20th, 1983. Focus on that date. Assume he was observed in the vicinity of a partially completed fifth of vodka in the early afternoon, assuming that continuing into the afternoon he was observed to have drunk a pint of vodka, assume that he smoked or joined in smoking six or seven joints of marijuana, assume that later in the day he had a couple of drinks of rum, assume that he consumed one or two hits of LSD that day. Do you have an opinion as to such an individual's mental state on that day with those facts?

A. I think his mental state would have been directly related to the level of drugs that he was on and those drugs, combination of LSD, alcohol and marijuana, those are phenomenal levels. This is a dangerous combination of drugs. I wouldn't have wanted to predict or could not predict exactly what an individual like that would do except it would be totally irrational. It would be without very much judgment or without very much restraint, it would be without the usual abilities to think out what somebody was doing.

Q. Would you say that individual's ability to control his conduct had been substantially impaired?

A. Absolutely, given those huge amounts of alcohol, drugs, LSD, et cetera.

Q. And would that be true of his ability to refrain from violent conduct?

A. He would have little or no judgment. He would lose the ability to make rational decisions and appreciate situations.

Q. Okay. Now, there has been testimony in this case that this individual was a, quote, walking time bomb, an accident waiting to happen. Would you agree with that assessment?

A. With those doses and those amounts, that bazaar combination of drugs, it would be very difficult to predict on a day-by-day basis what this

individual would do or wouldn't do. And in that context one might use the term bomb.

    Q.  Do you think the drug effects alone would be sufficient to account for that behavior?

    A.  Given these doses and that combination of drugs, yes.

    Q.  We wouldn't have to make any assumption as to the individual's psychology?

    MR. GIBBS:    I object to the form of the question.

    THE COURT:   Sustained.

    Q.  (BY MR. GORTON:)  To support that opinion do you have to make any additional assumption?

    A.  I would suggest that all of us in this room given those doses and those drugs would be highly unpredictive as to what might happen, yes.

    Q.  And might lose the ability to refrain from violent conduct?

    MR. GIBBS:    Objection. Leading.

    THE COURT:   Sustained. Let's don't lead.

    Q.  (BY MR. GORTON:)  Could you comment on the average person's ability to refrain from violent conduct under that dosage level?

    A.  If all of us in this room were using that amount of drugs in that combination this would be a most peculiar, bizarre place to be right now.  I wouldn't want to predict what might be going on or not be going on.

    Q.  Now, would you say that your opinion as to the effects of this combination of drugs is widely shared in the medical community of Birmingham?

    A.  Not only in the medical community, but given in the political and social area.

    MR. GIBBS:    I object to that as unresponsive.  The question asked for the medical community.

    THE COURT:   Sustained.

    A.  The medical community, absolutely.

Rule 20 Record, R-366-76.

    Dr. Lerner had never met the petitioner.  He had read some material which stated the facts of the case, and perhaps a brief.  He recalled the facts as being that Duren "[w]as picking up two individuals, driving to a store, leaving a store, going out to the country and firing a gun and killing one of the individuals and injuring the other." Rule 20 Record, R-389-90.  He stated that there were other experts such as himself in the Birmingham area in 1984.  When Dr. Lerner was asked whether a person who had abused alcohol for a long period of time and thus would be not as prone to display the normal outward signs of intoxication would be more able to cope with the overt signs of intoxication, the following testimony ensued:

    A.  That is an interesting statement, but in point of fact in studies done by both ourselves and other people, it's interesting that normal behavior and even normal vocabulary is pretty primitive.  This chair, for instance, is within two inches of the height of any other chair, and since we sit in chairs all of our lives it's very easy to learn, wether intoxicated or not intoxicated, how to lower your rear end so that it hits this chair. So that, for instance, walking a straight line or

touching one's nose, frankly we touch our noses so much that this is a very easy act to accomplish. In the tolerant individual these normal repetitive routine acts are done just as well as you or I.

But if you then look at the ability to make judgments, for instance, doing something as simple as moving the nose up three or four inches, and even the person who has been drinking large amounts for years will still miss their nose. But if you leave the nose where it is they hit it each and every time.

What I'm saying is that, yes, very simple things, the usual observations we make about people, how they talk and what they do, most of us wouldn't recognize that they had a huge blood alcohol level on. Many of my patients are professionals who go about their daily lives with it, nobody recognizing a very high blood alcohol level. But put in a crisis or something that isn't the usual and they literally fall apart. Again because that high level, that sophisticated computer, whether tolerant or not, does not work.

Q.  When you say fall apart, would you expand on that?

A.  I could make it quite literal. Even in a tolerant individual, I see it when they get up on my examining table, if you think about the examining table in a doctor's office, it's a very unusual height, and although they come into the room and sit down and chat with me I don't notice anything wrong, and then I take them back to the examining table and ask them to sit on it and they have an unbelievably hard time getting onto that table. They have answered every question that I've asked them, but their memory for the questions is short. I ask them as you did me to face towards me, I ask the patient. And with that blood alcohol level they've given me an extensive history of what they've done, what kind of work they've done, et cetera, they are unable to remember that I asked them to face facing me. So that it's in the higher, more sophisticated areas that these people fall apart.

Q.  All right. Would you say that driving an automobile is more like touching your nose or more like climbing up on your examination table?

A.  Again, that is a fascinating one. If the road is fine, nothing unusual happens, it's estimated, for instance, in a city of the size of Richmond, Virginia on a Saturday night over a thousand people are intoxicated. Of that thousand, nine hundred and ninety of them will successfully go through the roads and get home. Of the ten who have the accident face something unusual. They approach -- they don't use good judgment when they come to a curve or the road is wet or a car comes out from the side that they can't see, and it's -- again, if it's a nice, normal function they do very well. But as soon as something unusual that requires us to think out, make new judgments, process new information, they fall apart.

Q.  So a person who was, excuse me if I say real drunk, might have a lot of trouble making plans, changing plans, responding to new stimuli or new events during the course of an evening, say?

A.  Could. Again, it depends on the sophistication and the level of those plans.

Q.  Well, something as sophisticated as armed robbery?

A.  Could.

Rule 20 Record, R- 391-94.  Lerner stated that a fifth of whiskey and two to three

valiums would kill persons who do not use much alcohol or drugs. He gave the following answer to a hypothetical:

Q. Would you expect that a person who drank as much as a fifth of whiskey in twenty-four hours, drank a fifth of whiskey, three or four, took three or four Valiums, maybe took some Quaaludes or mepergans or Placidyls, would you expect that person to be up and around and moving around the city or would you expect that person to be at home or stay pretty much in one place?

A. Again, it comes to the difference between acute and chronic. If acute, if I had done that for the first time I would be passed out in my house for a long period of time. If I had been doing this day on day on day, boringly, these doses of drugs, as I said with my example of getting on the examining table stumbling with almost lethal doses of alcohol, four or five hundred milligrams percent, so they were walking and talking. We see them in the emergency room all the time. They are hardly quiet. They get into a lot of trouble. That is why they end up in places like emergency rooms.

Q. You were in here while Mr. Christian was testifying?

A. Yes, I was.

Q. You heard him testify that when Mr. Duren would drink he would go off by himself and basically do nothing, would that be consistent with the amount of alcohol that he has reported or the alcohol and drugs that Mr. Christian testified that Mr. Duren took?

A. Again, it depends, you know, in a twenty-four hour a day given that level of drugs it wold depend on when the drugs peaked and when they weren't peaking. At the absolute height a person would want to sit in one place, and as it came down a little they would be acting out, getting into some trouble. It's common in the ER, for instance, to see people who had very high drug alcohol levels and they are just sort of snoring on the side. And then you bump into them and they jump up and become violent and aggressive, it takes three people to hold this fellow down. And the next minute they are back snoring peacefully away.

And I think one of the horrors of this kind of drug use is that the behavior changes back and forth from aggressive acting out to the somnolent person that is described. So in a given day there is a lot of variability in how these people act and how they function.

Rule 20 Record, R-397-99. Lerner opined that, given Duren's purported daily use of drugs, he could not go for a day without taking drugs. When asked what his opinion would be if Duren had taken drugs but not in the amounts on which Dr. Lerner based his opinions, he stated:

If he had consumed only two to three drinks, then he would not have had the acute effects of alcohol. He would have had some of the chronic effects for the weeks and months before he had consumed, but the acute effects wold be gone.

Rule 20 Record, R-405.

Finally, Dr. Lerner stated that the opinions he expressed met the criteria published in various journals for the criteria for the diagnosis of acute and chronic substance abuse.

(viii) Bair's affidavit: The trial court admitted Bair's Rule 20 affidavit into evidence. Dr. Bair's affidavit stated:

1. I am a licensed psychologist admitted to practice in the State of Alabama. I graduated from the University of Illinois with a B. A. degree in Psychology and English Literature. I received my doctorate in 1977 from Baylor University. I have been engaged in the private practice of psychology since 1980 and am currently in the private practice of psychology, with Meredith, Bair & Peacock P.C. Since 1989, my practice has been in the Birmingham area. Before that, I practiced in Tuscaloosa from 1977 to 1980.

2. On February 9, 1982, on a referral from Attorney Roger C. Appell, I performed a psychological evaluation of the petitioner in the current proceeding, David Ray Duren. Mr. Duren was 21 years old at that time, and awaiting trial on charges of capital murder. The evaluation included a mental status examination and clinical interview, and administration of a battery of psychological tests. The evaluations included taking a case history of Mr. Duren. Subsequent to the evaluation, I reported on my findings to Attorney Roger Appell.

3. On the basis of my evaluation, I informed Attorney Appell that Mr. Duren's psychological testing results were consistent with a diagnosis of Atypical Personality Disorder. This condition is recognized in the official psychiatric nomenclature as a mental disorder. I informed Attorney Appell that Mr. Duren exhibited a number of significant psychological deficits, in the area of ego functioning, emotional control, and social and occupational performance. I reported that Mr. Duren was struggling with pent-up feelings of hopelessness and helplessness, coupled with anger and frustration, possibly attributable to a history of neglect, physical abuse, rejection, and abandonment as a child.

4. I also informed Attorney Appell that Mr. Duren reported, as part of his case history, a pattern of alcohol and drug abuse going back to his early teens. I told Attorney Appell that Mr. Duren's alcohol and drug use had led to repeated financial difficulties, from which he had to be rescued by his parents. I informed Attorney Appell that Mr. Duren's abuse of alcohol and drugs became even more extensive while he was in the army. I related an episode in which Mr. Duren reports having been caught smoking marijuana in his barracks, which led to a reduction in rank. Following a discharge from the army, as I told Attorney Appell, Mr. Duren experienced serious social and occupational difficulties and disruptions in his family relationships. This behavior is consistent with a pattern of chronic drug and alcohol abuse.

5. Mr. Duren reported, in giving his case history, that he had taken drugs every day for many months leading up to October 20, 1983, and also had abused alcohol during that period. Mr. Duren indicated he had used alcohol, marijuana and LSD on October 20, 1983. I relayed this information to Attorney Appell.

6. On the basis of my psychological evaluation and the information gathered in my clinical interview and mental status exam, I formed a clinical judgment that Mr. Duren was in fact a serious abuser of alcohol and drugs prior to his arrest on October 20, 1983. Substance and alcohol abuse are recognized by the psychological profession as mental disorders. I informed Attorney Appell of my conclusions.

7.     Furthermore, on the basis of my psychological evaluation and the information obtained in my clinical interview and mental status exam, I formed the clinical judgment that Mr. Duren was intoxicated on the evening of October 20, 1983. I reached the conclusion that Mr. Duren was under the influence of LSD, marijuana, and alcohol, in combination, when he committed the crime on the night of October 20, 1983. (Further investigation would have been necessary to assess the extent of his intoxication at that time.) I told Attorney Appell of my conclusions.

8.     I have been advised by Mr. Duren's present counsel that evidence of chronic alcohol and drug abuse, and intoxication, and evidence of mental disorder, are relevant to the issue of Mr. Duren's criminal responsibility. Additionally, I am informed that such evidence must be weighed in mitigation of a possible death sentence if presented in a capital sentencing hearing. The clinical judgments I reached in my evaluation of Mr. Duren could be used by counsel to investigate and develop such evidence. My conclusions would further support a theory that drugs and alcohol played a major part in disinhibiting Mr. Duren to the point of committing violence on October 20, 1983. Given Mr. Duren's tenuous control mechanisms, alcohol and drugs could lead to violent acting out by releasing pent-up hostile and aggressive impulses. I informed Attorney Appell of the likely effects of substance abuse on David's personality, in potentially triggering violent behavior.

9.     If requested by Attorney Appell, I was available following my evaluation to give an affidavit or testimony stating my clinical conclusions. However, I was not asked to provide any evidence whatsoever, of any kind in any phase of Mr. Duren's criminal proceedings. Instead, Attorney Appell instructed me to destroy my records of the psychological evaluation of Mr. Duren. (I did so at his request.)

10.     I was also available to Attorney Appell to provide an affidavit supporting any requests for funds from the state to obtain psychiatric and psychological assistance for Mr. Duren's defense. Mr. Appell did not seek such assistance.

*Rule 20 Record,* R-697-701.

The state called deputies Galloway and Radigan.

(ix) Jerry Galloway:  Deputy Galloway had been employed by the Jefferson County sheriff's department for ten years at the time of the Rule 20 hearing. He testified as follows. At 1:00 a.m., David and Kinder were brought, in custody, to the house where Charles Leonard was being tended. Duren was at the house approximately thirty minutes, and was in Galloway's presence about fifteen or twenty minutes. Galloway explained to Duren his *Miranda* rights, following which Duren gave a detailed and lucid account of what happened. Deputy Galloway, who had been around intoxicated persons on many occasions, observed no indication that Duren was intoxicated.

(x) Terry Radigan:  Deputy Radigan, who holds a BS degree in criminal justice, had also been with the department for ten years. He first saw the defendant at 12:42 a.m. At about 12:40 a.m., Radigan stopped Duren and Kinder as they were walking. Deputy Radigan asked them to identify themselves and to

state their business. They stated they were going to some apartments. This contact lasted for about one minute, and the petitioner and Kinder were allowed to go on their way. After he learned of the perpetrators' descriptions from Leonard, Radigan drove back to where he had left Duren and Kinder and picked them up and went back to the house where Leonard was laying, which trip took a couple of minutes. Deputies Galloway and Radigan walked Duren and Kinder up to Leonard to determine if he could identify them. After they were identified, Duren and Kinder were searched, cuffed, and put into separate patrol cars. Galloway explained the *Miranda* rights to Duren, while Radigan did the same with Kinder. While Radigan was talking to Kinder, Galloway walked over to Radigan and told him that Duren confessed and that he would show them where the Leonard car was. Duren took Radigan to the location of the Leonard car at approximately 1:20 a.m. Duren could not remember the exact location of the gun, but it was found at about 1:50 a.m. Duren then showed Radigan where the abduction had taken place. Radigan then took Duren to a police sub-station for interviewing, which took about ten minutes. Radigan testified that he had come in contact with persons under the influence of drugs or alcohol on many occasions, and in his opinion Duren was sober.

The following witnesses testified at the sentencing hearing.

(xi) Shelby Duren's testimony: Duren was born prematurely, with a respiratory problem which stayed with him throughout his childhood. He had pneumonia several times. His parents were married and living together in Birmingham when the petitioner was born. For the next two years, the parents went back and forth between Birmingham and Mississippi, where they were planning to move. Duren was sometimes left with relatives in Birmingham, and things were "unsettled". The petitioner's mother left her family for another man, in Mississippi, and Ms. Duren's brother, who lived in Birmingham, got legal custody of Duren. Later the petitioner went to live with a great aunt in Tuscaloosa for about a year and a half; he was with this aunt between the ages of two and two and one half. When Duren was four, his father re-married, and the petitioner went to live again with his father in Birmingham. That marriage lasted approximately seven years before Duren's father and his stepmother separated. After the separation, Ms. Duren testified, the petitioner always had a smile on his face, even when he had nothing to smile about. He was much happier when he was living alone with his father. There was a reconciliation, and the witness described an incident that occurred when Duren's father was packing to go back to live with his second wife. The witness, Duren's father, and Duren were all crying in anguish at the thought. The reconciliation lasted only a few days, and Duren and his father left and resumed living alone again, and again the petitioner was a happy child. After six to eight months, the father met and married another girl. That third marriage lasted approximately three years. From almost the beginning of this marriage, Duren mostly stayed in his room. Apparently before the break-up of the third marriage, the petitioner ran away from home and worked at a car wash. When he was told that his father was living alone, the petitioner returned home. Duren was probably sixteen at the time. The father re-married for a third time, and Duren was very unhappy. Ms. Duren thought that the petitioner was a bright person, but he would not study, and he dropped out in the tenth grade.

The witness described the petitioner as a very tender-hearted person. Duren entered the army when he became seventeen, and he became more optimistic and appeared to be headed in the right direction. A sergeant said he was proud of Duren for the dedication he had displayed. The petitioner stayed two years in Germany. The petitioner then came back home, and stated that he had received a general discharge for smoking marijuana. He got a job in a printing company where his father worked. He did well there until his father took another job, and the petitioner was later fired. Duren then got a job in a super market, and later worked at Mrs. Winner's, and then went to work for a company that treated telephone poles for insects. He then was in a car accident, in which he lost control of the car he was driving and hit a brick wall; he was charged with DUI. Duren was living in his father's home, but there were two younger boys living there, too, and the petitioner's presence there created problems because he would bring beer and marijuana into the house. The father told the petitioner that he was welcome, as long as he abided by the rules. As a result, the petitioner moved in and out of the father's house several times. Ms. Duren asked the jury to have mercy on the petitioner because he did not have a stable mother in his life and he was badly mistreated in his formative years. She stated that she loved him.

(xii) Terri Sullivan's testimony: Ms. Sullivan testified at the sentencing hearing, at which time she was seventeen years old. She stated that the petitioner was a close friend, and that he was always very nice and kind. She could not believe that he had shot anyone.

(xiii) Shelby Davis' testimony: Nineteen-year-old Ms. Davis testified that she had dated Duren. She also testified that Duren was a nice person. She was shocked when she learned of the crimes in question. She knew him to use speed, and to smoke pot every now and then. She said that speed makes one hyper, and that pot makes one sleepy.

(xiv) Mary Jo Detlefsen's testimony: Duren's great aunt testified that when the petitioner was almost three years old he lived with her for approximately eleven months. She had little contact with the petitioner after he rejoined his father at the end of those eleven months. She asked for a sentence of life.

(xv) James Duren's testimony: James Duren was the petitioner's paternal grandfather. The petitioner lived with his grandparents from time to time when he was a child. This witness emotionally testified that his grandson was a happy child. He met the petitioner at the airport when Duren returned from Germany. The petitioner's behavior before he went to Germany and his behavior after his return were somewhat different; he was not as friendly toward everyone as he usually was. Mr. Duren asked the jury just to let the petitioner live.

(xvi) Raymond Duren's testimony: Raymond Duren was the petitioner's father. He told the jury of the petitioner's poor health, and that his mother was twenty when he was born. She was a below average mother, in that she did not know how to care for a sick baby. The petitioner spent weeks at a time with his paternal grandparents. The petitioner's parents got divorced, and Mr. Duren remarried when the petitioner was between four and five years old. According to Mr. Duren, his second wife mistreated the petitioner. On one occasion, because of the way eggs were cooked, the petitioner gagged on each bite, and, presumably as a result of this, Mrs. Duren hit him in the head with a flower vase. On another

occasion she choked him until he passed out. Another time she threw him across the room. (On cross-examination, Mr. Duren stated that he was not present when any of these incidents occurred, that they were something David told him years later, and that he had not seen any evidence of choking.) The petitioner was locked in a closet almost all day. Mr. Duren stayed married to this woman for seven years. Mr. Duren spend a great deal of time at work, and the petitioner was afraid to say anything to his father about his mistreatment for fear that his stepmother would retaliate against him when his father was not home. Mr. Duren described this marriage as one big fight. He left home several times, for a night or two, and left the petitioner with his wife. David became much happier after his father left this wife. Mr. Duren then married for the third time a woman who had two little girls. Everyone got along well at the beginning. David was sent to his room for two days as punishment for failing to do his school work. David turned the two-day punishment into several weeks. He refused to leave his room except to eat and to do other necessary things. Mr. Duren and his third wife divorced after about three years, when she found another man she liked. David was fifteen or sixteen at this time. David and his second stepmother did not get along well together. When David was sixteen, Mr. Duren married his fourth wife, who had two boys. The petitioner quit school when he was seventeen and joined the army. Mr. Duren thought that army life would mature David, but he noticed little change in his behavior when the petitioner returned from Germany. David misled his father about the reason for his discharge from the military by telling him that he had received an early discharge. The petitioner lived with his father off and on until about a month before the crimes in question. David was drinking, smoking pot, and not coming in when he was told. Mr. Duren told the jury that he loved his son and asked that his life be spared.

(xvii) David Duren's testimony: The petitioner was the last witness for the defense at the sentencing phase of the trial. The last time he saw his natural mother was when he was five years old. He spoke of his mistreatment at the hands of his first stepmother, who beat him and her children with anything that was handy, including coat hangers and fly swatters.

Duren stated that he was in the second grade when the egg incident occurred; he did not tell his father because he feared that would precipitate a fight between his father and his stepmother, and the petitioner would be left alone with her, as the father always left after a fight. When he was eleven, the petitioner said, she choked him and threw him across the room, causing him to hit his head on a chair and pass out. Duren endured this kind of treatment for six or seven years. He hated his stepmother. He did not tell his father of most of the abuse until he was in jail. He felt unwanted by his father's next wife. Duren made corporal while in Germany, but his rank was reduced to private first class for smoking pot in the barracks. Before entering the service, the petitioner had smoked pot and drank. In the service he "tried just about every drug there [was]... heroin, cocaine, acid, barbiturates, quaaludes, all kinds of them." Trial Transcript, R-639.

After his discharge from the Army, the petitioner got a job as a printer's assistant. He was fired from this job. His next job was at Western Supermarket, where he was fired for eating items from the store during breaks without paying for them. He quit his next job, at Gold Kist Chicken Manufacturer, after four

months, because he did not like the work. He was then twenty one. After sharing an apartment with two friends for six months, Duren lived in his father's home again. After about two or three months, his father told him that if he could not behave himself he would have to move out. About a month later, he murdered Kathy Bedsole and seriously wounded Charles Leonard.

Duren testified that he killed Kathy accidentally. He shot Charles Leonard "because it was his car and he had been staring at me the whole time, trying to get a good description of me. I was afraid he would — " Trial Transcript, R-642. Duren expressed to the jury his remorse:

> I wish there was anything I could do to change it...Because I see how many people I have hurt and how wrong it was... [I hurt] the Bedsole family and Leonard family, my family... I have hurt the Bedsole family because I have taken the life of someone they must have loved very dearly. And I have hurt the Leonards because I put them through so much with their son Chuck, and I have hurt my family. I feel I have let them down more than I have ever let them down before.

Trial Transcript, R-643.

The petitioner asked the jury for mercy: "I know I have no right to ask it. I know I didn't show any mercy for those two, but I would still like to ask the jury to show mercy on me... Because I still don't understand how it happened. But I do know that I would never do it again." Trial Transcript, R-643.

On cross-examination, Duren testified that he had not needed to kill Kathy because, never having looked at him one time, she could not have identified him. Kathy had, however, looked at Kinder. Duren also stated that he had never as much as slapped a girl, and that even if Kathy had posed a threat to him, he did not believe that he could kill her.

R&R at 49-99. The Magistrate found that the evidence was sufficient to support the factual findings of the Rule 20 court:[51]

> Appell testified that he did not know if he knew the extent of Duren's past use of drugs or alcohol, or Duren's use of drugs or alcohol on the day of the crimes, and that he could not recall taking any "particular steps" to learn the same. Although he was certain that evidence that a criminal defendant had taken LSD would not assist in an effort to win sympathy from a jury, Appell was not sure that he had actually thought about that proposition at the time he was preparing Duren's case.

> It is important to remember that Appell on many occasions stated that he could not remember all that he was told or knew or said. He clearly stated that he knew that intoxication could in some circumstances constitute a defense, but he formed the opinion that intoxication would not be a good defense. When asked to state the basis for that opinion, Appell stated that all he could remember was that Duren told him that he had used LSD on the day the crimes were committed,

---

[51] The findings of the Rule 20 court are stated supra at 8-10.

but he had not told the police that he had taken LSD because he thought that telling them that would only add to his troubles. Appell thought that the jury would not believe Duren had taken LSD, and Appell testified that he did not want to do anything that would endanger his efforts to evoke some sympathy from the jury (Duren's unfortunate childhood, the absence of a criminal record, and his family's pleas that Duren's life be spared.) Appell also testified, in effect, that one of the reasons he engaged Dr. Bair, in addition to hoping for aid in the sentencing phase, was to explore the possibility of an insanity defense.

The record shows that, in spite of Appell's limited recall, he possessed a great deal of other information at the time he was preparing Duren's defense. That information disclosed Duren's drug use, alcohol abuse, and psychological problems, and/or pointed to or indicated that such material existed. Shelby Duren (later Heath) testified that Appell told her that it was suspected that Duren was discharged from the army because of drugs. Appell's stated intention to elicit sympathy from the jury by showing a distressed childhood obviously means that Appell was aware of Duren's purported childhood problems. The next item of information within Appell's knowledge was a long and important one: the affidavit of Dr. Bair. That affidavit, which was admitted into evidence by the Rule 20 trial court, contains some of the actual substance of, and certainly at least a total sense of, the drug use, alcohol abuse, and psychological and medical evidence presented by Duren's Rule 20 experts. Bair stated in the affidavit that he had given all of this information to Appell. Bair even stated that Appell told him <u>to destroy his records</u>, and Appell in his testimony stated that he had so instructed Bair. Appell's instruction to Bair to destroy Duren's records shows that Appell considered the Bair information to be <u>damaging</u> to Duren, information that Appell wanted to make sure was not used by the prosecution. Appell's testimony shows that he also considered the effect that such evidence, if presented at the guilt phase, would have on the punishment phase.

Additionally, the weight of the evidence against the petitioner supported a decision to forego an intoxication defense. The defense that Duren did not intend to shoot and kill <u>Kathy</u> was consistent with what Duren said in his confessions. Duren's statements that he could not hurt a girl and that it was the boy, Leonard, he meant to shoot, because it was Leonard who had gotten a good look at him, was evidence that Duren was capable of forming an intent to kill. None of the persons who were with Duren that day and who testified in the penalty phase said that Duren had used LSD. The state court's finding that Duren's confession, given just after the crimes were committed, was admissible was itself a finding that Duren was not intoxicated at the time he gave it. The state court's Rule 20 finding that Duren was not intoxicated at the time the crimes were committed included credibility findings. Appell's Rule 20 statement that he should have done more investigating into Duren's use of drugs and alcohol was made when, by his own statements, his recollection of these matters was weak, and he was speaking from the benefit of hindsight. The state court factually found that Appell was experienced in defending capital murder defendants.

R&R at 113-17.

Pertaining to the failure of the petitioner's attorney to present evidence of intoxication, the Rule 20 Court found that:

> Appell was aware of and investigated Duren's drug and alcohol use before trial. He also had Duren evaluated by a psychologist. Based on that investigation and his own contact with Duren, Appell decided not to present Duren's drug and alcohol use to the jury. Appell had two reasons for this decision. First, he thought, based on the events of the night of the murder and the murder itself, Duren's claimed drug use was not credible. Second, based on his extensive experience as a criminal defense attorney in Jefferson County, Alabama, Appell thought that presenting evidence of Duren's drug use would be harmful because of juror prejudice against drugs and those who use them. Appell knew that any prejudice against Duren at the guilt stage would carry over to the penalty stage and would undercut the effectiveness of his penalty stage defense, that Duren had been subjected to an abusive and troubled upbringing and lacked any criminal history.

Duren v. State, CC-83-0382 at 7-8 (Cir. Ct. Jeff. Co. July 27, 1989). On this issue, the court distinguishes two major factual findings of the Rule 20 court, each of which relies upon two minor factual premises: The first is the finding that Mr. Appell investigated Mr. Duren's drug and alcohol use prior to trial because, one, he was aware of the drug use and, two, he had Mr. Duren examined by a psychiatrist. The second finding is that Mr. Appell made a strategic choice not to present evidence based upon his investigation because Mr. Appell neither believed as credible the evidence of drug use nor believed that the jury would respond favorably to Mr. Duren on the argument that he was a drug abuser.

In Sumner v. Mata, 449 U.S. 539, 551-52 (1981), the Supreme Court stated that a District Court must follow certain guidelines in deciding to disavow state court findings of fact:

> When it enacted the 1966 amendment to 28 U.S.C. S 2254, Congress specified that in the absence of the previously enumerated factors one through eight, the burden shall rest on the habeas petitioner, whose case by that time had run the entire gamut of a state judicial system, to establish "by convincing evidence that the factual determination of the State court was erroneous." 28 U.S.C. S 2254(d). Thus, Congress meant to insure that a state finding not be overturned merely on the basis of the usual "preponderance of the evidence" standard in such a situation. In order to ensure that this mandate of Congress is enforced, we now hold that a habeas court should include in its opinion granting the writ the reasoning which led it to conclude that any of the first seven factors were present, or the reasoning which led it to conclude that the state finding was "not fairly supported by the record." Such a statement tying the generalities of S 2254(d) to the particular facts of the case at hand will not, we think, unduly burden federal habeas courts even

though it will prevent the use of the "boilerplate" language to which we have previously adverted. Moreover, such a statement will have the obvious value of enabling court of appeals and this Court to satisfy themselves that the congressional mandate has been complied with. No court reviewing the grant of an application for habeas corpus should be left to guess as to the habeas court's reasons for granting relief notwithstanding the provisions of § 2254(d). Cf. Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 444 F.2d 841, 851 (1970).

Thus, this court must give thorough reasoning supporting its decision if it concludes that the findings are erroneous.

The Rule 20 judge states that Mr. Appell was aware of drug use. Statements by Mr. Appell at the Rule 20 hearing indicate that Mr. Duren informed him of LSD usage and the affidavit of Dr. Bair, the psychologist who examined Mr. Duren, indicates that Mr. Appell was informed of Mr. Duren's drug use in the past and, more specifically, on the night of Ms. Bedsole's murder. However, as the Rule 20 judge also states, Appell chose not to pursue an intoxication defense because he found unbelievable that Mr. Duren had used drugs.

Appell testified:

Q. Did you ask Dr. Bair what he would say if called to testify about Mr. Duren's use of drugs?
A. I don't remember.
Q. Did you ask Dr. Bair about what he would say if called to testify about Mr. Duren's use of alcohol?
A. I don't remember.
Q. Did you ask Dr. Bair about what he would say if called to testify about Mr. Duren's condition on the day of the crime with respect to either drugs or alcohol?
A. In regard to drugs or alcohol, I don't remember.
Q. Did you do anything to obtain any medical records of Mr. Duren?
A. I don't believe I did, but I'm not sure.
Q. Did you do anything, if you recall, to obtain Mr. Duren's military records?
A. No, I did not.
Q. Did you do anything to obtain any records which indicated why Mr. Duren received the general discharge from the Army?
A. No, I did not.
Q. Did you do anything to attempt to obtain records for the conviction for driving under the influence?
A. I didn't know about that, but I did not, no.
Q. Did you do anything to get the police reports with respect to Mr.

Duren's arrest?

A. I don't know if I did or did not.

— — —

Q. Did you ask any of Mr. Duren's family to testify or otherwise provide information about his involvement with drugs?

A. The only thing I can tell you about his family is that we had many, many discussions about David in general. So as to specific things about drugs, I don't remember.

Q. And do you remember whether you asked any of his family to testify or otherwise provide information about his use of alcohol?

A. Same answer. I don't remember because we had many discussions with his grandfather and his aunt, and we discussed a lot of things. But I can't specifically tell you what we discussed.

Q. And you don't recall asking them to provide all information which might have been available to them about his drugs [sic] use, is that right?

A. No. I don't remember that.

Q. Do you recall if asked any of Mr. Duren's friends or acquaintances to give you information or testimony about his drug use?

A. I don't recall.

— — —

Q. Do you recall asking any of Mr. Duren's friends or acquaintances about his use of drugs?

A. Same answer I gave you as far as his family. I don't remember if I did or did not.

Q. Do you remember if you asked any of his friends or acquaintances to give you information or testify about his use of alcohol?

A. Same answer.

— — —

Q. But in any event, the testimony at the trial from his friends and relatives was all of the testimony you asked him to provide, is that right?

A. I tried to get out all the information I could possibly get from them.

Q. Did you ask any of Mr. Duren's friends or acquaintances to testify or to give you any information about his activity on the day of the crime?

A. Not that I remember.

Q. And do you recall if you asked any of his friends or acquaintances to give you any information or provide any testimony about his activities in the six month period leading up to the time of the crime?

A. No, I did not.

PAR at 49-53.

Q. What steps did you take to determine the nature and extent of Mr. Duren's past drug use?

A. I didn't take any particular steps, that I can remember, to find out the extent of his drug use, but I am not sure if I knew or he ever told me the extent of his drug use. I am not denying that he ever did say that. I don't remember. I do remember him telling me that on the day in question he had used LSD.

Q. What did you do, if anything, to determine what kinds of drugs Mr.

Duren had abused up until the time of his arrest?

    A.  I don't remember doing anything.  Because I don't remember if I knew that. . . .

PAR at 55.  Other than Mr. Bair, the psychologist, no other witnesses at the Rule 20 hearing indicated that Mr. Appell attempted with any effort to determine the extent of the petitioner's drug use.  The petitioner's aunt stated:

    Q: Tell me, Ms. Heath, what Mr. Appell told you he wanted you to testify about.

    A.  He wanted me to testify in regards to David''s childhood, his upbringing from birth to that point.

    Q.  Did he tell you to emphasize anything?

    A.  He wanted me to emphasize his — the negligence by his natural mother when he was a baby and his mistreatment in his formative years.

    Q.  Did Mr. Appell ask you to provide any information about Mr. Duren's drug or alcohol use?

    A.  No, not directly.

    Q.  Did he ask you to give the names of friends who might have that information?

    A.  He did ask for a list of friends, of his current friends.

    Q.  Did you ever have any discussion with Mr. Appell about Mr. Duren's military record?

    A.  I did.

    Q.  What was that discussion?

    A.  He indicated that he would try to get the military records, but to my knowledge he never followed through.  I know they were never presented as evidence.

    Q.  Did he give you any explanation as to why he was going to get those records?

    A  To investigate the reason for the discharge and the suspicion that drugs were involved.

PAR at 100-01 (emphasis added).  At the Rule 20 hearing, a friend of Mr. Duren's, Terry Hardigan, was questioned as to whether Mr. Appell had contacted her concerning Mr. Duren's drug use:

    Q.  Did Mr. Appell ever contact or ask you about Mr. Duren's drug or alcohol use?

    A.  No.

PAR at 158.  Charles Christian, another friend of the petitioner's who had experience with Duren when he was using drugs, stated that Mr. Appell did not attempt to contact him.

    Appell was aware that the petitioner had not told the police that he was using drugs on the day of the incident.  "The question of whether an attorney's actions were a product

of a tactical decision is an issue of fact, and a state court's decision as to this issue is therefore presumed correct, absent convincing evidence to the contrary.  See Horton v. Zant, 941 F.2d at 1462;  see also Cunningham, 928 F.2d at 1011 ('[s]tate factual findings ... are entitled to a presumption of correctness' by a reviewing habeas court)."  Jackson v. Herring, 42 F.3d 1350, 1367 (11th Cir. 1995).

*ii. Whether Any Failure to Investigate the Petitioner's Intoxication or Present Evidence of the Intoxication Was Unreasonable.*

In determining whether a decision not to investigate a possible defense or not to present evidence of a possible defense, the Eleventh Circuit Court of Appeals has stated, with respect to mitigating evidence, that:

> Failure to conduct a reasonable investigation into possible mitigating circumstances and to present certain mitigating evidence may render counsel's assistance ineffective. See Lightbourne v. Dugger, 829 F.2d 1012, 1025 (11th Cir.1987) (per curiam), cert. denied, 488 U.S. 934 [] (1988).  Nevertheless, counsel is not required indiscriminately to present evidence:
>> In order to determine what evidence might be appropriate, defense counsel has the duty to conduct a reasonable investigation.  The failure to conduct any investigation of a defendant's background may fall outside the scope of reasonable professional assistance.  After a sufficient investigation, however, "counsel may make a reasonable strategic judgment to present less than all possible available evidence in mitigation."  A lawyer's election not to present mitigating evidence is a tactical choice accorded a strong presumption of correctness which is "virtually unchallengeable."
> Id. (citations omitted) (quoting Mitchell, 762 F.2d at 889; Sinclair v. Wainwright, 814 F.2d 1516, 1519 (11th Cir.1987)).  In addition, "[U]nder some circumstances, an attorney may make a strategic decision not to pursue a particular line of investigation, or to pursue a particular inquiry only so far."  Bolender v. Singletary, 16 F.3d 1547, 1557 n. 11 (11th Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 589 [] (1994).  The question is whether failing to present certain mitigating evidence to the jury, or ending an investigation short of exhaustion, was a reasonable tactical decision.  "If so, such a choice must be given a strong presumption of correctness, and the inquiry is generally at an end."  Porter v. Singletary, 14 F.3d 554, 557 (11th Cir.), cert. denied, ---- U.S. ----, 115 S.Ct. 532 [] (1994).

Mills v. Singletary, 63 F.3d 999, 1024 (11th Cir. 1995).  A three-prong test has been developed for the determination of whether a decision not to investigate is reasonable:

> When determining whether defense counsel conducted a reasonable investigation,

our inquiry is three-fold. First, "it must be determined whether a reasonable investigation should have uncovered the mitigating evidence. If so, then a determination must be made whether the failure to put this evidence before the jury was a tactical choice by trial counsel." Blanco v. Singletary, 943 F.2d 1477, 1500 (11th Cir.1991) (emphasis in original) (quoting Middleton v. Dugger, 849 F.2d 491, 493 (11th Cir.1988)), cert. denied, 504 U.S. 946 [] (1992); see also Porter, 14 F.3d at 557. If the decision was tactical, that decision is afforded a "strong presumption of correctness." Id. If, however, the decision was not tactical, we must then determine whether "there is a reasonable probability that absent the errors, the sentencer ... would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." Blanco, 943 F.2d at 1503-04 (quoting Strickland, 466 U.S. at 695, 104 S.Ct. at 2068).

Baxter v. Thomas, 45 F.3d 1501, 1513 (11th Cir. 1995).

The first prong of the Middleton test is whether reasonable investigation would have turned up any mitigating evidence, or in the instance of demonstrating a defense, any evidence substantiating the defense. That the Rule 20 court found that Mr. Duren was not intoxicated on the night of the murder does not preclude a finding that evidence substantiating the defense might have been found. The Rule 20 judge made his findings upon a preponderance of the evidence standard, thereby finding that the evidence of no intoxication outweighed evidence of intoxication. The Rule 20 court's finding is that it is more likely than not that Mr. Duren was intoxicated, not that no evidence exists on which to substantiate the defense that Mr. Duren was intoxicated. Such evidence does, in fact, exist, first in the testimony of Mr. Duren himself, and, second, in the testimony of those who were friends of the petitioner who were with him on that day. In addition, there is evidence in past police and military records that Mr. Duren regularly used drugs and alcohol. Finally, there is expert evidence which, if properly presented in concertwith other testimony of Mr. Duren's drug use might raise a defense (successful in the eyes of the trial court or not) that Mr. Duren was intoxicated the night of the murder and could therefore not have formed the requisite intent to commit capital murder.

The second prong of the Middleton test is whether the failure to put on the evidence or further investigate the evidence was the result of a tactical choice by the trial attorney. "If, however, the failure to present the mitigating evidence was an oversight, and not a tactical decision, then a harmlessness review must be made to determine if there

is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Middleton v. Dugger, 849 F.2d 491, 493 (11th Cir. 1988). The intoxication defense was arguably the only plausible line of defense for the petitioner. As stated by the Eleventh Circuit Court of Appeals in McCoy v. Newsome, 953 F.2d 1252, 1262-63 (11th Cir. 1992):

> Effective assistance of counsel embraces adequate pretrial investigation. "[W]hen a lawyer fails to conduct a substantial investigation into any of his client's plausible lines of defense, the lawyer has failed to render effective assistance of counsel." House, 725 F.2d at 617-18 (citing Washington v. Strickland, 693 F.2d 1243, 1257 (5th Cir. Unit B 1982), cert. denied, 469 U.S. 870 [] (1984)). Failure to investigate evidence that would be helpful to the defense is also an indication of ineffective assistance of counsel. Goodwin v. Balkcom, 684 F.2d 794, 805 (11th Cir.1982), disapproved on other grounds by Zant v. Stephens, 462 U.S. 862 [] (1983).

### iii. Whether Petitioner Was Prejudiced by His Counsel's Failure to Present an Intoxication Defense.

To prove prejudice, a petitioner must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland v. Washington, 466 U.S. 668, 694 (1984). A defense of intoxication, while not entirely of the sort that would absolve a criminal defendant of a charge of murder, is a defense perhaps sufficient to undermine a finding of intent essential to the commission of a crime.

A demonstration that Mr. Duren was intoxicated and under the influence of drugs could aid in showing that on the night of the murder, he could not form a clear intent to perform any acts, that his will was substantially weakened and that as a result of his akrasia, he was susceptible to the suggestions of Richard Kinder to kill Ms. Bedsole and Mr. Leonard.

In finding Mr. Duren not prejudiced, the Rule 20 court gave the following reason:

> Duren was not prejudiced by Appell's strategic decision not to present evidence of Duren's drug and alcohol use because Duren was not intoxicated on the night of the murder.

Duren v. State, CC-83-0382 at 8 (Cir. Ct. Jeff. Co. July 27, 1989). The determination of prejudice is whether there was a reasonable probability that a jury could have reached a different outcome based upon evidence of intoxication, not whether the judge himself believed that the petitioner was intoxicated.

The Magistrate found no prejudice because:

> The jury was apprised of Duren's alleged unfortunate childhood experiences. As for his experts, they accepted as true what Duren told them about his childhood problems and his alcohol and drug use. Dr. Hooper testified that he did not do a complete forensic examination, and that for the evaluation to be reliable it should have included a consideration of the testimony of the sheriff's deputies who dealt with Duren almost immediately after the murder was committed, and Duren's taped statements to police. In any event, the essence of their expert opinions was simply that Duren had an unhappy childhood, and that he developed feelings of hostility which, when Duren's normal inhibitions and self-control were overcome by the effects of alcohol and drugs, erupted into violence. Because of the relative weakness of the testimony of Duren's experts, and for the many reasons stated throughout this report, including Duren's planning and methodical execution of the crimes, his acts to conceal the evidence of his crimes, and his lucid communication with the police almost immediately after the commission of the crimes, it is opined that there is no reasonable probability that Duren would not have been found guilty of capital murder if the intoxication evidence had been presented.

R&R at 137-38.

### 4. On Whether Mr. Appell's failure to Strike Certain Jurors Was Ineffective Assistance of Counsel.

The Magistrate found that Appell was not unreasonable in not striking Jurors Jones and McFrancis. The court agrees.

### 5. On Whether Mr. Appell's Failure to Object to Photographs of the Crime Scene and Autopsy Slides Was Ineffective Assistance of Counsel.

Although the slides and photographs may have been inflammatory, they could not be excluded on either a constitutional or an evidentiary basis. That Mr. Appell did not object to the introduction of the evidence may have been offhandedly neglectful, but it was not unreasonable or prejudicial. The court agrees with the Magistrate that this claim is meritless.

**6. On Whether Mr. Appell's Failure to Object to the Prosecutor's Improper Closing Arguments Was Ineffective Assistance of Counsel.**

The court finds no constitutional error in the prosecutor's arguing a speculative inference.

**7. On Whether Mr. Appell Rendered Ineffective Closing Argument.**

The petitioner does not raise any objection to the Magistrate's findings on this claim and therefore, neither will this court. The Magistrate's Report and Recommendation on this issue is adopted.

**8. On Whether Mr. Appell Improperly Distanced Himself from the Petitioner.**

On the claim that the petitioner's attorney improperly distanced himself from the petitioner, the Magistrate found:

> Duren further asserts that Appell improperly distanced himself from his defendant. Counsel stated that he was appointed counsel, emphasized that the killing was a horrible crime (R-666), "reiterated" the trial theme that Duren took a life intentionally, highlighted Duren's lack of mercy, and stated that the petitioner was "lost to us." The respondent asserts that Appell's statements resulted from the strategic decision to be forthright with a jury which had just found Duren guilty of capital murder. The respondent further asserts that the statements were consistent with the reasonable decision to plead for mercy, and that the statements cited by the petitioner were taken out of meaningful context. Appell made the following comments:
>
>> Now, I'm not saying to you that mitigating circumstances is a legal justification or excuse for what happened. That is not the purpose of mitigating circumstances. A mitigating circumstance, the purpose of a mitigating circumstance is for you to be able to apply mercy in this case. And the Judge will instruct you on all of that.
>>
>> Now, I want to go briefly into the witnesses. We had a number of them. They were very short. They didn't spend hours and hours and hours into their testimony. But I brought them here and they wanted to come here. I had met them right after I was appointed to represent David and we spent --
>>
>> MR. MCDONALD:   Judge, we object to his alluding to that, may it please the Court. That's improper.
>>
>> MR. DECARLO:   That's improper.
>>
>> THE COURT:   Sustain. Disregard it, ladies and gentlemen.
>>
>> MR. APPELL:   Ever since I have been representing David, I had an opportunity to meet his family, talk to his family and go through all of

this. And you know the question has always been one of the first questions and I'm sure it's on your mind and some of you said this in voir dire, why did this happen? Now, I think if we stayed here forever, we would never have an answer as to why it happened, but I wanted you to get an understanding or a feeling of possibly why it happened.

Only by talking to David's family, his father, his aunt, his grandmother, was I able to get an understanding of David Duren, and I was hoping to present that evidence to you. You didn't get an opportunity to sit down and just talk to them, talk and talk and talk like I have. But we tried to present that evidence to you through their testimony. And a lot of times it's very difficult to get across exactly what you are trying to get across, but in essence -- and again none of this is a justification for what happened and we are not asking for an excuse for why it happened. We are just trying to get an understanding.

David Duren is a boy whose mother is a young woman, probably not much understanding of children as David's father testified, Raymond Duren, three years there, some years here, some years there. And in his life, he had four different mothers. That's no excuse for going out and killing Kathy Bedsole but it's something that [is] sitting there something you could understand. David has not had maybe the kind of life we have had, you and I, mother , a father, a happy home.

His second mother, you heard of David's testifying to the abuse that he received from the second mother. Now, I'm sure Mr. McDonald -- I'm sure that he is going to argue that he made that up and it's all a grave lie. Well, I don't know. I know that David told that to his father after they left. And I know he told it to him when this case came up, but I don't believe that he is lying. I believe that that did happen.

I believe David had a horrible childhood, not an excuse, not a justification, but he had the kind of childhood that none of us would want our children to have. Because of that childhood, something inside David Duren, what, I don't know -- maybe three hundred other children could have gone through the whole same circumstances and never have gone out and done something like this, but David did. I'm not asking for forgiveness. I'm asking for understanding and mercy.

David went into the service. David started doing a lot of drugs. David came out of the service. He started to drift. He lost contact and started losing contact with the ones that he loved. And you saw his family. You saw his immediate family. You saw the love and feeling and emotion that those people have. And you saw David. Mr. McDonald asked him, are you scared or nervous now? And David said, no, but I don't think that David understands his true feelings. I don't think he really understands what goes on inside him.

You heard people talk about what a loving, smiling, happy child he was. He didn't show that emotion to you on the witness stand. I think the years have taken that emotion away from David. I think David is lost to us, Ladies and Gentlemen of the Jury. I think David is lost. But do we kill him? Do we exterminate him as Mr. DeCarlo wants you to do? Do we

wipe him off the face of the earth forever, never to be here again?

Now, Mr. McDonald argues for an hour, no notes. Mr. DeCarlo argues with no notes. I have to have some notes. I'm sorry. But I want to be able to express myself to you because I have an awesome duty just like you do. I have to convince you, Ladies and Gentlemen of the Jury, to save David's life. That's all I'm asking for. We are asking for mercy. There is no question that we are asking each and every one of you to be merciful.

Mr. DeCarlo has said it and Mr. McDonald has said it that David Duren showed absolutely no mercy to Kathy Bedsole or Chuck Leonard that night and there is no question about it because, if he had showed mercy, if he had been a merciful person, we wouldn't even be here today. We wouldn't be here. But is mercy only given to the merciful? Do you only show mercy to those who have been merciful?

I believe as most of you or -- all of you said that you were members of different denominations. I believe that the ultimate mercy comes to us as you know through God. God teaches us about mercy.

Now, Jesus has said he who's without sin cast the first stone. That's a Bible saying and I guess we have all heard it, but we all know what it means. It says we are all sinners and we have all done wrong in our lives. Jesus showed mercy, and we are asking you to show mercy not because he showed mercy to someone else. So that we, too, can move towards a merciful existence.

You have the most awesome duty and power that any human beings can have because you as human beings now have the power of life and death. And I ask you to follow the tenet and the teachings of Jesus Christ and God when he says be merciful. That's not an easy thing to do because we are human beings and our emotions as Mr. DeCarlo stated and Rusty will get up there and state to you is to kill, to revenge. Revenge is so easy. And it's so easy to be a revengeful person.

Now, a thing that we learn is the Ten Commandments. The Ten Commandments say thou shalt not kill. Period. No exceptions. There is no exception. It doesn't say thou shalt not kill unless this happens or this happens. It says thou shalt not kill. Period. It says, Ladies and Gentlemen of the Jury, you shall not kill. There is no exception, no footnote to that. Thou shalt not kill.

We are human beings and everyone will kill. Every one of us here will kill and everyone in that audience will kill. You will kill to protect yourself. If someone is attacking your child, you will kill to protect your child. If your country is invaded, you will kill to protect your country.

We as human beings justify that and we say that's okay because we are human beings, we are not God and we are not Jesus and we are not perfect. We will kill, but don't we wish and don't we desire and don't we in all of the teachings we have ever had wish to become as Godlike as we can, to follow the tenets of Jesus Christ, thou shalt not kill? We know we will. But don't we want to live in a society where we don't have any killing? We want that. And we want to move as human beings as close to God as we can, and God has told us thou shalt not kill.

You know that killing David will not bring Kathy back. I mean, that's a very simple statement because I believe that David Duren's family and everybody in this courtroom would kill David Duren right now if it could bring Kathy Bedsole back, but that's not possible. So the ultimate question is why should we kill David Duren? Why should we kill him?

Now, Mr. DeCarlo has spoken of two reasons, revenge. I submit to you, ladies and gentlemen, that revenge is not an acceptable standard to base our criminal justice system on. It is not an accepted form of punishment neither in this country nor in any civilized country that I know of.

There is no religious teaching that I know of that speaks of revenge, that asks for revenge. That is a human emotion. It has a quick fix answer to our immediate emotions. It makes us feel good. Revenge is sweet. But revenge sours quickly and leaves an awful taste in one's mouth when it settles. Revenge is not the answer.

Another quick fix answer, deter. By killing David Duren, we will deter others from committing these crimes. And that's another argument that I'm sure Mr. McDonald will make. Now, I know of no studies, I have heard of no studies, I have seen no studies that says that killing one person deters another from killing. There are a lot of people that believe that. I mean, I have no doubt Mr. DeCarlo when he says he believes that it's going to deter. There are many other people that don't believe it.

I mean, I don't know and I don't think anybody knows because, for example, back in England they used to execute publicly pickpockets on the square and hang them. It would be a big social event. People would come out and watch it. I think probably all of you have read about that. The biggest ones caused the biggest amount of pickpockets. They would come out and that's when they would make their big score, picking pockets while they were hanging the pickpockets.

Now, we have had the death penalty in this country for many, many years. It was abolished for a while. It was brought back. And we have had people executed in this country. There are some states that have execution and some states don't. But I don't know of any studies, I don't know of any studies that say that the states that have the death penalty stop the killings and the states that don't have the death penalty, the killings go on, because, listen, when these people do these things, do you honestly think they sit there and say, am I in a death penalty state or not a death penalty state? Am I going to get the electric chair for doing this or am I not going to get the electric chair? People that commit these kinds of crimes do not think when they do them or they wouldn't do them.

I have never said to you, not once, that I don't believe David Duren should be punished. One time I head a district attorney say, argue to a jury, said, don't give him life without parole. Don't slap him on the wrist. I said to myself that's an awful slap on the wrist. We are not talking about a pat on the cheek and go on home, kid. We are talking about life without parole. We are talking about a young man, twenty-one years of age and we all know people live to about sixty-five.

I wrote down some figures. David is looking at spending forty-four years, a minimum of probably forty-four years if he lives to sixty-five in the penitentiary. That's five hundred and twenty-eight months. That's sixteen thousand and sixty days in jail. The only relief that he can look forward to is death of old age or whatever. That's day after day after day after day locked up, no relief in sight, no sunny afternoon in the park, no family, no friends in life and a living hell, and he deserves it. He deserves it. He took another human being's life intentionally. We have all found that to be true. He already confessed to that.

But to electrocute him would not solve any problems and not end the killings. And I have asked -- I asked you at the beginning and I'm going to ask you again for mercy, to be Godlike, to show David something that he did not show Kathy Bedsole, to show the world that we are not going to kill for killing's sake because it solves no problems and it does no answer, gives no answer.

I get to speak second and then Rusty McDonald gets to speak again. You have heard Rusty speak and I can't compete with him. I can't get up here and yell and scream and say the things that he says because, first of all, it's not appropriate in my situation.

I mean, I can't argue with Rusty about the fact that this was a horrible crime. I can't argue with him about that. I can't argue with him because it is true. It's correct. It was a horrible crime. It was a miserable crime. A sixteen year old girl has no reason to die like this or any reason. But yelling and screaming and jumping up and down and saying that revenge is sweet and let's do it it doesn't bring Kathy back. It's not going to stop anything.

I ask you to listen to what Rusty has to say. I ask you to listen to what I have to say. More important, I ask you to listen to what the Judge has to say because he is the one that's going to give you what the law is. And your determination has to come to the mitigating -- do the mitigating circumstances outweigh those aggravating circumstances.

You are going to have to make a decision today or maybe tomorrow, but whatever decision you make is going to affect a lot of people, a lot of people. Not only David Duren, not only his family, not only the Bedsoles, but the community.

Now, some cases may serve the death penalty. I don't know. I'm not here on some cases. I'm here on this case. David Duren has asked you for his life. His family has asked you for his life, and I beg you for his life.

Trial Transcript, R-656-67.

With respect to the comments Duren asserts were prejudicial to him, clearly counsel was dealing realistically with the facts. The capital crime was horrible, Duren intended to kill, and the acts that were committed did suggest that the actor was lost to humanity, which "lostness" in Duren's case could be attributed to a horrible childhood. Appell was allowed to argue that religious tenets should be applied by the jury in considering what its advisory verdict should be, even if those tenets were contrary to Alabama's capital punishment law, such as the argument that the ten commandments forbid killing for any reason. Defense

counsel pled for mercy. Appell's argument to the jury did not constitute ineffective assistance.

The court finds no error in this analysis.

### 8. On Whether Mr. Appell Failure to Seek Proper Sentencing Charges Was Ineffective Assistance of Counsel.

On the matter of whether Mr. Appell's failure to seek proper sentencing charges was ineffective assistance of counsel, the Magistrate stated:

> Jury's absolute discretion to grant mercy: The petitioner states that Appell should have taken steps to ensure that the court would charge the jury as to its absolute discretion to grant mercy. Duren asserts that the jury should not have been instructed that it should recommend death if it found the presence of aggravating circumstances and that the aggravating circumstances outweighed the mitigating circumstances. The respondent states that this claim was raised in Duren's Rule 20 petition and Rule 20 appeal.
>
> Duren cited Woodson v. North Carolina, 428 U.S. 280 (1976), and Spivey v. Zant, 661 F.2d 464, 470-71 (1981). These cases require that the jury be properly charged as to mitigating circumstances and the option to recommend mercy. The option to recommend mercy, however, is not free-floating. It is dependent upon a finding of one or more mitigating circumstances. The charge to the Duren jury as to aggravating and mitigating circumstances is quoted in Section H, *supra*. The court instructed the jury that it could consider in mitigation anything that had been presented. This claim is without merit.
>
> Advisory verdict: The petitioner asserts that trial counsel should have objected to the court's repeated referral to the fact that the jury's sentencing verdict would be an advisory verdict, and cites Caldwell v. Mississippi, 472 U.S. 310 (1985), and Mann v. Dugger, 844 F.2d 1446, 1448-50 (11th Cir.1988). The respondent asserts that this claim was procedurally defaulted because it was not raised in the Rule 20 petition. The respondent alternatively asserts that this claim is without merit in two ways. First, the petitioner was convicted in March, 1984, but Caldwell was not decided until June, 1985, and that counsel cannot be found to have rendered ineffective assistance for not anticipating changes in the law, citing Elledge v. Dugger, 823 F.2d 1439, 1443 (11th Cir.), modified on other ground, 833 F.2d 250 (11th Cir. 1987). Second, the petitioner asserts, even if the holding in Caldwell applied to this case, there would not be Caldwell error.
>
> This claim was defaulted in state court, and the petitioner has not shown cause to overcome the default. Attorney error can in some circumstances serve as cause, but Duren does not assert attorney error as cause.

R&R at 150-51. The court is baffled by the Magistrate's conclusions. The ineffective assistance of counsel claims pertaining to failure to seek improper sentencing charges were

raised at the Rule 20 hearing. Thus, they were not procedurally defaulted. At issue is not whether the claims themselves can be addressed, but whether Mr. Appell's failure to seek proper charges is ineffective assistance of counsel.

If the petitioner's attorney's strategy is to plead mercy, it is quite possibly unreasonable for his attorney to fail in the attempt to provide a mercy charge to the jury. However, standing alone, the failure to have provided such a charge is not prejudicial. The failure to have the judge instruct the jury on the option of mercy does not cast any doubt upon the outcome of the jury's sentence.

**9. On Whether, as a Whole, Mr. Appell's Representation of Mr. Duren Constituted Ineffective Assistance of Counsel.**

While the issue of effective assistance of counsel is a close one, the court cannot conclude, in the face of the overwhelming evidence of a horrible crime, that the counsel could have been expected to do any better.

The petition will be denied.

This 10th day of July 1997.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE